**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**WILLIE JEROME MANNING**                                    **PETITIONER**

**V.**                                    **CIVIL ACTION NO.: 1:05CV256-WAP**

**CHRISTOPHER EPPS, ET AL.**                                    **RESPONDENTS**

## MEMORANDUM OPINION

Willie Jerome Manning, sentenced to death on two counts of capital murder by the

Circuit Court of Oktibbeha County, has petitioned the Court for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254, asserting that his convictions and sentences are unconstitutional. Having

considered the alleged circumstances, the cited authorities, and the record in this matter, the

Court **DENIES** the application for the reasons set forth below.

### Facts & Procedural History

In July of 1994, the Circuit Court of Oktibbeha County, Mississippi, returned a two-count

indictment against Petitioner for the capital murders of Jon Steckler and Tiffany Miller while

Petitioner was engaged in the commission of a robbery. Mississippi State University students

Tiffany Miller and Jon Steckler were murdered in Oktibbeha County, Mississippi, on December

11, 1992. The couple was last seen alive leaving Jon's fraternity house between 12:50 a.m. and

1:00 a.m. on December 11, 1992, in Miller's two-seater Toyota MR2 sports car. At

approximately 2:15 a.m. that morning, Jon Steckler was discovered lying in the right-hand lane

of Pat Station Road. Deputy Sheriff Robert Elmore arrived on the scene approximately

seventeen minutes later, and he discovered that Jon was still alive. Deputy Elmore discovered

Tiffany's body in nearby woods. She had been shot twice in the face at close range. A gold

token, three shell casings, and a projectile were discovered near where Jon's body was found, and deputies discovered a set of car tracks that ran through puddles of blood. It was later determined that Jon's body bore extensive abrasions that occurred prior to his death, and he had other injuries that were consistent with his having been run over by a car at a low speed. Jon's wallet was found in his back pocket, but it did not contain any money.

Later in the morning of December 11, 1992, Tiffany's car was found parked in front of apartments on Old Mayhew Road. Hair and flesh were found on the underside of the car, and blood was found on and under the vehicle. Nearby on the pavement by the driver's side door, coins were found. Several more coins and a ring identified as belonging to Tiffany were found about a hundred yards from the apartment complex driveway and approximately the same distance from Tiffany's residence at University Hills Trailer Park.

At trial, witnesses presented testimony about the couple's actions on the night prior to the murders. Around 11:00 p.m. on the evening prior to the murders, John Wise, one of Jon's fraternity brothers and his roommate, had loaned his car keys to Jon so that Jon could retrieve something from Wise's car, which was parked outside the fraternity house. Approximately two and a half hours later, which would have been early in the morning of December 11, 1992, Wise went to his car to get something, and he noticed that the passenger side door of his car was unlocked. He testified that he retrieved the item from his car and locked the door. He stated that around 8:00 or 9:00 a.m., he went out to his car and discovered it had been burglarized, though there was no sign of forced entry to the vehicle. Wise reported that a portable CD player and adapter, a brown leather bomber jacket, a silver monogrammed huggie, and several dollars of change that Wise kept in the console were missing. Included in the missing change was a token

from a Grenada, Mississippi, gas station. The only two places in the State that used this type of token were a Kentucky Fried Chicken store in Laurel and a Dutch Oil Company gas station in Grenada.

There was evidence presented at trial that Jon wore a Cathedral High School class ring, which was gold in color, and a watch with several clocks on its face. The jury heard evidence that Petitioner attempted to sell a class ring immediately after the murders, as well as a watch that matched the description of Jon's watch. Oktibbeha County Sheriff Dolph Bryan contacted Wise after hearing about the burglary, and Wise identified the coin found at the murder scene as being exactly like the token that was taken from his car. Sheriff Bryan then began to search for whomever burglarized Wise's car as the possible murderer. In April of 1993, the Starkville Fire Department found Wise's silver huggie while flushing out a hydrant on Industrial Park Road south of Starkville. This area is approximately five miles from where Petitioner lived with his mother. Petitioner, who was familiar to local law enforcement, became the primary suspect in the investigation.

Sheriff Bryan wanted to speak to Paula Hathorn, who lived on and off with Petitioner in the fall of 1992, to determine whether she had any information that would help the investigation. Paula and Petitioner lived at the home of Ruth Ann Bishop, Petitioner's mother, in late 1992. In April of 1993, Sheriff Bryan spoke with Hathorn, and he asked her if Petitioner had any leather jackets. Hathorn gave the sheriff a jacket that Petitioner had given to her, which was identified by Wise as being the one which was stolen out of his car the night it was burglarized. Hathorn also informed police that Petitioner used to target practice on a tree around his mother's house. A search warrant was obtained for Ruth Ann Bishop's home, and investigators recovered .380

projectiles and cartridges out of the tree described by Hathorn.  It was later determined that the projectiles recovered during the investigation of the crime and the projectiles taken from the tree that Petitioner used for target practice were fired from the same weapon.

Hathorn testified that on December 9, 1992, Petitioner told Hathorn that he was going to Jackson, Mississippi.  Hathorn testified he had a gun and some gloves with him at that time. When she next saw him on December 14, 1992, she stated Petitioner no longer had the gun but did bring several items into the house.  One of the items was Wise's leather jacket, which Petitioner gave to Hathorn in late January or early February of 1993.  Petitioner also had a CD player that he took to a business named Sound Reasoning and tried without success to sell there. Petitioner eventually sold the CD player to a man who later pawned it at Metro Pawn in Jackson, Mississippi.  Metro Pawn recorded the serial number, which matched the serial number of the CD player stolen from Wise's car.

At trial, several witnesses placed Petitioner at the 2500 Club in Starkville, Mississippi, on the night of the murders, though no credible witness could place him there at the time of the murders.  Frank Parker and Earl Jordan, both of whom were inmates at the Oktibbeha County Jail in May 1993 testified that Petitioner had made incriminating statements regarding the murder of the students.  Petitioner was found guilty on both counts of capital murder on November 7, 1994, and Petitioner was subsequently found to be an habitual offender.  Following a sentencing hearing, the jury returned a death verdict for the capital murder convictions on November 8, 1994.  On Count I, the capital murder of Jon Steckler, the jury found as aggravating circumstances that the murder was committed during the commission of the crime of robbery, while engaged in the commission of the crime of kidnapping, and that it was especially heinous,

atrocious, and cruel.  On Count II, the capital murder of Tiffany Miller, the jury found that the

murder occurred while Petitioner was engaged in the commission of a robbery, and that it was

committed while engaged in the commission of a kidnapping.  Petitioner was sentenced to death

on both counts.

Petitioner's convictions and death sentences were affirmed on direct appeal.  *See*

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998), cert. denied, *Manning v. Mississippi*, 526 U.S.

1056 (1999) ("*Manning I*").  Petitioner filed a pro se petition for post-conviction relief in State

court on February 2, 2001, almost a year and ten months following the Supreme Court's denial

of certiorari.  On October 8, 2001, Petitioner filed an application for leave to file a motion for

post-conviction relief in the trial court, which was almost two and one half years after the denial

of certiorari on direct appeal.  Post-conviction relief was denied on March 9, 2006 in a

substituted opinion.  *See Manning v. State*, 929 So. 2d 885 (Miss. 2006) ("*Manning II*").[1]

Petitioner did not seek a writ of certiorari from the decision.  Petitioner filed his federal habeas

petition on October 12, 2005, prior to the completion of the State post-conviction process.

Respondents moved to dismiss the petition for failure to comply with the time limitations under

the AEDPA.  *See* 28 U.S.C. § 2244(d).  On December 28, 2006, this Court denied Respondents'

motion for summary judgment based on the statute of limitations, finding that equitable tolling

---

[1] Initially, the Mississippi Supreme Court partially granted post-conviction relief by
vacating the death sentences and remanding for a new trial on both counts of capital murder.  *See*
*Manning v. State,* 903 So. 2d 27 (Miss. 2004).  Subsequently, the Mississippi Supreme Court
granted the State's petition for rehearing, and an evidentiary hearing was held in the trial court
on the question of whether there was a discovery violation at trial.  The circuit court denied relief
on April 22, 2005, following an evidentiary hearing.  The Mississippi Supreme Court entered an
opinion on August 5, 2006, which it withdrew and substituted with its opinion on Petitioner's
motion for rehearing, which is the March 9, 2006 opinion.

should allow Petitioner an opportunity to present his claims.[2]

## Applicable Standard

This petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997) (AEDPA applies to all federal habeas applications filed on or after April 24, 1996).  Pursuant to the AEDPA's scope of review, habeas corpus relief cannot be granted in connection with any claim adjudicated on the merits in State court proceedings unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented evidence.  *See Schriro v. Landrigan*, 550 U.S.

---

[2] *See* docket entry no. 15.  On April 15, 1999, the Mississippi Supreme Court remanded Petitioner's case to the Circuit Court of Oktibbeha County for counsel to be appointed to assist Petitioner in State post-conviction proceedings.  (*See* docket entry no. 13, Pet. Response, Ex. 2).  Petitioner was appointed counsel on May 6, 1999.  Petitioner's first court-appointed attorney failed to file pleadings as ordered and moved to withdraw based on his lack of qualifications.  (Pet. Response, Ex. 2, 3, 5, 6, & 7).  On January 11, 2000, the Mississippi Supreme Court suspended the deadline for filing post-conviction relief until the issue of counsel could be resolved.  (Pet. Response, Ex. 9).  The Circuit Court of Oktibbeha County appointed Petitioner new representation on January 11, 2000, and this second court-appointed attorney subsequently moved to withdraw on April 14, 2000, based on his lack of qualifications.  (Pet. Response, Ex. 12).  On June 21, 2000, the pleadings deadline was again suspended until the Circuit Court could address the matter.  (Pet. Response, Ex. 17).  On November 17, 2000, the withdrawal motion of Petitioner's second court-appointed attorney was granted, and the Office of Capital Post-Conviction Counsel ("Office") was appointed to represent Petitioner.  (Pet. Response, Ex. 18).  The Office was never served a copy of the order, and the order itself was misfiled.  (Pet. Response, Ex. 20, 21, 22).  It was not until March 29, 2001, while at a hearing on an unrelated case that counsel learned of their appointment in this case.  On October 8, 2001, counsel filed a petition for State post-conviction relief and a motion *nunc pro tunc*, asking the court to accept the post-conviction filing effective April 1, 2000, in order to comply with the federal statute of limitations.  (Pet. Response, Ex. 27).  The motion was granted in part and denied in part by the Mississippi Supreme Court.  (Pet. Response, Ex. 28).  Petitioner then filed his federal habeas petition while his State post-conviction application was still pending.

465, 473 (2007); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); and 28 U.S.C. § 2254(d)(1) & (2). The factual findings of the State court are presumed correct, and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) have been held to have independent meanings. *See, e.g., Bell v. Cone*, 535 U.S. 685, 694 (2002); *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08; *see also Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry, and it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Williams,* 529 U.S. at 410-11; *Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004) (habeas relief merited where state decision both incorrect and objectively unreasonable).

Additionally, habeas relief does not generally lie for rules of constitutional law which have not been announced or that were announced after the challenged conviction became final on direct review. *See Teague v. Lane*, 489 U.S. 288, 310 (1989). A new rule is not retroactively applied unless the United States Supreme Court holds the rule to be retroactive. *See Tyler v.*

*Cain*, 533 U.S. 656, 663 (2001). It is a violation of the principles of *Teague* for a federal court to create new constitutional rules on habeas review. *See Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001).

A petitioner must exhaust his remedies in State court prior to seeking federal habeas relief. *See Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); 28 U.S.C. §2254(b)(1). A petitioner has exhausted his claim when he has fairly presented the claim for which he seeks relief to the highest court of the State. *See Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004). The federal claims presented for habeas relief must be the substantial equivalent of those presented to the State court in order to satisfy the requirement of fair presentation. *See Morris*, 379 F.3d at 204-05; *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999). A claim is not exhausted for purposes of federal habeas review if a petitioner presents the federal court with different legal theories or factual claims than those pursued in State court. *See Wilder*, 274 F.3d at 259 ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001). A federal court may not grant federal habeas relief on an unexhausted claim, but relief may be denied on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Mercadel v. Cain*, 179 F.3d 271, 276 (5th Cir. 1999).

Where a petitioner fails to exhaust his State remedies, but it is clear that the State court to which he would return to exhaust the claim would find the claim procedurally barred, the claim

is procedurally defaulted for purposes of federal habeas corpus relief.  *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley v. Johnson*, 243 F.3d 215, 220 (5ᵗʰ Cir. 2001); *Sones v. Hargett*, 61 F.3d 410, 416 (5ᵗʰ Cir. 1995).  Likewise barred from federal habeas review are claims that the State court held procedurally barred on review on the basis of independent and adequate State law grounds.  *See*, *e.g., Coleman*, 501 U.S. at 729-30 ("The doctrine applies to bar federal habeas claims because the prisoner had failed to meet a state procedural requirement.  In these cases, the state judgment rests upon independent and adequate state procedural grounds."); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977).  In order to receive federal habeas review of procedurally defaulted claims, Petitioner must demonstrate "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citations omitted).

In order to demonstrate cause, a petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Prejudice may be demonstrated by showing that the errors "worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (internal quotations omitted).  If a petitioner is unable to demonstrate cause and prejudice, he may obtain review of his claim by demonstrating that the application of the procedural bar would result in a miscarriage of justice because he is actually innocent of the crime.  *See House v. Bell*, 547 U.S. 518, 537-38 (2006).  An allegation of actual innocence requires that a petitioner support his claim "with new, reliable evidence that was not presented at trial and show that it was more likely than not that no reasonable juror

would have convicted him in light of the new evidence." *Fairman v. Anderson*, 188 F.3d 635, 655 (5th Cir. 1999) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  In terms of the sentencing phase of trial, "miscarriage of justice" also means that, but for constitutional error, no reasonable juror would have found Petitioner eligible for the death penalty under the applicable state law. *Sawyer v. Whitley*, 505 U.S. 335, 336 (1992).

Where a State court holds a claim barred on independent and adequate State law grounds and reaches the merits of the claim in the alternative, the bar imposed by the State court is not vitiated.  *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Hughes v. Dretke*, 412 F.3d 582, 592-93 (5th Cir. 2005) (alternate holding on merits by state court did not preclude imposition of bar on federal habeas review for petitioner's failure to contemporaneously object on federal constitutional grounds in State court); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005) (procedural bar imposed for petitioner's failure to contemporaneously object and preserve claim for review not circumvented by State court's alternative holding that constitutional claim lacked merit).

Finally, the Court notes that the AEDPA imposes the burden of obtaining an evidentiary hearing in federal court on the petitioner, and it limits the circumstances in which an evidentiary hearing may be granted for those petitioners who fail to diligently seek to establish the factual bases for their claims in state court.  *See Williams*, 529 U.S. at 433-34 (prisoners at fault for deficiency in state court record must satisfy heightened standard to obtain evidentiary hearing); *Clark v. Johnson*, 202 F.3d 760, 765-66 (5th Cir. 2000);  *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); 28 U.S.C. § 2254(e)(2).  Even where an evidentiary hearing is not precluded due to a petitioner's lack of diligence, the decision to grant an evidentiary hearing is

discretionary.  *See, e.g., Clark,* 202 F.3d at 765-66.  In order to be entitled to an evidentiary hearing in federal court, a petitioner must demonstrate that he was denied a "full and fair hearing" in State court and persuade the Court that his allegations, if true, would warrant relief. *Id.* at 766 (citations omitted).

With the foregoing standards in mind, the Court turns to Petitioner's specific claims for relief.[3]

## I. *Batson* Violation

Petitioner, who is black, was convicted of murdering two white victims.  Petitioner maintains that the prosecution engaged in race-based discrimination in the exercise of its peremptory strikes in order to eliminate qualified black jurors from serving on his jury in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  Petitioner contends that the reasons given by the prosecution for striking the jurors were sometimes demonstrably false, and that several of the reasons proffered by the prosecutor applied to white jurors who were not challenged.  The jury venire in Petitioner's case consisted of eighty-five members, twenty-eight of whom were black.

On direct appeal, the Mississippi Supreme Court found Petitioner's claim that the prosecutor's proffered reasons for the strikes were pretextual had been waived by Petitioner's failure to rebut the explanation offered, with the exception of one juror for whom no reason was

---

[3] In the memorandum in support of the petition for writ of habeas corpus, Petitioner withdrew several claims for relief.  While Petitioner briefed twenty-four distinct claims for relief, they have been consolidated here for the sake of convenience.

given for the strike. *See Manning I*, 726 So.2d at 1183.[4]  The court engaged in an alternative

discussion of the merits as to each prospective juror and found no reversible error. *See id.* at

1183-86.  On post-conviction review, Petitioner brought a claim that trial counsel performed

ineffectively in failing to preserve a number of issues for direct appeal, including a claim that the

prosecutor violated *Batson*. *See Manning II*, 929 So.2d 885, 904 (Miss. 2006).  The State argued

that the *Batson* claim was raised at trial, and the court noted that it reviewed the claim on direct

appeal. *Id.* at 904.  The court found that the issue of trial counsel's performance was litigated on

direct appeal, and it held the claim procedurally barred. *Id.* at 904-05.  The court found,

alternatively, that Petitioner's claims would not satisfy the test for ineffective assistance of

counsel. *Id.* at 905.

Petitioner maintains that he raised this issue in rebuttal on direct appeal, thereby

precluding a determination that he had waived his right to contest the strikes, and that the court

otherwise failed to adjudicate *Batson*'s third step.  (Pet. Memo 13-14, 27-31).[5]  Petitioner

contends that the Mississippi Supreme Court reversed its prior finding of default in its post-

conviction opinion.  (Pet. Memo 14, Pet. Reply 6-7).  In addition, Petitioner maintains that the

finding that he had not made out a prima facie case of discrimination is an unreasonable

determination of facts based upon the record.  (Pet. Memo 16).  In the alternative, Petitioner

argues that counsel failed to preserve this claim for review, such that he rendered ineffective

---

[4] The prosecutor offered no reason for striking Troy Fairley, and the Mississippi Supreme
Court did not expressly determine Petitioner had waived the right to contest the strike. *Id.* at
1183.

[5] Petitioner concedes the court did consider on direct appeal the rebuttal arguments raised
with respect to potential juror Ronald Henry. *See* Pet. Memo 13-14.

assistance. (Pet. Memo 31).

Respondents maintain that the State court held the underlying *Batson* claim barred on direct review, and that the court's ruling on post-conviction dealt only with the ineffective assistance claim, which was not barred. (R. Memo 43-45). Respondents assert that the failure to rebut or object to the reasons proffered by the prosecution fails to preserve the claim on direct review under Mississippi law, and that the rule is an adequate and independent one. (R. Memo 47).

At the beginning of the exercise of peremptory challenges, a total of eight black jurors were included in the forty-five jurors on the panel from which Petitioner's jury was ultimately selected. (*See generally* Trial Tr. vol. 16, 532-548). At Petitioner's trial, the State tendered to the defense twelve jurors after exercising six peremptory strikes, four of which were against black jurors. (*See* Trial Tr. vol. 16, 533-34). Following defense counsel's objections to the strikes, the trial court determined there was no prima facie showing of purposeful discrimination, but it nonetheless required the prosecution to state into the record race-neutral reasons for its exercise of the strikes. (*Id.* at 534).[6] After the prosecutor submitted the reasons for striking the jurors, the trial court instructed defense counsel to begin exercising peremptory challenges, where it struck five white jurors. (*Id.* at 538-39). The prosecutor asked the trial court to demand that defense counsel provide race neutral reasons for striking the five jurors, all of whom were white. (*Id.* at 539). Defense counsel provided reasons for the strikes, and the trial court stated it "voice[d] no opinions on the State's reasons or on the defendant's reasons." (*Id.* at 542). The trial court then told the State to submit five more jurors, and defense counsel Williamson stated

---

[6] Two of the strikes were against white jurors. *See id.* at 534, 537.

for the record that only one black juror had been selected.  (*Id.* at 542).  The trial court stated, "[w]hat I want to know is whether you have any motions or anything at this time.  If you do, state them; if you don't, I want [the prosecutor] to submit you five more names."  (*Id.* at 542).  Williamson stated he wished to object to the racial composition of the jury, and the trial court determined the motion was premature and overruled it.  (*Id.* at 543).  The State selected five jurors after exercising two strikes, one of which was against a black juror.  (*Id.* at 543).  Williamson objected, and the trial court instructed defense counsel to make the objection after the State finished exercising all peremptory challenges.  (*Id.* at 543).  The trial court asked Williamson if he wanted the prosecutor to give "piecemeal" explanations for the strike, and despite Williamson's concession that the prosecutor could do it at the end of jury selection, the trial court required the prosecutor to state his race-neutral reasons.  (*Id.* at 543-44).  When the prosecutor finished with the first strike, Williamson commented that there were "[t]wo blacks on this jury."  (*Id.* at 544).  Williamson began exercising his peremptory strikes at the conclusion of the State's proffered reasons without commenting further.  (*Id.* at 544).  Defense counsel struck three white jurors and stated its reasons for the strikes into the record.  (*Id.* at 545-547).  The State submitted the next three jurors without exercising any strikes, and defense counsel struck two of those jurors.  (*Id.* at 547-48).  The State used its ninth peremptory strike on juror number 42, a black female, and submitted two more jurors to the defense.  (*Id.* at 548).  Defense counsel did not request a race-neutral reason for the strike of juror number 42.  (*See id.*).  The State used a peremptory strike to challenge a black juror as an alternate, and no race-neutral reason for that strike was requested.  (*Id.* at 549).

       After the jury was selected, the defense objected to the jury's racial composition, and the

trial court suggested defense counsel develop his motion and present it before the jury was

sworn.  (*Id.* at 550-51).  The next morning, on November 2, 1994, the defense made its motion.

(*Id.* at 558-59).  Specifically, the defense argued that Petitioner was being denied a jury of his

peers, as the make-up of the jury did not represent the racial make up of Forrest County or

Oktibbeha County.  (*Id.* at 559).  The trial court stated it had

> already ruled on this on the *Batson* issue and the *Batson* challenges. . . [and]
> required when the jury was selected to state race neutral reasons into the record
> for any challenge they made.  Undoubtedly both sides were satisfied with those
> race neutral reasons for the exercise of peremptory challenges since no further
> request was made of the Court for any hearings thereon. . . . The defendant did
> not exhaust all peremptory challenges in the exercise of or during the course of
> voir dire and jury selection.  Because of that fact the defendant could not now be
> heard to complain of the composition of the jury.  The motion is overruled.

(*Id.* at 560).  The trial court also noted that the defense had requested and been granted a change

of venue twice.  (*Id.*)  Two black jurors, Linda Ann Moore, juror number 8, and Gerald

Woodson, juror number 29, served on the jury.  (*See* i*d.*).

In order to raise a successful *Batson* challenge, the opponent of the strike must first make

out a prima facie showing that a peremptory challenge has been exercised for the purpose of

excluding a particular person from the venire based on his or her race.  *Batson v. Kentucky*, 476

U.S. 79, 96-97 (1986).  Then, the proponent of the strike must then give a race-neutral basis for

the exercise of the strike.  *Id.*  Any reason offered is deemed race neutral so long as the reason is

not discriminatory on its face, and it need not be a persuasive or plausible explanation.  *Purkett*

*v. Elem*, 514 U.S. 765, 767-78 (1995).  Finally, in light of the parties' submissions, the court

must determine whether purposeful discrimination has been shown.  *Batson*, 476 U.S. at 98.

 The resolution of whether prosecutor acted with a discriminatory purpose in removing a

juror is a factual determination that relies mainly upon credibility findings.  *See Hernandez v.*

*New York*, 500 U.S. 352, 364 (1991).  The question of whether there has been purposeful discrimination is one of intent, and there is no definitive proof of discrimination merely because the basis for a strike may be factually contradicted.  *See Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."); *United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993) ("But the ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based.").  Rather, the trial court considers the proponent's credibility, which may include the demeanor of the prosecutor, the reasonableness or probability of the explanation given, and whether there is some basis in trial strategy for the explanation.  *See Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).  A trial court's decision is not disturbed unless it objectively unreasonable and rebutted by clear and convincing evidence.  *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005).  Moreover, the deference afforded to the state trial court's factual findings extends to "those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."  *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005).

Mississippi has long held that trial courts may resolve *Batson* issues on the basis of the explanations offered by the State where the defendant fails to rebut the justifications.  *See, e.g., Mack v. State*, 650 So.2d 1289, 1297 (Miss. 1994) (holding that the defendant's failure to raise the argument of pretext before the trial court constitutes waiver of the claim).  However, the Fifth Circuit has suggested that a defendant's failure to rebut the State's race-neutral reasons does not constitute waiver of a comparative analysis in capital cases.  *See Reed v. Quarterman,*

555 F.3d 364, 372-75 (5th Cir. 2009). The Court will not hold Petitioner's claim procedurally barred insofar as it alleges that similarly situated white jurors were not struck, but it does note that when a defendant fails to object to the prosecutor's explanation, he acquiesces in the explanation and the reviewing court may accept the trial court's acceptance of the prosecutor's reason as race-neutral. *See Haynes v. Quarterman*, 526 F.3d 189, 200 (5th Cir. 2008) (court can accept prosecutor's race-neutral explanation if the explanation is facially valid and the defendant does not object). In this case, defense counsel was not restricted from making an argument before the trial court, and he did not argue pretext. Petitioner must demonstrate that the state court's decision that the prosecutor did not engage in purposeful discrimination on the basis of race is an unreasonable application of clearly established federal law, or that it is an unreasonable determination of facts in light of the evidence presented in State court. *See* 28 U.S.C. § 2254(d)(1) and (2).

Petitioner's argument that the trial court per se violated *Batson* by it's failure to articulate specific findings does not warrant relief. This Court defers to the implicit factual findings by the trial court regarding the credibility of the proffered reasons absent clear and convincing evidence otherwise in the record. *See Miller-El*, 537 U.S. at 347 ("We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it."); *Moody v. Quarterman*, 476 F.3d 260, 268-72 (5th Cir. 2007) (holding state court's factual findings on *Batson* claim entitled to deference even where state court failed to employ three-step approach required to analyze *Batson* claims).

Petitioner maintains that the prosecutor failed to give race neutral reasons for the strikes of prospective jurors Graves, Robertson, and Merritt, as one of his stated reason for striking each of those jurors was that they read "liberal" magazines that championed O.J. Simpson's innocence

in the charges he faced for the June 1994 murders of his ex-wife and her friend, Ron Goldman. (*See*, e.g., Trial Tr. vol. 16, 536, 544, 537).[7]  Petitioner argues that the magazines read by the stricken prospective jurors included *Ebony* and *Jet,* which are marketed to a black audience, and that the prosecutor was using "liberal" as a code word for "black."  Petitioner has attached to his habeas petition articles from these magazines that reference the Simpson trial up to the time of Petitioner's trial, in an attempt to demonstrate that the justifications given by the prosecutor are not race-neutral and are demonstrably false, as the articles do not proclaim Simpson's innocence. (*See*, *e.g*., Pet. Memo 20-25 and Pet. Memo, Ex. 1 & 2).  Petitioner also notes that Charles Newcomer and Tonya Beisel, each of whom are white, were accepted on the jury even though they read some of the same periodicals that served the basis for striking Robertson.  (*See* Pet. Memo 25).[8]  Petitioner also notes that Linda Ann Moore, a black female, indicated on her questionnaire that she red *Jet* magazine and was accepted by the prosecution when it first tendered jurors to the defense.  (*See* Trial Tr. vol. 16, 533).

The Court is not persuaded that the periodicals a person reads is inherently based on race. Petitioner urges the Court to find that the prosecution's acceptance of Ms. Moore demonstrates that the prosecutor was not striking jurors merely because they read *Jet* magazine.  (*See* Pet. Memo 20 n. 19).  However, the prosecution did not list what periodicals any potential juror read as the sole basis for exercising a peremptory strike against them.  Instead, he listed a

---

[7]The Court notes that Petitioner's trial began on November 1, 1994, which was just days before the jury was selected in O.J. Simpson's criminal trial.  *See* O.J. Simpson Criminal Trial, Simpson Criminal Trial Timeline, http://www.usatoday.com/news/index/nns053.html (jury of twelve selected on November 3, 1994).

[8] Robertson listed on his questionnaire that he read *Gentlemen's Quarterly*, *Time*, and *Newsweek*.  Newcomer listed *Time* as a magazine he read, while Beisel read *Newsweek*.  (*See* SCP vol.11, 1579; 1507; SCP vol. 8, 1118).

combination of characteristics of these jurors, one of which was reading materials, that led to the strikes. *Moore v. Keller Industries, Inc*., 948 F.2d 199, 202 (5th Cir. 1991) (where multiple reasons for a strike exist, there is no proof of pretext merely because some of jurors share characteristic). While race-neutral reasons may be refuted by pointing out that similar claims can be made about non-excluded jurors, Petitioner has not demonstrated that the inclusion of Ms. Moore, a black juror who read *Jet*, on the jury refutes the explanations given by the prosecution and demonstrates that the strikes were racially motivated.

Mrs. Troy Fairley was struck by the State's exercise of its ninth peremptory challenge, and defense counsel did not object to her exclusion from the jury. (*See* Trial Tr. vol. 16, 548). Fairley stated she would like to know the motive for the crimes before voting whether to inflict the death penalty, and she appeared late to court on the second day of voir dire. (*See* Trial Tr. vol. 16, 478-80; Trial Tr. vol. 15, 382). Punctuality is a race-neutral reason on which the prosecution was entitled to rely. *See Davis v. State*, 660 S0.2d 1228, 1242 (Miss. 1995) (juror tardiness is a race-neutral reason). Moreover, Fairley's comments concerning motive, which was not part of the prosecution's burden, could have certainly made the prosecutor think she would not be a juror highly favorable to the prosecution.

The prosecution struck James Graves because of his attire, the publications he read, and the fact that the trial court and prosecutor believed him to be unemployed. (*See* Trial Tr. vol. 16, 536). Graves indicated on his juror questionnaire that he read *Jet* magazine, and he did list an employer on his juror questionnaire. (*See*, e.g., SCP vol. 9, 1342, 1339). Petitioner argues that four white jurors either indicated on their questionnaires that they were unemployed or did not

otherwise indicate an occupation, but they were not struck by the prosecution. (Pet. Memo 20).[9]

Petitioner maintains that the prosecutor's objections to Graves' appearance, when considered in connection with the false reasons, requires a conclusion that Graves was struck because of his race. A prospective juror's appearance is race-neutral. *See Purkett*, 514 U.S. at 769 (explanation juror struck "because he had long, unkempt hair, a mustache, and a beard" deemed racially neutral" and sufficient to satisfy burden of stating nondiscriminatory reason for strike); *United States v. Clemons*, 941 F.2d 321, 324 (5th Cir. 1991) (noting strikes based upon prospective jurors' age, dress, and hairstyle are race-neutral). Petitioner argues that the remaining proffered reasons are demonstrably false. However, as the Court previously noted, the issue is not accuracy but intent. The fact that the trial judge and prosecution were mistaken about Graves' employment does not make the proffer per se pretextual. Moreover, the Court also notes that the jurors cited by Petitioner for purposes of comparison all maintained on their questionnaires that they strongly agreed with the death penalty, while Graves did not indicate such strong agreement with the death penalty on his questionnaire. (S*ee* SCP vol. 8, 1136, 1128; SCP vol. 9, 1304, 1344; and SCP vol. 11, 1573).

Petitioner next maintains that the prosecutor violated *Batson* when he struck Cristi Law Marque Robertson, as he lived "in the functional equivalent of Brooksville Gardens in this community; he lives in an extremely bad neighborhood," for reading "those same magazines" with articles concerning O.J. Simpson's innocence, and for leaving numerous blanks on his juror questionnaire. (*See* Trial Tr. vol. 16, 544). The Court has already addressed the issue of the

---

[9] Earl Bolinger, juror number 37, actually sat on the jury. Bobbi Jo Dearman, a white female and juror number 7; Sharron Nell Roberts, a white female and juror number 46, and Robert Frank Blackney III, a white male, were the others. *See* Pet. Memo n.20.

periodicals read by Robertson, and it found that what magazines a person reads is not inherently

based on race. Petitioner argues that numerous white potential jurors left blanks on their

questionnaires and were found acceptable by the prosecution. (*See* Pet. Memo 24-26).[10] The

Court has reviewed the juror questionnaires, and it agrees that Robertson did not leave an

inordinate number of blanks compared to some jurors found acceptable by the prosecution.

However, multiple reasons were given for the strike of Robertson. *See Moore v. Keller*

*Industries, Inc*., 948 F.2d 199, 202 (5th Cir. 1991) (where multiple reasons for a strike exist, there

is no proof of pretext merely because some of jurors share characteristic). Petitioner essentially

makes the argument that the neighborhood Petitioner lived in was predominately all black, so an

inference that the strike was racially motivated should arise. However, a fair reading of the

record is that the prosecutor struck Robertson because he lived in a high crime area, which is not

a race-based reason to exercise a strike. *See Baldwin v. State*, 784 So.2d 148, 155 (Miss. 2001)

(living in high crime neighborhood constitutes valid race-neutral reason); and *Lockett v. State*,

517 So.2d 1346, 1356 (Miss. 1987) (same).

  The prosecution stated that it struck Shirley Wooten because she stated in voir dire that

she could impose the death penalty if "it was beyond a shadow of a doubt." *(See* Trial Tr. vol.

16, 535). The prosecutor also stated that he had been informed that Wooten had told co-workers

that she did not want to serve on the jury for this case. (*Id.* at 535-36). The record in this case

demonstrates that the prosecutor could appropriately determine Wooten did not understand the

distinctions between "no doubt" and "reasonable doubt," and determine she might not be able to

---

[10] In his brief in support of the petition for writ of habeas corpus, Petitioner only lists
juror Earl Bolinger as an example of someone who left numerous blanks on his questionnaire but
was nonetheless found acceptable by the prosecution. (*See* Pet. Memo 26).

adequately follow the court's instructions. (*See* Trial Tr. vol. 15, 417-425). The prosecutor is allowed to make such intuitions, and the strike based on her vacillating responses regarding the burden of proof is race-neutral. *See*, *e.g*., *Uttecht v. Brown*, 551 U.S. 1, 15 (2007) (trial court could properly excuse juror for cause where juror's statement that he could follow the law as given was "interspersed with more equivocal statements").

The prosecutor stated several reasons for exercising a peremptory strike against Joyce Merritt. First, he stated that she responded in court that she had an opinion on the death penalty, while she indicated on her juror form that she had no opinion. (Trial Tr. vol. 16, 537). Next, he stated that she "watche[d] a tremendous amount" of television, and that she has a family member who had been convicted of a crime. (*Id.*). The prosecutor also stated that "she is unemployed and she was making some eye contact with defense counsel and . . . the other men that were over there with defense counsel during some recesses." (*Id.*). As a final reason, the prosecutor stated she read magazines that had published articles espousing O.J. Simpson's innocence. (*Id.*). Petitioner does not argue that inconsistencies between a juror questionnaire and response on voir dire are not race neutral reasons. The Mississippi Supreme Court has held that they are. *See Puckett v. State*, 768 So.2d 752, 761 (Miss. 2001). Moreover, a vacillating response on the death penalty is a race-neutral reason. *See*, *e.g*., *Uttecht*, 551 U.S. at 15; *see also Underwood v. State*, 708 So.2d 18, 28 (Miss. 1998). Additionally, a prospective juror's eye contact or appearance of favoritism toward one particular side is a race-neutral reason to exercise a strike. *See, e.g.*, *United States v. De La Rosa*, 911 F.2d 985, 991 (5th Cir. 1990) (stating that "intuitive assumptions," such as eye contact, may be a valid reason to exclude a potential juror); *United States v. Fields*, 72 F.3d 1200, 1206 (5th Cir. 1996) (prospective juror avoiding eye contact with

22

prosecutor and looked at defendants flirtatiously).

The prosecutor stated that he struck potential juror, Ronald Henry, because (1) Henry gave responses in his juror questionnaire inconsistent with the responses he gave during voir dire concerning the death penalty; (2) Henry repeatedly shook his head and shut his eyes when the trial court informed the potential jurors that the jury would be sequestered; and (3) Henry's brother had been convicted of statutory rape. (*See* Trial Tr. vol. 16, 536). Petitioner maintains that the prosecutor found white jurors who had been arrested acceptable, which demonstrates the pretextual nature of the prosecutor's stated reasons. (Pet. Memo 21).[11] The Court notes that it could not locate Henry's juror questionnaire within the State court papers. The Court notes that vacillation on the death penalty and a relative's criminal history are race-neutral reasons for the exercise of a strike. *See, e.g., Underwood*, 708 So.2d at 28 (death penalty views are race-neutral); *Benson v. State,* 551 So.2d 188 (Miss. 1989) (relative convicted for crime is race-neutral). The prosecutor's explanation regarding Henry's body language and/or demeanor was race-neutral. *See United States v. Perkins*, 105 F.3d 976 (5th Cir. 1997) (prosecution's explanation that black juror shook his head and had disgusted look on his face was race-neutral). Multiple reasons were given for Henry's strike, and Petitioner may not demonstrate that the reasons were pretextual merely by pointing out that another juror with an individual characteristic in common was not struck. *See, e.g., Hicks v. Johnson*, 186 F.3d 634 (5th Cir.

---

[11] Walter Mixon was arrested for DUI and Terry Gill for public drunkenness. Juror 9, Mary Palmer, had a brother-in-law who had been convicted of various crimes, and Robert Bartee, juror 22, had a son who had been arrested for the sale of marijuana. (*See* Pet. Memo 22 and n.21). Where the reason proffered by the prosecution applies just as well to a venire member of a different race who was not struck, it is evidence of purposeful discrimination to be considered. *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

1999) (none of juror alleged to be similarly situated to those challenged possessed the same combination of negative qualities as the struck jurors); *Moore v. Keller Industries, Inc*., 948 F.2d 199, 202 (5th Cir. 1991)(where multiple reasons for a strike exist, there is no proof of pretext merely because some of jurors share characteristic).       Petitioner has not demonstrated that he is entitled to relief on this claim.  The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  *Rice*, 546 U.S. at 338. He has not rebutted with clear and convincing evidence the determination that the strikes were not racially motivated.  *See* 28 U.S.C. § 2254(e)(1).  Petitioner has failed to demonstrate that the rejection of this claim was contrary to or an unreasonable application of clearly established federal law, or that it was unreasonable in light of the evidence presented in State court.  *See* 28 U.S.C. § 2254(d)(1) & (2).

Petitioner alternatively argues that trial counsel performed ineffectively in failing to rebut the race-neutral reasons given by the prosecutor in order to avoid the imposition of a procedural bar.  (Pet. Reply 9).  In order to succeed on a claim of ineffective assistance of counsel, Petitioner must show that his trial counsel's performance fell below an objective standard of reasonableness, determined under prevailing professional norms at the time the assistance was given.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Prejudice must be affirmatively proved, and if it is not, the Court is not required to address the issue of counsel's performance.  *Id.* at 693, 697.  As Petitioner has failed to demonstrate that his claim of purposeful discrimination has merit, he

cannot meet the prejudice prong of *Strickland*. *See Medellin v. Dretke*, 371 F.3d 270, 279 (5th Cir. 2004). This claim shall be dismissed.

## II. *Witherspoon v. Illinois*

Petitioner maintains that two prospective jurors, Chanteau Bowens and Joyce Brown, were improperly excused from jury selection based upon their allegedly equivocal answers concerning their views of the death penalty. (Pet. Memo 36-39). Chanteau Bowens indicated on her juror questionnaire that she could never personally vote to impose the death penalty, but she stated during voir dire that she could impose the death penalty if it was warranted by the presented evidence. (*See* SCP vol. 8, 1152 and Trial Tr. vol. 15, 325). Bowens was individually voir dired regarding the death penalty and stated that it would take the presentation of evidence to overcome the opinion she had already formed about the case. (*See* Trial Tr. vol. 16, 483). Bowen stated that though she could presume Petitioner innocent until proven guilty, it would take evidence to overcome her negative opinion of him. (*Id.* at 485-86). Bowen stated that she could vote to impose the death penalty upon sufficient evidence, but she "would have to choose life over death" if she had to give an answer during voir dire concerning her ability to vote to inflict the death penalty. (*Id.* at 488).

The prosecution moved to challenge Bowen for cause because she indicated she would be impartial in the sentencing phase, and because she stated it would take evidence to overcome the opinion she had already formed. (*See*, e.g., Trial Tr. vol. 16, 523). Defense counsel objected and argued that Bowen stated that the news coverage she heard would not influence her decision and she would give equal consideration to the sentencing options. (*Id.*). The trial court stated that both sides were entitled to jurors who would start the sentencing phase of trial with their

options on "equal footing," a statement to which defense counsel conceded. (*Id.* at 524). The trial court sustained the challenge.

Joyce Brown stated on her juror questionnaire that she mildly agreed with the death penalty and might be able to impose it. (*See* SCP vol. 9, 1208). When voir dired by the State as to her feelings regarding the death penalty based upon her questionnaire response, Brown stated she "probably could" vote to impose the death penalty if she heard the facts but could not truthfully answer affirmatively without knowing the facts. (*See* Trial Tr. vol. 15, 313). During sequestered voir dire on the death penalty qualification the next day, Brown stated that she would have to say that she could not vote to impose the death penalty if she had to give a definitive answer. (*See id.* at 389-90). She indicated this response three separate times in response to the State's questions. (*See id.*). Defense counsel was allowed an opportunity to voir dire Brown, and her responses as to whether she could vote to impose the death penalty vacillated. (*See id.* at 393, 394-95). The prosecution challenged Brown for cause based upon her equivocation on the death qualification, and defense counsel argued that Brown stated she could impose the death penalty if the evidence warranted it. (*See* Trial Tr. vol. 16, 517-18). The trial judge stated it was his recollection that she had equivocated on the death qualification and sustained the challenge. (*Id.* at 518).

On direct appeal, the Mississippi Supreme Court found that both of these prospective jurors' responses indicated either vacillation or equivocation that would substantially impair their ability to perform their duties as a juror in accordance with their oath. *See Manning I*, 726 So.2d at 1186-87. The court determined that deference was owed to the trial judge's observations of juror demeanor, and that juror bias need not be found with unmistakable clarity.

*Id.*[12]

Petitioner's claim alleges a violation of the *Witherspoon-Witt* rule. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968). These cases and their progeny hold that a venire member may not be excluded from serving on a jury in a capital case merely because he or she voices general objections to the death penalty or expresses conscientious, religious, or moral scruples against its infliction. *Witherspoon*, 391 U.S. at 521-22. A venire member may only be excused for cause based on his views of the death penalty where those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (citing *Adams v, Texas,* 448 U.S. 38, 45 (1980)). Where a court "is left with the definite impression" that the prospective juror would "be unable to faithfully and impartially apply the law," then a court has the discretion to excuse that juror. *See id.* at 426. The bias of a potential juror need not be "proved with unmistakable clarity," and deference is owed to the trial judge who is in a position, having heard and seen the juror, to form a definite impression as to whether a potential juror would be able to follow his or oath. *Id.*

A trial court may properly resolve ambiguity about a juror's ability to impose the death penalty in favor of the State. *See Uttecht v. Brown*, 551 U.S. 1, 18 (2007) ("Juror Z's assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case. . ."). It is permissible to strike a prospective juror for cause if his or her responses

---

[12] The court also considered whether Cleo Stewart was improperly excluded for cause on this basis, which Petitioner has not alleged as part of his claim on federal habeas review. *See Manning I*, 726 So. 2d at 1187.

are "equivocal and shifting."  *Clemons v. Luebbers*, 381 F.3d 744, 756 (8th Cir. 2004); *see also*

*Martini v. Hendricks*, 348 F.3d 360, 366-67 (3rd Cir. 2003) (challenge for cause of juror

expressing noncommittal and equivocal responses to voir dire questions relating to death penalty

warranted for-cause challenge).  Both Bowens and Brown gave contradictory answers, and the

trial judge was in the best position to see and hear these jurors and make a determination of

whether bias existed.  That impression is entitled to a presumption of correctness that Petitioner

has failed to rebut.  *Witt,* 469 U.S. at 425-26.  ("Despite this lack of clarity in the printed record,

however, there will be situations where the trial judge is left with the definite impression that a

prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why

deference must be paid to the trial judge who sees and hears the juror."); *see also Ortiz v.*

*Quarterman*, 504 F.3d 492, 501 (5th Cir. 2007) (holding that whether a juror is excludable under

*Witherspoon-Witt* is a question of fact entitled to a presumption of correctness on habeas

review).  The decision of the Mississippi Supreme Court does not represent an unreasonable

determination of the facts in light of the presented evidence, and the decision did not involve an

unreasonable application of established Supreme Court precedent. This claim shall be dismissed.


### III.  Paula Hathorn

At trial, Petitioner's ex-girlfriend, Paula Hathorn, provided testimony that linked

Petitioner to the leather jacket John Wise identified as the one stolen from his vehicle, and her

testimony also linked Petitioner to the firearm used in the murders.  (*See* Trial Tr. vol. 19, 986-

97).  During December 1992, Hathorn lived with Petitioner on and off at the home of Petitioner's

mother, Ruth Ann Bishop.  Hathorn testified that she saw Petitioner on December 14, 1992, after

not having seen him for a few days, and that he came home with a number of items, including jewelry, clothing, and a compact disc player. (*See*, *e.g.*, Trial Tr. vol. 17, 670-80). Sheriff Bryan testified that on or about April 27, 1993, he approached Hathorn to attempt to question her about Petitioner, and that as a result of their conversations, he retrieved from her the leather jacket John Wise later claimed as the one stolen from his vehicle. (*See*, *e.g.*, Trial Tr. vol. 18, 820-21). Hathorn also told Sheriff Bryan that she had seen Petitioner shooting a gun into a tree at his mother's residence, which led Sheriff Bryan to obtain a search warrant for the residence. (*See*, *e.g.*, Trial Tr. vol. 18, 820-22).

At trial, Hathorn admitted that she had previously been convicted of a felony for false pretense, and she had approximately twelve misdemeanor bad check convictions. (*See* Trial Tr. vol. 17, 689). Hathorn admitted that she had not served any jail time for the misdemeanor false pretense convictions, and that she had not paid the restitution to which she agreed under the terms of her plea on the felony charge. (*See id.* at 691-92). Hathorn admitted that she had gone to the penitentiary on the felony charge, and that she had been convicted on more misdemeanor charges after her release. (*See id.* at 690-91). She stated that after her release from the penitentiary, she began giving tips to the Sheriff's Department about possible crimes in the community. (*See* Trial Tr. vol. 17, 698, 700). Hathorn testified that she had worked out a plea on six misdemeanor charges by agreeing to pay restitution, and that no one had intervened on her behalf. (*See id.* at 692). On re-direct examination, Hathorn stated she encountered legal difficulties stemming from checks she had written because her attorney, Mark Williamson, failed to take care of them as promised. (*See id.* at 720, 724). Both Hathorn and Sheriff Bryan testified that Hathorn did not receive any leniency in the resolution of her legal difficulties in exchange

for her cooperation with law enforcement in this case. (*See*, *e.g.*, Trial Tr. vol. 17, 690; Trial Tr. vol. 18, 838).

At trial, Sheriff Bryan admitted that he had testified in prior proceedings that Hathorn was untrustworthy, and he stated his belief that she continued to write bad checks while working with the Sheriff's Department. (*See* Trial Tr. vol. 19, 886, 888). Sheriff Bryan also stated that he would recommend that Hathorn get some of the $25,000 reward offered in the case due to the help she provided. (*See id.* at 885-86). Sheriff Bryan testified that he did not make any deals with Hathorn as to leniency on her pending charges, and that he did not speak to any prosecuting entity on her behalf. (*See* Trial Tr. vol. 19, 838).

Petitioner was in the Oktibbeha County jail in the spring of 1993 on charges unrelated to the students' murders. (*See* Evid. Hr'g Tr. at 26-27). At that time, Sheriff Bryan arranged for Hathorn to secretly record her telephone conversations with Petitioner in an attempt to get information relevant to the murder investigation. (*See id.* 39-44). Sheriff Bryan arranged for the telephone calls to be recorded onto microcassette tapes, provided Hathorn with questions to ask, and he had at least one of the microcasette tapes transcribed. (*See id.* at 27-28). The tapes went undiscovered by any member of Petitioner's defense team, however, until Petitioner's post-conviction proceedings, when post-conviction counsel discovered two microcassette tapes upon inspection of Sheriff Bryan's files. In response to a December 2, 2004, Order by the Mississippi Supreme Court, the trial court conducted an evidentiary hearing on January 12, 2005. (*See* Evid. Hr'g Tr.). Circuit Judge Lee J. Howard, who presided over Petitioner's trial, heard evidence to determine whether Petitioner was entitled to a new trial based on the allegedly exculpatory evidence. (*See id.*).

At the evidentiary hearing, the prosecutor's paralegal testified that the District Attorney's office had never had the microcassette tapes. (Evid. Hr'g Tr. at 23-24). Williamson testified that the defense was never informed that Hathorn was acting as a State agent, and that they were never informed of the existence of the tapes. (*See id.* at 48-50). Williamson stated that Hathorn was "100 percent" of the case against Petitioner, and that he would not have overlooked such evidence had it been in the materials in the Sheriff's office. (*Id.* at 49-51). Defense co-counsel Richard Burdine also testified that he had not seen the tapes or transcripts at or near the time of trial, but that they would have been extremely important in impeaching Hathorn's testimony and uncovering her incentive to cooperate. (*See id.* at 78).

Sheriff Dolph Bryan testified at the hearing for the State and in rebuttal to defense witnesses. Sheriff Bryan testified that he arranged to have Petitioner call Hathorn into a private line where the conversations were taped, and that one of the two microcassette tapes produced as a result was partially transcribed. (*See id.* at 27-28). Sheriff Bryan stated that in the conversations Petitioner referenced the call being monitored several times, and he stopped taping the calls after determining that no useful information was going to be revealed. (*See id.* at 28-29). Sheriff Bryan stated he put the tapes and the transcribed portion in an envelope and put them in one of two big boxes of evidence, each of which measured about one-half of the size of a washing machine box. (*See id.* at 28-29). Sheriff Bryan stated that when he was instructed to get the evidence ready for defense counsel's review, he had a deputy gather the evidence and bring it in his office. (*See id.* at 34). Sheriff Bryan testified that the tapes would have been in the box at that time. (*See id.*). Sheriff Bryan stated that defense counsel Williamson made only a cursory examination of the evidence in the boxes when he came to look at the file. (*See id.* at

35-36). Bryan also testified that the evidence had been put in new boxes since the time of the investigation due to the poor condition of the old ones, but that the evidence had not changed. (*See id.* at 36).

Also at the evidentiary hearing, Sheriff Bryan stated he helped Hathorn generate questions to ask Petitioner, which included a suggestion that Hathorn tell Petitioner she was being threatened with criminal charges. (*See id.* at 83-87). Bryan testified that Hathorn was never threatened with arrest, and that her inconsistent statements were a role- play to attempt to get an admission from Petitioner. (*Id.* at 87). He also stated that Petitioner did not make any admissions on the tapes. (*See* i*d.* at 41). Sheriff Bryan admitted that no detailed inventory was made of the evidence, but that he had no doubt that the tapes were in the box. (*See id.* at 97). He testified that evidence was easy to miss in the boxes, and he stated that the microcassettes were very small. (*See* i*d.* at 88-89). Sheriff Bryan also stated that the tapes and transcripts were generated before Petitioner was indicted for capital murder in July 1993, and that defense counsel would have inspected the files after Petitioner's indictment. (*See id.* at 96-97). Sheriff Bryan stated that he did not turn over the tapes to the District Attorney, though the evidence was in the boxes for his review. (*See id.* at 42). Williamson denied that the tapes or transcript were in the boxes, stating at the hearing that he went through the evidence "with a fine tooth comb." (*See id.* at 47-50). Williamson stated that he would not have missed evidence affecting Hathorn's credibility, as he considered her testimony to constitute the case against Petitioner. (*See id.* at 49).

The circuit court entered an order on April 22, 2005, finding that no *Brady* violation occurred and that a new trial was not warranted. (Evid. Hr'g Order, 1-5). The court found that

no factual basis existed to prove the State suppressed the existence of the tapes, and that defense counsel had full opportunity to examine all evidence in the State's custody. (*See id.* at 2). The court determined that the evidence was included with the other physical evidence made available to Petitioner's attorneys, and that "[o]nly now does Petitioner's trial counsel aver that the tapes were not with the other evidence that he examined." (*See id.* at 2). The court stated that defense counsel's reasoning - that he would have certainly used the tapes had he known of them, so they must not have been there - was directly contradicted by Sheriff Bryan's testimony. (*See id.* at 3). The court also determined that the evidence was not *Brady* material, as the tapes contained very little impeachment value. (*See id*).[13] Additionally, the court found that Hathorn was merely repeating questions given to her, and that no incriminating statements were made by Petitioner. (*See id*). Finally, the court determined that there was nothing contained within the conversations of significant impeachment value "so as to give rise to a reasonable probability that a different verdict would have resulted if this evidence had been used during the original trial of the Petitioner." (*See id.* at 4).

As part of the investigation related to Petitioner's post-conviction proceedings, post-conviction counsel secured an affidavit from Paula Hathorn. Hathorn's affidavit states that Sheriff Bryan told her that she would get a reward in exchange for cooperating with police on the murder investigation when he first approached her about identifying the purportedly stolen items, and she ultimately received $ 17,500 in reward money. (*See* PCR Ex. 29). Hathorn also states she had more than thirty-three outstanding bad check charges, and that she owed more than $10,000 in checks and court fees when she was approached by Sheriff Bryan. (*See id.*).

---

[13] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) requires that the prosecution disclose evidence favorable to the accused that is material to guilt or punishment.

Paula stated her charges were "passed to the file" and that she had not served any time on the fraudulent check charges. (*See id.*). She also stated that Sheriff Bryan told her "not to worry about going to jail." (*See id.*). She stated that she pled guilty to some of the charges in the Justice Court of Oktibbeha County based on Sheriff Bryan's assurance, and that she had not been prosecuted on the other charges. (*See id.*).

The Mississippi Supreme Court determined that the findings of the Oktibbeha County Circuit Court were supported by the record. *Manning II*, 929 So.2d at 891-893 and n.1. The court found that "[d]efense counsel was given every opportunity to listen to the tapes and view the transcripts, as all evidence was made available to defense counsel, and no evidence was intentionally withheld by the State." *Id.* The court found that the absence of a *Brady* violation finding was supported by the record, and that the exculpatory issues related to Paula Hathorn were without merit. *Id.* In a footnote, the court noted that Petitioner argued that Paula's status as a state agent, while relevant and the disclosure of which would likely have been beneficial, did not provide Petitioner with relief, as Petitioner still had to prove a *Brady* violation in order to be entitled to the sought relief. *See id.* n.3. The Court now considers the claims Petitioner has raised concerning Paula Hathorn.

A. *State Failure to Disclose Impeachment Evidence*

Petitioner maintains that had the existence of the microcassette tapes been disclosed, defense counsel could have had information to expose Hathorn's bias and incentive for testifying and demonstrated that she made statements on the tapes inconsistent with her trial testimony. (Pet. Memo 45-47 and PCR Ex. 39, Att. B). Petitioner maintains that the tapes and transcripts were suppressed, and *Brady* and its progeny were unreasonably applied by the Mississippi Supreme Court. (Pet. Memo 54). Petitioner further argues that the finding that Hathorn was

merely "role playing" in her conversations with Petitioner enhances the materiality of the recordings, as it establishes that Hathorn would say whatever she was directed to say. (Pet. Memo 63).

The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See Banks v. Dretke*, 540 U.S. 668 (2004) (quoting *Brady*, 373 U.S. 83, 87). The rule applies in the absence of a request for the information, and it also applies to evidence known only to police. *See Strickler v. Greene*, 527 U.S. 263, 280-81 (1999); *see also Kyles v. Whitley*, 514 U.S. at 437 (finding prosecutors have duty to learn of favorable evidence known to those acting on government's behalf). To establish a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeachment; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Graves v. Dretke*, 442 F.3d 334, 339-40 (5th Cir. 2006) ("*Brady* applies equally to evidence relevant to the credibility of a key witness in the state's case against a defendant."). The materiality standard is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see also Banks*, 540 U.S. at 698 (evidence is material under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different).

Petitioner has failed to demonstrate it was unreasonable to determine that the evidence was not suppressed. Here, the factual finding of the trial court has an evidentiary basis in the record. Sheriff Bryan testified that the tapes were made before Petitioner was indicted, the

evidence was reviewed after Williamson was appointed to defend him, and that the tapes and transcript were contained within the box with the other evidence. Petitioner has not rebutted that finding by clear and convincing evidence. *See Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007). Petitioner argues that it was unreasonable to say that the evidence was not suppressed as it was buried. However, there is no requirement that the State must inventory or otherwise distinguish evidence for the defense, even when it turns over a mass of material. *See United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir. 1997) (*Brady* does not require government to "point the defense to specific documents within a larger mass of material that it has already turned over"). Here, defense counsel was given an opportunity to inspect all of the documents within the State's possession. *See Moralez-Rodriguez*, 467 F.3d 1, 15 (1st Cir. 2006) (evidence not suppressed where defense allowed to conduct open-file discovery of all documents in government's possession, which included the allegedly suppressed reports). Evidence that could have been discovered with the exercise of due diligence has not been suppressed. *See Bigby v. Dretke*, 402 F.3d 551, 574-75 (5th Cir. 2005); *Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997) (The State has no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence."). The decision that the State did not suppress the material is not contrary to nor involving an unreasonable application of federal law, or an unreasonable determination of the facts presented to the State court.

Moreover, Petitioner has not demonstrated that the evidence was material. *See*, *e.g., Kyles*, 514 U.S. at 436-37 (1995)("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."). In *United States v. Bagley*, 473 U.S. 667 (1985), the Court determined that "evidence is material only if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. There, the Court found a significant likelihood that the prosecutor's response to the discovery motion filed by defense counsel "misleadingly induced defense counsel to believe that [the witnesses] would not be impeached on the basis of bias or interest arising from inducements offered by the Government." *Id.* at 683.

At the evidentiary hearing in this case, there was ample testimony that Paula Hathorn was working from a script. In considering whether the tapes and transcripts show an incentive to lie that would have negatively affected Hathorn's credibility, the Court considers whether the evidence can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (citation omitted). There would have been little value in pointing out Paula Hathorn's inconsistent statements, and the Court has no difficulty in determining that defense counsel's failure to learn of her acquiescence on the tapes would not have made a difference in the outcome of Petitioner's trial. *See United States v. Reed*, 167 F.3d 984, 988 (6th Cir. 1999) (finding contradictory statements made on surreptitiously recorded tape not to be "taken at face value" due to attempt to capture defendant making inculpatory admissions). The affidavit filed by Hathorn is vague, it is contrary to the testimony offered at trial and the evidentiary hearing, and it was filed years after the events in question. Hathorn testified that she cooperated with the police, Sheriff Bryan testified that she cooperated with the police, and her criminal history was explored at trial. The impeachment value provided by the tapes and transcripts is slight and therefore not material. *See Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005) (holding that where the impeachment value of

evidence is incremental, it is not material). Petitioner has failed to demonstrate that he is entitled to relief on this claim, and it shall be dismissed.

### B. False Impression of the Evidence

Petitioner also maintains that the prosecution elicited false testimony from Hathorn and gave a false impression of her testimony. Petitioner maintains that the prosecution knew or should have known that Hathorn's testimony concerning Williamson's obligation to take care of her false pretense charges was false, yet the prosecution presented testimony to the contrary in an attempt to undermine Williamson's credibility while bolstering Hathorn's. (*See* Pet. Memo 95-97). Additionally, he maintains that the State failed to disclose that it promised Hathorn leniency on her pending charges and a large portion of the reward money if she testified. (*See id.* and PCR Ex. 29).

Mark Williamson was appointed in April 1991 to represent Hathorn in connection with two felony false pretense charges, and he negotiated a plea bargain on Hathorn's behalf. (*See* PCR Ex. 27, 28). The terms of the plea required Hathorn to plead guilty to one felony charge and attend a restitution center, and the State retired the remaining felony charge and recommended a sentence of three years' probation and restitution on the pled charge. (*See id.*). Hathorn's sentence was revoked by an order entered December 3, 1991, for her failure to pay restitution as ordered and for absconding from the restitution center. (*See* PCR Ex. 27). Hathorn was sentenced to the penitentiary, and after her release, she began giving tips to the Sheriff's Department about possible crimes in the community. (*See* Trial Tr. vol. 17, 698, 700).

On post-conviction review, the Mississippi Supreme Court noted this argument within the context of its discussion of whether trial counsel performed ineffectively with regard to Paula Hathorn. *See*, *e.g.*, *Manning II,* 929 So.2d 885, 891; 902-04. The court stated that "[t]he

allegations that the State presented evidence that created a false impression and withheld information from the defense is all supported in Manning's post-conviction relief application by an affidavit of Hathorn given during a recent incarceration and vaguely expressed, years after the trial." *Id.* at 902.   Also on post-conviction review,  the court cited to *Giglio v. United States*, 450 U.S. 150 (1972) in response to Petitioner's claim that the prosecutor gave a false impression to the jury by failing to disclose an assurance or deal in exchange for Hathorn's testimony. *See* i*d.* at 891.   The court found "all exculpatory issues" relating to Paula Hathorn to be without merit. *See id.* at 893.

Petitioner maintains that the Mississippi Supreme Court's discussion of the conflict of interest claim cannot serve as a decision on the merits of the due process claim presented to the court, and that the State is not entitled to § 2254(d) deference on this claim.  (*See* Pet. Memo 100 and Pet. Reply 23-24).  This Court is satisfied that the Mississippi Supreme Court understood the claim presented to it, and that the court merely disposed of all of the myriad of exculpatory claims in one discussion.  The Court is concerned with the ultimate conclusion reached by the court, and not the way it catalogued the claim. *See*, *e.g*., *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  Moreover, Petitioner was aware Hathorn was cooperating with Sheriff Bryan's office, and Sheriff Bryan testified at trial that he would recommend that she receive some of the reward.  In this instance, there is no credible proof of a hidden understanding or evidence of leniency given to Hathorn after she testified that is attributable to the State. *See, e.g., Giglio,* 405 U.S. at 154-55 (holding that evidence of agreement between witness and state as to future prosecution that is not disclosed violates due process).  Hathorn's affidavit is inconsistent with the testimony that both Hathorn and Sheriff Bryan gave at trial, and it was provided years after Petitioner's trial. *See*, *e.g.*, *Summers v. Dretke*, 431 F.3d 861, 871 (5th Cir. 2005) (court holding

that federal habeas court is not in a position to disturb state court's findings based on uncorroborated, recanting affidavit of informant). Following Petitioner's trial, Hathorn was given a fine and suspended jail sentence for two counts of false pretense in the justice court on September 28, 1993. (*See* PCR, Ex. 30). These exhibits do not indicate a relationship or agreement between the State and Hathorn, and the Court will not infer one. Moreover, there is no evidence of a reasonable likelihood that the jury's verdict was affected by the failure to question Hathorn on the extraneous matter of whether Mark Williamson was supposed to have paid her fees. Petitioner has not demonstrated an entitlement to relief on this claim, and it shall be dismissed.

### III. Right to Conflict-Free Counsel

Petitioner maintains that he was denied his right to conflict-free counsel at trial due to Mark Williamson's previous representation of both Paula Hathorn and Earl Jordan. (Pet. 18-19). Petitioner maintains that he was denied an opportunity to fully impeach Paula Hathorn, as Williamson would have had to have Hathorn recall her prior, privileged communications with him to establish Hathorn was lying about his failure to "take care" of her charges. (Pet. Memo 87-92). Also, at trial, it was alluded to that Williamson had represented Earl Jordan for various criminal offenses. (Pet. 22).

The Mississippi Supreme Court considered Petitioner's claim on direct appeal. *See Manning I*, 726 So. 2d 1167-69. The court noted that Williamson owed no conflicting duty to Hathorn at the time of trial, as Hathorn was not a co-defendant nor represented by Williamson at the time of trial. *Id.* at 1168. Noting that Hathorn was one of many witnesses against Petitioner, the court determined that her testimony that she had witnessed Petitioner shooting into a tree was less damning than the ballistics expert who matched the bullets from the tree to

those that killed the victims. *See id.* The court otherwise determined that a full cross-examination of Hathorn was conducted, and the court declined to presume Petitioner was prejudiced in the absence of an actual conflict of interest. *See id.* at 1168-69. The court determined that Petitioner failed to show prejudice under the *Strickland* standard, as there existed no reasonable probability that the proceedings would have resulted differently had the jury known the full details of Williamson's prior representation of Hathorn. *See id.* at 1169.

Petitioner maintains that the Mississippi Supreme Court's decision is contrary to and an unreasonable application of federal law in the area of conflicts of interest, as its application of the "reasonable probability" test is at odds with the presumption of prejudice in *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980). Petitioner argues that the finding that a full cross examination was conducted is unreasonable, as Williamson failed to challenge the false accusations, which is the critical issue. (Pet. Memo 94). Under *Cuyler v. Sullivan*, 446 U.S. at 348-49, a defendant who demonstrates that his lawyer represented actual conflicting interests is entitled to have the court presume that prejudice flowed from the conflict. *See id.*; *see also Strickland*, 466 U.S. at 692; *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000)(discussing distinction between *Cuyler* and *Strickland*).

A Sixth Amendment violation of the right that a defendant has to representation free of any conflict of interest requires a defendant to establish (1) that his counsel operated under an actual conflict that (2) adversely affected the attorney's performance at trial. *United States v. Culverhouse*, 507 F.3d 888, 892 (5th Cir. 2007). There is an "actual conflict" if the attorney had to choose between the "competing interests of a former or current client." *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006). This is a fact-dependent inquiry. *Id.* at 392.

41

Relevant factors include (1) whether the attorney is in possession of confidential information helpful to one client but harmful to the other; (2) how closely related the subject matter of the representations is; (3) the proximity in time of the representations; and (4) whether the prior representation was unambiguously terminated. *Id.* It requires more than a showing that the attorney merely cross-examined a former client. *Perillo v. Johnson*, 205 F.3d 775, 801-02 (5th Cir. 2000). Petitioner must show that the attorney forfeited a plausible alternative defense strategy because of the actual conflict. *United States v. Infante*, 404 F.3d 376, 393 (5th Cir. 2005).

In *Mickens v. Taylor*, 535 U.S. 162 (2002), the Supreme Court stated that an actual conflict and adverse effect are not separate issues, as "an'actual conflict' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *See id.* at 175. Petitioner has not demonstrated that the Mississippi Supreme Court made an unreasonable determination of facts in finding that no actual conflict existed, thereby defeating Petitioner's argument that *Sullivan* controls and prejudice is presumed. Williamson represented Hathorn over two years before Petitioner's trial on charges unrelated to those Petitioner faced. There were no competing loyalties at stake, and the testimony complained of came on re-direct examination. Petitioner was not forced to forfeit a defense strategy based upon the representation, and the defense attempted to impeach Hathorn's credibility. For the reasons set forth above, Petitioner can demonstrate no deficient performance or prejudice. Petitioner has made no meaningful argument concerning Williamson's prior representation of Jordan, and his claim as to Jordan likewise fails. This claim shall be dismissed.

## IV. Bolstered Testimony of Earl Jordan

Petitioner maintains that he was denied his right to confront Earl Jordan when the trial

court admitted testimony that Jordan was willing to take a polygraph examination while denying counsel the right to cross-examine Jordan on that issue.  (*See*, *e.g*., Pet. Memo 114).  At trial, Earl Jordan gave testimony that he was in the Oktibbeha County Jail with Petitioner in mid-May of 1993,  and that Petitioner admitted to him that he killed the students.  (*See* Trial Tr. vol. 20, 1335-36).  Jordan testified that Petitioner told him he had killed the students at the direction of Jessie Lawrence after the students caught Petitioner and Lawrence breaking into a car on the Mississippi State University campus.  (*See id.* at 1137-38, 1140).  Jordan testified that he had been put under a lot of pressure about testifying in the case, and that he only told Sheriff Bryan about his conversation with Petitioner after Sheriff Bryan heard about the conversation through someone else.  (*See id.* at 1141).  Jordan admitted that he had been convicted of burglary and was in the Oktibbeha County jail awaiting trial on looting charges at the time of Petitioner's trial, but he denied being promised any leniency on the pending charges in exchange for his testimony. (*See id.* at 1134-35).

On cross-examination, Jordan was confronted with his 1987 and 1989 felony convictions for burglary, and Jordan admitted that he went to the penitentiary for the 1989 charge and was released in July of 1992.  (*See id.* at 1142-44).  In December of 1992, he was arrested for looting, which could carry a jail term of fifteen years, and a charge that would support him being indicted as an habitual offender.  Jordan admitted that he was not indicted on the looting charge until July 1993, which was approximately two months after he gave his statement to Sheriff Bryan, and that he was not indicted as an habitual offender.  (*See id.* at 1145-46).  Defense counsel attempted to question Jordan about other criminal incidents, but the trial court limited defense counsel's questioning as to whether Jordan was or was not charged with other crimes due to his cooperation with law enforcement. (*See id.* at 1147-53).  Jordan denied that the State agreed not

to prosecute him on any other crimes because of his assistance to law enforcement in this case. (*See id.* at 1154).

Also during cross-examination, Jordan stated that he was in jail approximately six months after the murders before he gave his statement implicating Petitioner to police, and he admitted that he had heard of the murders before Petitioner confessed to him. (*See id.* at 1157). Jordan also admitted that he gave a statement in December 1992 to Sheriff Bryan that implied that another person might be responsible for the crime. (*See id.* at 1163-65). Jordan admitted that his May 1993 statement did not contain specific details about the crime, but that another statement given approximately one week to Petitioner's trial contained details of specific conversations about how the crime transpired. (*See id.* at 1165-66). At the time of Petitioner's trial, Jordan had not gone to trial on his looting charge. (*See id.* at 1170). Jordan admitted that he had asked his attorney to delay his trial on the looting charge, as he was hoping for leniency due to his cooperation in this case. (*See*, *e.g., id.* at 1170). On re-direct, Jordan was allowed over defense counsel objection to state that he had volunteered to take a lie detector test. (Trial Tr. vol. 21, 1181). Defense counsel was denied an opportunity to re-cross on the point. (*See* Trial Tr. vol. 20, 1174).

Sheriff Bryan testified that he spoke to Jordan the day after Petitioner was arrested, but that he did not ask to many questions due to Jordan's reluctancy to talk. (*See id.* at 1191-92). Bryan testified that as Jordan was living in the general population, he did not want Jordan labeled as a snitch. (*Id.*). Bryan stated that Lawrence was in jail in Alabama at the time of the murders. (*Id.* at 1193-94).

On direct appeal, the Mississippi Supreme Court determined that the prosecutor's question about the polygraph was proper, as there was no attempt to disclose whether the test

had been taken or the results thereof. *Manning I*, 726 So. 2d at 1179. Petitioner presented three

arguments on post-conviction review regarding the trial court's admission of the polygraph

question. *Manning II*, 929 So. 2d at 894. The court noted that since Petitioner's trial, the

Mississippi Supreme Court had overruled its prior precedent, finding "that testimony pertaining

to a witness's offer to take a polygraph, whether it be a witness for the State or the defense, is not

admissible at trial." *Id.* (citing *Weatherspoon v. State*, 732 So. 2d 158, 162 (Miss. 1999)). The

court noted that it had interpreted Mississippi Rule of Evidence 608(b) in pre-*Weatherspoon*

cases to allow references to a polygraph test on re-direct examination as long as the results of the

test were not disclosed, thereby precluding a finding of reversible error in the trial court's

decision to allow the State to question Jordan in an attempt to rehabilitate Jordan's testimony.

*Id.* at 896. The court held that at the time of Petitioner's trial, the trial court followed precedent.

*Id.* at 896. The court determined that the issue before it was whether to apply *Weatherspoon*

retroactively pursuant to the precedent set forth in *Teague v. Lane*, 489 U.S. 288 (1989) and its

progeny. *Id.* The *Teague* rule limits the retroactive application of new rules of constitutional

law to cases already final on direct appeal to those instances where the new rule would result in a

determination that the defendant engaged in an act not punishable under the law, or those

"watershed rules of criminal procedure" that, unless the procedure is applied, diminishes the

likehood that an accurate conviction has resulted. *See id.* The Mississippi Supreme Court

found *Weatherspoon* to be a procedural rule not retroactively applicable to cases already final on

direct review. *Id.* at 899 .

    The court noted that the prosecutor was allowed to question Earl Jordan as to whether he

volunteered to take a polygraph, which was the sole mention of the test by the State. *Id.* at 899.

It noted, however, that Petitioner's counsel made five references that Carl Rambus, one of

Petitioner's witness, had volunteered to take a polygraph. *Id.* at 899-900. The court found that neither *Teague* exception was present to demonstrate actual prejudice, as the new rule in *Weatherspoon* did not place the conduct outside of criminal activity or limit punishment for a class of defendants; and second, it was not a watershed rule of criminal procedure that diminishes the likelihood of an accurate conviction. *Id.* at 900. The court found the issue without merit. *Id.*

The Mississippi Supreme Court used the principles of cause and prejudice found in *Teague* to guide its application of the cause and prejudice test in the Mississippi Uniform Post-Conviction Collateral Relief Act, which requires a prisoner wishing to avail himself to an intervening decision to show that he is entitled to relief based upon cause and actual prejudice. *See* Miss. Code Ann. § 99-39-21. At the time of Petitioner's trial, the rule in Mississippi was that neither the fact of a polygraph examination nor its results were admissible into evidence unless it was admitted to support the credibility of a witness whose credibility had been attacked. *See Conner v. State*, 632 So.2d 1239, 1257 (Miss. 1993).

Petitioner also argues that the court unreasonably applied clearly established law by employing the *Teague* retroactivity doctrine as a test for prejudice rather than analyzing the facts under the standard in *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 694 (1986), which identifies factors to be considered in determining whether any prejudice has resulted from the denial of the right to cross-examination. (Pet. Memo 116-118). The Court determines Petitioner has not shown that the decision reached by the Mississippi Supreme Court is objectively unreasonable. The admissibility of polygraph evidence is a state law issue. *See Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *Weston v. Dormire*, 272 F.3d 1109, 1113 (8th Cir. 2001). Petitioner has not demonstrated that his trial was rendered fundamentally unfair by the introduction of evidence

showing Jordan volunteered to take a polygraph.  *See Castillo v. Johnson*, 141 F.3d 218, 222 (5ᵗʰ Cir. 1998) (polygraph evidence issue of State law that habeas considers only to determine whether ruling rendered trial unfair).

The Sixth Amendment right to confrontation may be limited if the evidence proposed is only marginally relevant.  *See Van Arsdall*, 475 U.S. at 679.  Nothing more could have been gained by questioning Jordan on the subject of the polygraph, as defense counsel would have been prohibited by the law from inquiring into the details of the examination. The issue, for purposes of the Confrontation Clause in the Sixth Amendment, is whether "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [petitioner's] counsel been permitted to pursue his proposed line of cross-examination."  *Van Arsdall*, 475 U.S. at 680.  Petitioner had an opportunity to explore Jordan's criminal history, the incentives he hoped for in exchange for his testimony, and the inconsistencies in his statements to police.  He was given an opportunity to expose the jury to the relevant facts upon which it was to assess Jordan's credibility.  Petitioner has not demonstrated an entitlement to relief on this claim, and it shall be dismissed.  *See Davis*, 415 U.S. at 318.[14]

## V.  Frank Parker

At trial, Frank Parker testified as a witness for the prosecution, stating that he was being held in the Oktibbeha County Jail under a material witness bond. (*See*, *e.g*., Trial Tr. vol. 20,

---

[14] Moreover, if error did occur, it is subject to a harmless-error analysis.  *See Van Arsdall*, 475 U.S. at 684 (requiring court to determine "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. ).  For the same reasons cited above, any error that resulted from the trial court's admission of this evidence was harmless, as the introduction of this evidence did not have a substantial and injurious effect or influence in determining the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

1116-17). Parker testified that he was placed in the same cell with Petitioner on May 12, 1993, after he turned himself in to Mississippi authorities on burglary charges he faced in Texas. (*See id.*). Parker testified that he overheard Petitioner tell another inmate that Petitioner had sold the gun used to commit the murders on the street, and Parker subsequently told Sheriff Bryan what he had heard. (*See id.* at 1119-20). Parker stated that the Texas charges against him were dropped after he wrote Texas authorities in the summer of 1993 to request that they be dismissed, and that a subsequent National Crime Information Center check on him came back clear. (*See id.* at 1117, 1121, 1125, 1126). Parker testified that he had served more time waiting to testify under the material witness bond than he would have had to serve had he been sentenced on the Texas charges. (*See id.* at 1126, 1131-32). Parker stated that he was still facing charges in Texas on May 12, 1993, the day he gave the statement to Sheriff Bryan that incriminated Petitioner, and defense counsel elicited from Parker that the Texas charges were dropped approximately one month after Parker gave Sheriff Bryan his statement. (*See id.* at 1121, 1126, 1127, 1129, 1131-32).[15]

Documents submitted during Petitioner's post-conviction proceedings demonstrate that Parker was indicted by a Texas grand jury for theft in August 1993, and that the indictment stemmed from an incident that occurred at the home of Parker's uncle on March 16, 1993. (*See* PCR Ex. 13; PCR Ex. 15; PCR Ex. 16). Letters from Parker to District Attorney Allgood and Judge Howard dated in March of 1994 establish that Parker knew he was facing a theft charge in Texas, and they also establish that Parker was concerned that he was not going to get any reward

---

[15] Parker stated that he did not know when the charges against him were dropped, but only that they were dismissed by the governor and the sheriff of Frio County, Texas. (*See id.* at 1129).

money for his cooperation.  (*See* PCR Exs. 19 and 20).  Parker returned to Texas following his release in Mississippi, where he pled guilty to a felony count of theft on April 10, 1995, which carried a range of punishment from two to ten years.  (*See* PCR Ex. 17).

Petitioner argues that the prosecution knowingly presented false evidence from Parker when it elicited testimony from him that he had been in jail approximately sixteen months with no charges pending against him, as he was under indictment in Texas at the time of trial. (Pet. 37-38).[16]  Petitioner argues that because Parker lied and said he did not have pending charges, he could not be properly cross-examined about his expectations of assistance.  (Pet. Memo 135) Petitioner maintains that his due process rights were violated because the prosecution (1) knew the testimony was false; (2) failed to correct the false evidence; or (3) presented the evidence knowing it would create a materially false impression of the evidence.  (Pet. Memo 133). Petitioner argues Parker's testimony did two important things.  First, he provided an admission linking Petitioner to the gun and provided an explanation as to why the gun could not be located. (Pet. Memo 134).  Second, he corroborated Paula Hathorn's testimony by linking Petitioner to the gun after the killings.  (Pet. Memo 134-35).  Petitioner also maintains that the charges pending against Parker and his desire to obtain some of the reward money were items of material evidence suppressed by the prosecution in this case.

On direct appeal, the Mississippi Supreme Court considered Petitioner's claim that his impeachment of Parker was unfairly limited as defense counsel was not allowed to show that Parker had avoided liability for various crimes due to his cooperation.  *See Manning I*, 726 So.2d

---

[16] Petitioner also argues Parker gave false testimony when he stated he had faced charges in Frio County, as there are no records of any charges ever having been filed against Parker there.  (Pet. 38; PCR Ex. 18).

at 1177.  The court determined that it is generally impermissible to cross-examine or attempt to impeach a witness solely because he has been charged with a crime, thus, there was no error in the trial court's limitation of cross-examination.  *Id.*  It also found that "defense counsel again failed to make an offer of proof under Miss. R. Evid. 103(a)(2), and therefore this claim for error is procedurally barred."  *Id.*

On post-conviction review, the Mississippi Supreme Court considered Petitioner's arguments and noted that Petitioner cited as authority cases holding that a new trial is required if the presentation of false testimony could have "in any reasonable likelihood affected the judgment of the jury."  *Manning II*, 929 So.2d at 890 (citing, *e.g.*, *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000)).  The court noted that Petitioner cited *Brady v. Maryland*, 373 U.S. 83, 87 (1963) for its holding that the suppression of favorable evidence is a violation of a defendant's due process rights.  *Id.* at 890-91.  The court also noted that the affidavits Petitioner relied upon to demonstrate a "deal" reveal that authorities in Mississippi did not make any explicit promises to assist Parker with his Texas charges in exchange for his testimony.  *Id.*  The Mississippi Supreme Court addressed Petitioner's claim in conjunction with the claims raised concerning Paula Hathorn.  *See id.* at 891-93.  The court determined that the four-part *Brady* test as applied to both Hathorn and Parker was not met, and that the trial court's findings were supported by the record.  *See id.* at 893.  The court found that "all exculpatory issues raised by Manning regarding Frank Parker" were without merit.  *Id.* at 891-93.

Where the credibility of a witness may determine a defendant's guilt or innocence, the presentation of false or misleading evidence at trial that is not corrected, regardless of whether it is solicited, violates the defendant's due process rights.  *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Naupe v. Illinois*, 360 U.S. 264, 269-70 (1959).  A due process violation as a

50

result of the prosecution's knowing use of false or misleading evidence requires a habeas petitioner to show that the evidence was false, material, and the prosecution knew it was false. *See Giglio*, 405 U.S. at 153-54. Evidence is "false" if, *inter alia*, it is "specific misleading evidence important to the prosecution's case in chief," and it is "material" if "there is any reasonable likelihood that [it] could have affected the jury's verdict." *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997)(citations omitted). Additionally, the suppression of material evidence that is favorable to a criminal defendant violates due process, regardless of the State's intent. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 427-38 (1995); *Johnson v. Dretke*, 394 F.3d 332, 336 (5th Cir. 2004).

First, the Court finds that the Mississippi Supreme Court did address Petitioner's claim on post-conviction review, as it clearly stated the claim raised, as well as the State's response to both the false testimony and discovery violation claims. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (AEDPA standard does not require a state court to cite Supreme Court cases or even be aware of them as long as the reasoning nor the result of the decision contradicts the clearly established law). In *United States v. Agurs*, the Court noted that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *See* 427 U.S. 97, 103 (1976). The Court later stated that this rule, while couched as being subject to harmless-error review, "may as easily be stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." *United States v. Bagley*, 473 U.S. 667, 679-80 (1985); *see also Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir. 1998) ("[I]f false evidence is presented by the prosecution at trial, a new trial is warranted only if the false testimony could have, in any

reasonable likelihood, affected the jury's determination.").

The Court determines that even if it were to assume that the testimony given by Parker was false and the State knew it was false, Petitioner has failed to demonstrate an entitlement to relief on this claim, because he has not shown that the evidence was material. That is, there is no reasonable likelihood that knowing that Parker was still facing Texas charges would have affected the jury's determination as to Parker's credibility.[17] It is clear that the trial court, the prosecutor, and defense counsel all knew that Parker was arrested in Mississippi for a crime committed in Texas. Parker testified that he was in jail on a material witness bond after turning himself in on a burglary charge out of San Antonio, Texas. (*See* Trial Tr. vol. 20, 1116). The jury was made aware of Parker's criminal history. Defense counsel cross-examined Parker, bringing out the fact that charges against him were dropped soon after he gave a statement to Sheriff Bryan implicating Petitioner. The elicited information suggested to the jury that Parker had an incentive to cooperate with law enforcement officials, and that information was as likely to have affected Parker's credibility as informing the jury that Parker faced a pending theft charge in Texas would have. The record does clarify that Parker was given no expectation of assistance from the State, even complaining in one letter that he was only getting a "bus ticket" home in exchange for his cooperation. (*See* PCR Ex. 19 and 20). Moreover, Parker's testimony only suggested to the jury an explanation for why the murder weapon was never found in this case. Petitioner has not demonstrated that the confidence in the outcome of his trial is undermined due to the undisclosed theft charge, or that the decision of the Mississippi Supreme

---

[17] The Court notes that the *Giglio* standard is not outcome determinative, in that Petitioner need not show that the jury's verdict would have been affected. *See Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

Court was objectively unreasonable.   This claim shall be dismissed.

## VI.  Misconduct of Prosecutor

*A.  Petitioner's Character*

Petitioner maintains that the prosecution violated a pre-trial order preventing the State from making reference to Petitioner's criminal record when Paula Hathorn and Sheriff Bryan were each permitted to testify as to Petitioner's prior bad acts, and that he was denied his right to a fundamentally fair trial as a result. (Pet. 44, Pet. Memo 153-54).  Petitioner argues that the State made Petitioner out to be a thief who fenced stolen property and beat women, which is prohibited under evidentiary rules and constitutional provisions.  (Pet. Memo 153-54).

On November 2, 1994, the trial court considered three motions in limine presented by defense counsel, the last of which pertained to references to Petitioner's criminal history and/or reputation.  (*See* Trial Tr. vol. 16, 565).  The trial court found the motion premature and determined that trial counsel should make an objection at the proper time if such evidence came up during the prosecution's case.  (*Id.* at 566).  The trial court considered the prior convictions of Petitioner that were tendered to the court, and after hearing argument and reviewing the rules, the trial court determined that Petitioner's misdemeanor convictions for receiving stolen property could not be used for impeachment purposes if Petitioner testified.  (*See id.* at 567-572).[18]

Counsel's motion in limine filed on November 2, 1994,  provided, in relevant part, that Sheriff Bryan stated that Petitioner "has a reputation for being a burglar and a thief," and that "any reference to [Petitioner's] criminal record . . . [and] any reference to the [Petitioner's]

---

[18]  In *Peterson v. State*, 518 So. 2d 632, 636 (Miss. 1987), the Mississippi Supreme Court held that a defendant may not be impeached by his prior convictions unless the trial judge has weighed particular factors and made an on the record determination that the probative value outweighs the prejudicial effect.

reputation for being a burglar and a thief would be extremely prejudicial to the [Petitioner]." (*See*

Trial Tr. vol. 3, 439-40). At trial, Hathorn testified that on the evening of December 14, 1992,

Petitioner made three trips into the home with various items of clothing and goods. (*See*, *e.g.*,

Trial Tr. vol. 17, 674-680). She testified that one of those items was a leather jacket, which was

the jacket she turned over to police. (*Id.* at 678). She also testified that there was a CD player,

as well. (*Id.* at 678). Hathorn testified that Petitioner was "the sweetest person in the world"

when he was not drinking, but that he became violent when he got drunk. (*Id.* at 689).

On direct examination, Sheriff Bryan was asked to explain how Paula Hathorn was

developed as a witness. (Trial Tr. vol. 18, 820). Bryan testified that he knew Hathorn had been

dating Petitioner, and he stated "I knew that he had beaten her up, so I thought if she knew

anything about some of this stuff she might would tell me." (*Id.* at 820).

On direct appeal, the Mississippi Supreme Court found Petitioner's claim procedurally

barred for trial counsel's failure to contemporaneously object to the testimony and otherwise

without merit. *See Manning I*, 726 So.2d at 1171-72. The court found Hathorn's testimony

otherwise admissible under Miss. R. Evid. 404(b) to show motive and identity. *Id.* at 1171. The

court also determined that Sheriff Bryan's testimony was elicited through the sheriff's

explanation of how Hathorn was developed as a witness. *Id.* at 1171-72.

Petitioner maintains that there is no procedural bar to his claim on habeas review, as

Mississippi does not consistently apply its contemporaneous objection bar in capital cases. (Pet.

Memo 155). Petitioner otherwise maintains that there is no connection between the purportedly

stolen goods Hathorn saw Petitioner with days after the murders and the murders themselves.

(Pet. Memo 155). Moreover, Petitioner argues, Hathorn responded to questions posed by the

prosecution, and the court's conclusion that the State did not elicit the information is

54

unreasonable.  (Pet. Memo 156).  Petitioner otherwise maintains that a contemporaneous

objection to Petitioner's prior bad acts was unnecessary in light of defense counsel's motion in

limine to prevent the admission of evidence of Petitioner's reputation or criminal record.  (Pet.

Memo 152, Pet. Reply 38-40).

        Petitioner's claim is barred on the basis of independent and adequate State law, and it is

Petitioner's burden to show that Mississippi's contemporaneous objection rule is not regularly

and consistently applied.  *See Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (petitioner

arguing procedural bar not strictly or regularly applied bears burden of demonstrating state fails

to apply bar to similar claims); *Smith v. Black*, 970 F.2d 1383, 1387 (5th Cir. 1992) (noting that

Mississippi's contemporaneous objection rule regularly and consistently applied).  Moreover, the

trial court's ruling is an evidentiary issue of State law, which is not reviewed by the Court except

to determine whether it violated Petitioner's right to a fundamentally fair trial.  *See Estelle v.

McGuire*, 502 U.S. 62, 67-68 (1991); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005);

*Herrera v. Collins*, 904 F.2d 944, 949 (5th Cir. 1990).  Even if this evidence was wrongfully

admitted, the evidence was not so unduly prejudicial as to deny Petitioner a fundamentally fair

trial, unless the evidence was "crucial, critical, or highly significant" in context of the case as a

whole.  *Givens v. Cockrell*, 265 F.3d 306, 308 (5th Cir. 2001); *Green v. Johnson*, 160 F.3d 1029,

1047 (5th Cir. 1998).  In determining whether the evidence rendered Petitioner's trial

fundamentally unfair, the question is whether there is a reasonable probability that the verdict

might have been different had the evidence been excluded.  *See*, *e.g.*, *Guidroz v. Lynaugh*, 852

F.2d 832, 835 (5th Cir. 1988).

        Here, the Court cannot state that Petitioner was denied a fundamentally fair trial by the

introduction of the evidence.  Hathorn's testimony was not irrelevant, as it went to establish that

Petitioner returned from his trip with purportedly stolen goods, which was the motive for murder. It also established that Petitioner had the leather jacket belonging to Wise upon his return. Moreover, Hathorn did not testify to a "beating" in response to the prosecutor's questioning, but stated that Petitioner behaved violently when he drank alcohol. (*See* Trial Tr. vol. 17, 689). Similarly, the court's findings with regard to Sheriff Bryan are supported by the record. He informed the jury as to how Hathorn was developed as a witness and why he believed she might be willing to cooperate with the police. Petitioner has not demonstrated an exception to the procedural bar, nor has he demonstrated that he would be entitled to relief based on the court's alternative resolution of this claim. This claim shall be dismissed.

B. *Prosecutorial Argument at Sentencing*

Petitioner maintains that he was denied a reliable sentencing determination by the prosecutor's closing statement at sentencing that invoked religious themes and argued Petitioner's future dangerousness. (Pet. Memo 253-55). Petitioner also alleged that his trial counsel performed ineffectively in failing to object to the prejudicial statements. (Pet. Memo 256).

On post-conviction review, the Mississippi Supreme Court held the claim barred for Petitioner's failure to raise it on direct review. *See Manning II*, 929 So.2d at 906. The court otherwise found the claim without merit, as it found scriptural references to be within the "broad latitude" attorneys are given in closing argument. *Id.* The court also determined Petitioner had failed to demonstrate prejudice as a result of the State's argument and found the issue without merit. *Id.*

Mississippi has consistently and regularly applied the procedural bar imposed against Petitioner's claim, and the Court finds the claim barred on that basis. *See*, *e.g.*, *Stokes v.*

*Anderson*, 123 F.3d 858, 860-61 (5th Cir. 1997). Therefore, the Court may properly review the claim only if Petitioner can demonstrate cause and actual prejudice stemming from the alleged violation, or if he can demonstrate that a fundamental miscarriage of justice will result from the Court's failure to consider the claim. *See Coleman v. Thompson*, 501 U.S. at 750. Petitioner asserts that his trial counsel's ineffectiveness is sufficient to overcome the bar, if the Court finds the bar applicable to his claim. (*See* Pet. Memo 257-68).

At trial, the State presented its closing argument to the jury first, and that argument explained the jury instructions and the proof the State believed to support the aggravating circumstances while commenting on the lack of mitigating evidence. (*See* Trial Tr. vol. 24, 1664-67). Burdine, who was primarily responsible for the case in mitigation, then addressed the jury for the defense. (*See id.* at 1672-83). Burdine argued to the jury, among other things, that society's laws are derived from biblical law, and that the jury could exemplify the love of Jesus Christ by sparing Petitioner's life. (*See*, *e.g.*, *id.* at 1674-76). Burdine further argued residual doubt to the jury and asked them to consider whether they would cry out to God to forgive them if Petitioner was executed and later determined to have been innocent. (*See id.* at 1680). The District Attorney gave a rebuttal closing in which he argued that a biblical commandment against murder is different from a commandment not to kill. (*See id.* at 1683-84). The District Attorney argued that biblical law recognized a society's right to defend itself, and that Petitioner posed a danger to the sanctity of life. (*See id.* at 1685-86). He asked the jury to consider how they would feel if Petitioner was sentenced to life imprisonment and they later learned that he had killed again. (*See id.* at 1685-86).

Respondents argue, and the Court agrees, that Mississippi law does not prohibit the State from arguing that a defendant may be violent in the future. *See*, *e.g.*, *Wells v. State*, 698 So.2d

497, 511-12 (Miss. 1997) (holding prosecutor's argument during sentencing in capital murder case that defendant would be danger to those in prison if life in prison was the returned verdict not improper argument); *Irving v. State*, 498 So.2d 305, 310 (implication that defendant would be future danger to society unless sentenced to death not error); *Thompson v. Mississippi*, 914 F.2d 736, 739-40 (5th Cir. 1990)(declining to grant habeas relief based on prosecutor's argument at trial imploring jury to find petitioner guilty to deter similar crimes) Moreover, in *Barclay v. Florida*, 463 U.S. 939 (1983), the Supreme Court found that even if the consideration of a non-statutory aggravating factor violated State law, it did not violate the Constitution. *See id.* at 958. Rather, the important inquiry was held to be whether the jury reached "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Id.* at 958 (citation omitted) (emphasis in original).

The Mississippi Supreme Court has rejected challenges to prosecutorial conduct based on closing arguments that include references to the Bible. *See*, *e.g*., *Berry v. State*, 703 So.2d 269, 281 (Miss. 1997) (biblical references permissible for comment during closing argument). The court has particularly noted the lack of error stemming from such argument where it is in response to defense counsel's own argument. *See Hodges v. State*, 912 So.2d 730, 753 (Miss. 2005) ("Defense counsel made use of Biblical references in his own closing arguments as well, which renders his position highly tenuous. Defense counsel, in the case sub judice, actually put the jury in the role of God. The comments by the State were in rebuttal to defense counsel's own use of biblical references."); *Branch v. State*, 882 So.2d 36, 77-78 (Miss. 2004) (not error for prosecutor to make biblical references in response to defense counsel's remarks in summation).

Prosecutorial argument that does not interject religious reference as the authority or law by which the jury is to make its decision does not run afoul of the United States Constitution.

*See Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998) (rejecting claim that prosecutor's closing mentioning Bible amounted to reversible error); *Romine v. Head*, 253 F.3d 1349, 1368 (11th Cir. 2001) (prosecutor misleads capital sentencing jury when he quotes scripture as higher authority for proposition that death should be mandatory for anyone who murders his parents). In this instance, the prosecutor was clearly rebutting the argument made by defense counsel. The prosecutor's argument was not urging the jury to apply biblical law to justify the death penalty but using familiar biblical references to argue that secular law demanded the punishment. Moreover, the prosecutor urged the jury to apply the law given to them by the trial court. *See Scott v. State*, 878 So.2d 933, 973 (Miss. 2004) (noting court repeatedly held comments to scriptural references proper in closing argument and noting defendant did not address fact that State closed by telling jurors that they were to follow the instructions given by the trial court).

The argument did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). The Court cannot say that the arguments of the prosecution were of constitutional dimension, and therefore, the Court finds Petitioner has not demonstrated that counsel performed ineffectively in failing to object to the comments. Petitioner has failed to demonstrate an entitlement to relief on this issue, and it shall be dismissed.

### VII.  Defense Limited in Impeachment of Witnesses

Petitioner asserts that he was denied the right to meaningfully confront witnesses against him at trial by the restrictions placed upon the questions he intended to pose to prosecution witnesses Paula Hathorn, Frank Parker, and Earl Jordan. (*See* Pet. Memo 156-59). Petitioner maintains that the State courts's adjudication of this claim with regard to Hathorn and Parker is unreasonable based on the record. The Mississippi Supreme Court found the claim barred due to

counsel's failure to proffer what would have been the substance of his cross-examination had the trial judge not sustained the prosecutor's objections, and the "substance of the evidence was not apparent from the context within which the question was asked." *Manning I*, 726 So. 2d at 1177. (Pet. Memo 163). Petitioner maintains this is unreasonable because it is logically inconsistent; if the purpose of the cross was not obvious from the record, the State court could not have alternatively determined whether the trial court's ruling was erroneous. (Pet. Memo 163).

On direct appeal, the court considered whether defense counsel was improperly limited in his attempts to impeach State witnesses. *See Manning I*, 726 So. 2d at 1176-78. The court first considered whether Petitioner was improperly prohibited from attempting to show that Hathorn could have been charged with felonies on her false pretense charges instead of misdemeanors. *Id.* at 1176. Defense counsel asked Hathorn the amount of the bad checks she had written, and the trial court sustained an objection to the question. *See id.* The court noted that once the objection had been sustained, "defense counsel made no attempt to explain to the judge why he sought to elicit the amount of the checks, or what he intended to show with that evidence." *Id.* The court acknowledged that defense counsel could have inquired into whether Hathorn received favorable treatment for her testimony, but it found that "the nature and purpose of the cross-examination is not apparent from the record, nor was it apparent to the trial judge." *Id.* at 1176-77.

Similarly, the court noted that defense counsel failed to make an offer of proof with regard to the substance of the testimony he wished to elicit from Parker. *Id.* at 1177. The court also noted that as defense counsel was attempting to cross-examine Parker on crimes for which he had not been convicted, there was no error in limiting defense counsel's impeachment. *Id.* The court noted that defense counsel sought to impeach Earl Jordan with the fact that he allegedly confessed to a robbery on the Mississippi State University campus for which he was not charged, and that he

committed a crime at the same location as the crimes for which Petitioner was charged.  *Id.*  The

prosecution objected, the objection was sustained, and defense counsel did make an argument

regarding the purpose of his cross-examination.  *Id.* at 1178.  The trial court allowed defense

counsel to question Jordan as to whether he had or had not been charged with crimes in exchange

for his testimony, but he cautioned defense counsel that it would be improper to inquire into the

details of those crimes.  *Id.*  Defense counsel asked Jordan whether he had avoided being charged

with a crime in connection with his agreeing to testify in this case, and Jordan answered no.  *Id.*

The Mississippi Supreme Court found that Petitioner was not restricted in his cross-examination

of Jordan on this issue, and it otherwise noted that Jordan was "thoroughly cross-examined."  *Id.*

The court also noted that Jordan admitted that he was hoping for leniency in exchange for his

testimony.  *Id.*

   The Court determines that Petitioner's claim as to Hathorn and Parker is barred due to the

imposition of an independent and adequate State procedural bar.  *See*, *e.g.*, *Coleman*, 501 U.S. at

735-36.  Petitioner has demonstrated no cause and prejudice for the default, or that a fundamental

miscarriage of justice would occur if this Court failed to consider the claim on its merits.  *See id.*

at 750.  Petitioner's contention that the decision of the State court is logically inconsistent is

without merit; the State court addressed the merits of the issue based upon the purported

arguments in support of the claim on direct appeal.

   The Court determines Petitioner would not be entitled to relief on his claim relating to

Hathorn and Parker in the absence of a procedural bar, and that Petitioner has not demonstrated

an entitlement to relief on this claim as it relates to Jordan.  The Confrontation Clause is generally

satisfied when the defendant has been "permitted to expose the jury to the facts from which

jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the

reliability of the witness." *United States v. Restivo*, 8 F.3d 274, 278 (quoting *Davis*, 415 U.S. at

318). *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) holds that the "improper denial of a

defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is

subject to . . . harmless-error analysis." In habeas proceedings, that is whether the error resulted

in "actual prejudice," which is present if the error "had substantial and injurious effect or

influence in determining the jury's verdict." *Brecht v. Abrhamson*, 507 U.S. 619, 637 (1993); *Fry

v. Pliler*, 551 U.S. 112(2007).

Where the right to expose potential bias or interest is denied, there is resulting prejudice.

"A witness on cross-examination may be interrogated regarding his interest, bias or prejudice in a

case." *Smith v. State*, 733 So.2d 793, 801 (Miss. 1999). The issue is not whether counsel was

limited as to the specific questions he wished to pose, but rather, whether counsel was denied the

ability to set forth the potential bias of the witness. Mississippi Rule of Evidence 616 states that

"[f]or the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest

of the witness for or against any party to the case is admissible." This rule, however, is

interpreted in light of all evidentiary rules, which requires a finding that the evidence is relevant

to the facts of the case. *See Tills v. State*, 661 So.2d 1139, 1142 (Miss. 1995). The evidentiary

rules are not displaced by the Sixth Amendment right to confrontation. *Van Arsdall*, 475 U.S. at

678-79.

Defense counsel was given the opportunity to expose Hathorn's potential bias. The jury

heard from Paula Hathorn that she had gone to the penitentiary, and that she had been convicted

of six more false pretenses charges after her release. (*See* Trial Tr. vol. 17, 691). Hathorn

admitted that she had not paid restitution, and the trial court sustained the prosecution's objection

when defense counsel asked if she had been writing more bad checks since she was convicted on

the misdemeanor offenses. (*Id.* at 693). Defense counsel moved on to Hathorn's statement to police, and then he later asked the amount of restitution on the bad checks, which was objected to and sustained by the trial court. (*See Id.* at 697). The reasoning behind defense counsel's questions concerning the amount of restitution is not obvious from reading the record, and it was not connected to the earlier questioning concerning the convictions. Nonetheless, the jury heard Sheriff Bryan testify that Hathorn had written more bad checks while cooperating with the Sheriff's Department, and he denied interceding on her behalf with regard to any of those checks being prosecuted as a felony. (*See id.* at 888).

Defense counsel asked Parker, after questioning him extensively regarding his Texas charges, whether he had been charged with any crimes since he had been in jail. (*See* Trial Tr. vol. 20, 1130). An objection to that statement was sustained. Even if the objection should not have been sustained, defense counsel was able to expose facts to impeach Parker's credibility by exploring his criminal history. Counsel obtained an admission that Parker's charges were dropped sometime after he gave the statements to Sheriff Bryan that incriminated Petitioner.

Defense counsel had the opportunity to question Jordan about the uncharged robbery, and the jury was exposed to his motive for testifying. The court stated that counsel should limit questioning "only to whether or not he was charged with other events or not charged with other events because of his cooperation or because of a statement that he might have given to the sheriff.." (*See* Trial Tr. vol. 20, 1152-54). Counsel rephrased his question, and Jordan denied that the State had agreed not to prosecute him on any other charges in exchange for his testimony. (*See id.* at 1154). Trial counsel did not pursue the matter further. (*See id.*). The Court notes that the jury heard that Jordan was hoping for leniency on his pending charge in exchange for the testimony.

With each of these witnesses, defense counsel was given an opportunity to explore bias sufficient to expose the jury to facts to assess their credibility.  Petitioner suffered no substantial violation of rights by the restrictions placed upon cross-examination of these witnesses. Petitioner has not demonstrated that he is entitled to relief on this claim, and it shall be dismissed.

## VIII.  Other Actions[19]

Petitioner asserts various trial errors that violate the principle of fundamental fairness. The Court notes that errors of State law are not cognizable in federal habeas cases unless the errors have so "infused the trial with unfairness as to deny due process of law."  *See Lisenba v. California*, 314 U.S. 219, 228 (1941) (due process is denied when the court fails "to observe that fundamental fairness essential to the very concept of justice); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").  A review of the record reveals that Petitioner was not denied a fair trial as a result of the trial court's actions, and that any error that did occur is therefore not cognizable in this Court, for the reasons that follow.

### A.  Sheriff Bryan's Opinion

Petitioner maintains that Sheriff Bryan was allowed to give a speculative opinion as to how the murders transpired, despite the fact that there was no evidence to support his theory of

---

[19]  In his petition, Petitioner argued that the State used the threat of perjury charges against Keith Higgins, a defense witness, to intimidate him.  (Pet. 47).  Petitioner failed to brief this issue, and the Court assumes that it was his intention to abandon the claim.  The Court otherwise notes that the prosecutor informed the trial court that Higgins would be charged with perjury during a bench conference, and that the record demonstrates that Higgins admitted on the witness stand that his prior statement to police officers was false.  (*See* Trial Tr. vol. 21, 1247-49).

kidnapping, or the fact that the burglar of Wise's car was the murderer.  (Pet. Memo 168-170). Petitioner maintains that there was no evidence presented at trial that (1) the victims were kidnapped from the fraternity parking lot; (2) Petitioner was connected to Miller's car; (3) the person who burglarized Wise's car kidnapped the victims; and (4) explained why Miller's car was found parked at the Old Mayhew Road apartments.  (Pet. Memo 168).  Petitioner maintains that in its decision on direct appeal, the Mississippi Supreme Court did not address the fact that this testimony is not admissible under the Mississippi Rules of Evidence.  (Pet. Memo 171).

Sheriff Dolph Bryan's testimony spans some 157 pages of the trial transcript.  (*See*, *e.g.*, Trial Tr. vol. 18, 782 through Trial Tr. vol. 19, 939).  On direct examination, Sheriff Bryan described to the jury the crime scene on Pat Station Road, and he described how the investigation of the case developed.  On cross-examination, Bryan was asked what evidence existed at the fraternity house to indicate that the students had been kidnapped. (*See* Trial Tr. vol. 18, 840). When Bryan responded that no physical evidence was present, defense counsel asked how the theory of kidnapping and burglary arose.  (*See id.*).  Bryan's theory was that the victims interrupted Petitioner burglarizing Wise's car.  (*See id.* at 857).  Bryan explained that his theory arose from investigating the facts of the case, and defense counsel asked several questions to attempt to establish that the testimony given was merely a theory.  (*See id.* at 849-53, 856-58). Bryan stated he based his opinion on the fact that the token, jacket, and CD player had been taken out of the burglarized car, and that the dropped token at the crime scene indicated that the burglar was responsible for the murders.  (*See id.* at 857-58).  Defense counsel was permitted to ask, over the prosecutor's objection, as to the Sheriff's opinion of when the victims were kidnapped from the parking lot.  (*See id.* at 859).  Later questioning based solely on Sheriff Bryan's opinion was objected to by the prosecution and sustained by the trial court.  (*See id.* at 859-61).

On re-direct examination, the prosecution asked Sheriff Bryan to detail his theory for the jury. (*See* Trial Tr. vol. 19, 915). Defense counsel objected to the testimony as being without the proper foundation, and the trial court found that defense counsel had opened the door to the testimony. (*See id.*). The trial court stated it would not have allowed the testimony had defense counsel not initiated the process on cross-examination, and that the prosecution should be allowed an opportunity to re-direct on the issue. (*See id.*). Sheriff Bryan was then allowed to give his opinion as to the matters inquired about by defense counsel. (*See id.* at 915-18).

On direct appeal, the Mississippi Supreme Court cited at length to the trial transcript and found that the trial court limited re-direct examination to those matters brought out by the defense on cross-examination of Sheriff Bryan. *Manning I*, 726 So. 2d at 1173-75. The court determined that no reversible error was committed by the trial court. *See id.* at 1175.

Rule 701 of the Mississippi Rules of Evidence allows a lay witness to provide testimony "limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See* Miss. R. Evid. 701. The Fifth Circuit has held that Rule 701 of the Federal Rules of Evidence requires that a non-expert witness giving an opinion or inference must give such opinion or inference (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue. *See United States v. Carlock*, 806 F.2d 535, 551 (5th Cir. 1986); *Washington v. Department of Transp.*, 8 F.3d 296 (5th Cir. 1993) (speculative opinion by lay witness generally inadmissible); *see also Hall v. State*, 691 So.2d 415, 420 n.3 (Miss. 1997) (noting that the Mississippi Rules of Evidence generally mirror the Federal Rules).

In this case, Sheriff Bryan inferred how the crime occurred based upon the known facts. The testimony offered by Sheriff Bryan came about as a direct result of defense counsel's questioning, and based upon a reading of the record, there is no reasonable basis to believe the jury could not distinguish between the factual evidence and Sheriff Bryan's theories, as he clearly delineated them as his opinion. Sheriff Bryan was present at the crime scene and had first-hand knowledge of the facts from which he drew reasonable inferences. Petitioner has not carried his burden under the AEDPA with regard to this claim, and it shall be dismissed.

## B. *Disparagement of Defense Counsel*

Petitioner maintains that the trial court rebuked defense counsel for the questions posed to Sheriff Bryan during his cross-examination, and that no curative instruction was given. (Pet. Memo 172-74). During defense counsel's cross-examination of Sheriff Bryan, the sheriff was asked to identify a document, which happened to be a list of possible murder suspects compiled by someone in the Sheriff's office. (*See* Trial Tr. vol. 18, 840-41). Defense counsel's cross-examination included a series of questions intended to attempt to demonstrate that Sheriff Bryan had only targeted young black men as suspects. (*See id.* at 841-46). Sheriff Bryan, in response to defense counsel's question as to what evidence pointed to a black perpetrator, stated that the only known car burglars on the Mississippi State University campus at that time were black men. (*See id.* at 842). Defense counsel asked Sheriff Bryan to identify a statement in the sheriff's notes that indicated that law enforcement officials were looking for "car burglars or just bad guys in general." (*See id.* at 844). Defense counsel began to question Sheriff Bryan about a white suspect in a rape charge, and the prosecution objected on the grounds of relevance. (*See id.* at 844-45). The trial judge allowed the question, provided defense counsel could connect it with something relevant in his line of questioning. (*See id.* at 845). Defense counsel asked whether

there were no bad white men in Starkville, and when he asked to approach the witness, the trial court first required counsel to demonstrate how the line of questioning was relevant to this case. (*See* id.). Defense counsel stated:

> BY MR. WILLIAMSON:  He said he was looking for also bad guys in general, yet his list was compiled only of - - of black individuals.
> BY THE COURT: And you consider that relevant in this case?
> BY MR. WILLIAMSON: Yes, sir, I do.
> BY THE COURT:  You may proceed.

(Trial Tr. vol. 18, 846).  Defense counsel asked for a recess before another question was posed to Bryan.  (*Id.* at 846).  He did not return to the previous line of questioning when court resumed. (*See id.* at 847-49).

On direct appeal, the Mississippi Supreme Court found this claim barred for trial counsel's failure to lodge an objection to the comment or request a mistrial.  *See Manning I*, 726 So. 2d at 1175.  The court otherwise determined that the issue was without merit, as the trial judge did not make a remark that amounted to a comment on the evidence.  *Id.*  Petitioner argues that the court failed to consider the effect of the comments as a whole, which undermines the conclusion that the trial judge did not make a comment on the evidence in violation of Mississippi Code Annotated § 99-17-35.  (Pet. Memo 174).  Petitioner argues that the court's conclusion was unreasonable in light of the record evidence.

The privilege of a trial judge to intervene during the course of a criminal jury trial is "limited to the point where the trial judge is under a strict duty to direct the jury clearly that they are the sole judges of the facts and are not bound by the judge's questions or comments."  *Barlow v. State*, 272 So.2d 639, 640 (Miss. 1973) (trial judge responsible for order and conduct of trial). The jury in Petitioner's case was instructed that "[y]ou should not infer from any rulings by the Court on these motions or objections to the evidence that the Court has any opinion on the merits

of this case favoring one side o[r] another." (*See* Trial Tr. vol. 4, 455-457, Instruction C.01).

The Court does not find that the trial court's question amounted to a comment on the evidence. The trial judge questioned defense counsel in order to rule on objections by the prosecution. Petitioner has not demonstrated that he was deprived of a fair trial or that the decision of the Mississippi Supreme Court was unreasonable. This claim shall be dismissed.

*C. Refusal of Circumstantial Evidence Instruction/Language*

Petitioner argues the trial court erred in refusing to grant the defense a circumstantial evidence instruction and by eliminating circumstantial evidence language from all of the other instructions, as the only direct evidence in his case came from Jordan's false testimony as to Petitioner's alleged confession. (Pet. 47; Pet. Memo 177). On direct appeal, the Mississippi Supreme Court determined that Earl Jordan's testimony constituted direct evidence and removed the case from the category of being entirely circumstantial; therefore, a circumstantial evidence instruction was not required. *See Manning I*, 726 So.2d at 1194.

Under Mississippi law at the time of Petitioner's trial, a circumstantial evidence instruction was required only where no direct evidence linked the defendant to the crime. *See Gray v. State*, 549 So.2d 1316, 1324 (Miss. 1989); *Ladner v. State*, 584 So.2d 743, 750 (Miss. 1991). At trial, the court refused defense counsel's circumstantial evidence instruction on the basis of Mississippi case law holding that any direct evidence removed the case from the circumstantial realm. Though the court noted that it had filed both a circumstantial evidence and direct evidence instruction out of an abundance of caution, Jordan's testimony concerning the confession constituted direct evidence and removed the circumstantial instruction issue. (*See* Trial Tr. vol. 23, 1507-09).

In *Holland v. United States*, 348 U.S. 121, 139-40 (1954), the Supreme Court held that

while some lower courts' decisions support the giving of a circumstantial evidence instruction where the evidence against the defendant is circumstantial, "the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect." 348 U.S. at 139-40 (citations omitted). Challenged jury instructions "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). In this case, the jury was properly instructed about the presumption of innocence and reasonable doubt. (*See* Trial Tr. vol. 4, 459, Instruction C.12(a) (presumption of innocence) and Trial Tr. vol. 4, 478, Instruction DGP-6 (reasonable doubt)). The court also notes that a cautionary instruction was given as to Jordan's testimony. (*See* Trial Tr. vol. 4, 479, Instruction DGP-7A instructing the jury that Jordan's "testimony is to be considered and weighed with great care and caution. In making this determination you may consider this witness' bias or interest. You may give it such weight and credit as you deem it is entitled."). Moreover, Petitioner has not demonstrated that he was actually prejudiced as a result of being denied a circumstantial evidence instruction. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that federal habeas relief lies for trial error only if the error resulted in actual prejudice to Petitioner). Petitioner has failed to demonstrate an entitlement to relief on this claim, and it shall be dismissed.

*D. Evidence Admitted*

The Mississippi Supreme Court held each of the following claims barred on direct appeal for Petitioner's failure to contemporaneously object to the evidence and/or testimony. *See Manning I*, 726 So.2d at 1180-82. Petitioner has failed to demonstrate that the Mississippi Supreme Court does not strictly or regularly apply its contemporaneous objection rule to similar claims. *See Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (Petitioner arguing procedural

bar not strictly or regularly applied bears burden of demonstrating State fails to apply bar to similar claims); *Smith v. Black*, 970 F.2d 1383, 1387 (5th Cir. 1992)(finding that Mississippi regularly and consistently applies its contemporaneous objection rule).  Petitioner has not demonstrated cause and prejudice sufficient to overcome the bar, or that a fundamental miscarriage of justice would result if the claims were not considered.  The Court otherwise determines Petitioner has not demonstrated that the Mississippi Supreme Court's alternate resolution of these claims would entitle him to relief, and the claims shall be dismissed, for the reasons that follow.

## 1.  Hair Fragments

Petitioner maintains that the introduction of expert hair comparison testimony is widely scrutinized, and that it was error for the trial court to allow an F.B.I. technician to offer such expert testimony at his trial. (*See* Pet. Memo 180).  Chester Blythe, a special agent with the FBI who was assigned to the microscopic analysis division and accepted as an expert by the trial court, testified at trial concerning the vacuum sweepings taken from Tiffany Miller's car.  (*See*, *e.g.*, Trial Tr. vol. 20, 1043-44).  Blythe testified that an examination of the hair fragments taken from the vehicle led him to a determination that the hairs "exhibited characteristics associated with the black race."  (*Id.* at 1047).  Defense counsel objected that the testimony was more prejudicial than probative as it related to Petitioner, and the trial court overruled the objection. (*Id.* at 1048).  Blythe went on to testify that as the hairs were only fragments, he could not compare the hairs to a known sample, and that he was limited to a determination as to the racial characteristics of the hair.  (*Id.* at 1048-49).  Defense counsel declined to cross-examine Blythe but renewed the objection, which was again overruled.  (*Id.* at 1049).

On direct appeal, the Supreme Court stated Petitioner was procedurally barred from

review of this claim because he asserted a new ground for the objection on direct appeal. Under Mississippi law, an objection on a specific ground waives all other potential grounds for objection. *Id.* at 1180. The court otherwise found that the trial judge did not abuse his discretion in admitting the testimony, as it was not more prejudicial than probative, and the expert did not testify that the hair matched Petitioner. *Id.* at 1181. The court noted that expert testimony concerning hair analysis had been found useful by the court. *See id.* The court found that the testimony did not invade the jury's province, and the claim was both procedurally barred and meritless. *Id.*

Evidentiary rules are governed by state law, and this Court may grant relief on an evidentiary error only where the trial was rendered fundamentally unfair by the introduction of the evidence. *See, e.g., Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007). The Court notes that "hair and fiber comparisons have long been recognized in Mississippi courts." *McGowen v. State*, 859 So. 2d 320, 334-35 (Miss. 2003); *Duplantis v. State*, 708 So.2d 1327, 1338-39 (Miss. 1998); *Slyter v. State*, 149 So. 2d 489, 492 (1963). The evidence at issue here proved very little, and it did not purport to identify Petitioner as the person to whom the hair belonged. Petitioner has not demonstrated that the decision of the Mississippi Supreme Court was unreasonable, and this claim shall be dismissed.

## 2. Ballistics Evidence

Petitioner argues that John Lewoczko, a ballistics technician with the F.B.I., was allowed to testify to a certainty that the projectiles recovered from the murder scene and those removed from the tree at Mrs. Bishop's home were fired from the same weapon. (Pet. Memo 181-82). Petitioner argues that while such an expert may testify as to a reasonable degree of certainty, it is

error to testify to an exact statistical match. (Pet. Memo 182).

John Lewoczko, a firearms examiner with the FBI, was called by the prosecution to testify as an expert witness without objection. (Trial Tr. vol. 20, 1074-76). He testified that he was asked to conduct a comparison of the four projectiles removed from the tree in Petitioner's yard with the projectiles recovered from the victims' bodies and crime scene. (*Id.* at 1076-77). He determined that all of the bullets were fired from the same weapon, "[t]o the exclusion of every other firearm in the world." (*Id.* at 1079). Lewoczko stated that the seven recovered bullets were "fired from the exact same barrel," and he compared the process of matching bullets to gun barrels to matching a person with fingerprints. (*See id.* at 1080).

On direct appeal, the supreme court stated there was no speculation on the part of the expert, and it found the claim procedurally barred for Petitioner's failure to contemporaneously object to the testimony. *See Manning I*, 716 So. 2d at 1181.[20] The court otherwise determined that no error resulted from the testimony, as the expert was certain that the projectiles from the victims and those from the tree came from the same gun. *See id.*

Lewoczko was accepted by the trial court as an expert in the field of ballistics without objection from defense counsel. (*See id.* at 1076). Petitioner does not argue that the evidence was inadmissible, that the examiner was unqualified, or that the methodology was unreliable. He only argues that the examiner should have been relegated to testifying as to probabilities. The conclusion of the expert is an issue of weight and not admissibility, and this matter of State law is not congnizable on federal habeas. *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077

---

[20] Defense counsel objected only to the prosecutor leading the witness. (*See* Trial Tr. vol. 20, 1079-80).

(5th Cir. 1996)("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."). The Court notes that the ballistics expert did not attempt to match a casing to a gun, but rather, testified as to his examination of the casings themselves. This claim is barred, and Petitioner has not otherwise demonstrated that his trial was rendered unfair by the admission of this testimony. This claim shall be dismissed.

3.  Right of Confrontation

Finally, Petitioner maintains that Sheriff Bryan was allowed to testify to ballistics results from tests performed by the FBI, even though the technician performing the tests was available to testify. (Pet. Memo 184). The Mississippi Supreme Court found this claim procedurally barred for trial counsel's failure to contemporaneously object, and it otherwise found Bryan's statement inadmissable hearsay. *See Manning I*, 726 So.2d at 1182. Nonetheless, the court found that unobjected-to hearsay, once received and presented, becomes competent evidence. *Id.* The court also noted that the testimony was not evidence against Petitioner but "was used to rebut the confusion left by defense counsel concerning an irrelevant piece of evidence." *Id.* at 1182.

Defense counsel called Billy Jefferson to testify at trial. Jefferson was a resident of Brooksville Gardens who was in possession of a .380 handgun that was eventually taken by the Sheriff's Department. (*See* Trial Tr. vol. 1419). Jefferson testified that he received the gun on December 5, 1992, and that it passed through several people's hands before finally being returned to him approximately a week later. (*See id.* at 1419-1421). When Williamson finished his questioning of Jefferson, the trial court asked Williamson the relevancy of the prior testimony. Williamson stated its purpose was to show that guns passed back and forth on the street. (*See id.*

at 1421-22).  On cross-examination, the prosecutor attempted to question Jefferson as to whether tests were performed that showed the gun was not used in the murder.  (*Id.* at 1423).  The trial court sustained defense counsel's objection to the question but allowed Jefferson to answer when the prosecutor asked whether the gun was used to kill anyone insofar as Jefferson had personal knowledge.  (*Id.* at 1423).  Jefferson answered no.  (*Id.*).

The State called Dolph Bryan in rebuttal and asked him to explain how he became familiar with the .380 firearm that belonged to Jefferson.  (*See* Trial Tr. vol. 23, 1483).  Sheriff Bryan had previously testified that he and his deputies had attempted to round up all of the .380s sold since November 1, 1992, up until the time of the murders, and that this particular firearm was one of the ones sent to the F.B.I. crime lab for a comparison testing to the projectiles that killed the students.  *(See*, *e.g.*, Trial Tr. vol.18, 831; Trial Tr. vol. 23, 1483).  The prosecution asked if the gun recovered from Jefferson was a match, and Sheriff Bryan stated that it was not.  (*See id.*).

Pursuant to Mississippi law, hearsay evidence becomes admissible evidence when no objection is lodged to it.  *See*, *e.g.*, *Veal v. State*, 585 So.2d 693, 697 (Miss. 1991); *Citizens Bank of Hattiesburg v. Miller*, 11 So.2d 457, 459 (Miss. 1943).  The Fifth Circuit has likewise held that hearsay evidence that is admitted without objection "is to be considered and given its natural probative effect as if it were in law admissible."  *United States v. Gresham*, 585 F.2d 103, 106 (5th Cir. 1978) (citations omitted).  Moreover, the complained of evidence was already before the jury for its consideration.  Jefferson himself testified that the .380 in his possession was taken by the Sheriff's Department for testing, but that it was not a match to the weapon used in the murders.  (*See* Trial Tr. vol. 22, 1419, 1423).  Sheriff Bryan's testimony, during the prosecution's case-in-chief, was that law enforcement officials sent every .380 they found to the FBI for testing, but that

the murder weapon was not recovered.  (*See* Trial Tr. vol. 18, 831).  The prosecution merely elicited a conclusion already before the jury.  Petitioner has not demonstrated an entitlement to relief on this claim, and it shall be dismissed.

## IX.  Aggravating Circumstances

At trial, two aggravating circumstances were presented in regard to the murder of both Tiffany and Jon.  The jury was asked to consider whether the murders were committed (1) "while the Defendant was engaged in the commission of the crime of robbery," and (2) "while the Defendant was engaged in the commission of the crime of kidnapping."  (*See* SCP vol. 4, 501, 505).  A third aggravating factor was submitted as to Jon, and the jury was to determine whether that murder was "especially heinous, atrocious, and cruel."  (*See* SCP vol. 4, 501).

Petitioner argues that "kidnapping" was improperly defined in both counts, as the court omitted the element of asportation from the instructions.  (Pet. Memo 195).  Petitioner also argues that no rational trier of fact could have found that Earl Jordan's testimony established kidnapping beyond a reasonable doubt.[21]  Respondents maintain that Petitioner did not present a claim to the State court that the evidence was insufficient to support the kidnapping aggravator, and that the claim is barred from federal review.  (R. Memo 186-87). Petitioner has argued that his claim regarding the sufficiency of the evidence is not barred, as the Mississippi Supreme Court was required to review the sufficiency of the evidence supporting the finding of the aggravating circumstances pursuant to Miss. Code Ann. § 99-19-105(3)(b).

---

[21]  In order for the aggravating circumstance of kidanpping to apply, the state must prove beyond a reasonable doubt that the defendant "forcibly seized and confined" a person or "inveigled or kidnapped any other person with intent to cause such person to be secretly confined or imprisoned against his or her will." Miss Code Ann. § 97-5-53.

The Court finds Petitioner's sufficiency of the evidence claim is barred for his failure to present it to the State court for review. *See*, *e.g.*, *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001) (petitioner who fails to raise claim in direct appeal or state petition is procedurally barred in federal habeas for failure to exhaust if state law would prohibit successive state petition raising claim). The Court finds Petitioner has not demonstrated the requisite cause and prejudice, or that a fundamental miscarriage of justice would result from the Court's failure to consider his claim. Moreover, Petitioner has cited the Court to no authority stating that the court must explicitly state in its opinions that it has complied with the statute. *See*, *e.g.*, *Blue v. State*, 674 So.2d 1184, 1216 (Miss. 1996) (finding claim procedurally barred despite defendant's argument that Court has statutory obligation to consider error).

Moreover, in a sufficiency of the evidence claim, the issue is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (holding that the *Jackson* standard is the appropriate review in determining whether state's application of aggravating factor was so erroneous as to raise due process violation). Petitioner's argument is essentially that Jordan's testimony lacked any credibility, rendering the evidence factually insufficient. The Court notes that the jury was presented with evidence from law enforcement officials, namely, Sheriff Bryan, that supported a conclusion that a kidnapping occurred. Additionally, the jury had before it sufficient evidence to assess Jordan's credibility, and this Court is prohibited from second-guessing that judgment. *See United States v. Ramos-Garcia*, 184 F.3d 463, 465 (5th Cir. 1999); *United States v. Martinez*, 975 F.2d 159, 161 (5th Cir. 1992); *see also Schlup v. Delo*, 513

U.S. 298, 330 (1995) (noting that "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review").

Petitioner's claim that the instruction omitted the element of asportation was rejected by the Mississippi Supreme Court, which found that the law does not require the element of asportation, or transport, in the definition of kidapping. *See Manning I*, 726 So.2d at 1196. The definition of a crime is a matter of State law that this Court does not review. *See Patterson v. New York*, 432 U.S. 197, 210 (1977). Moreover, Mississippi law does not require that the victim be transported in order to support a charge of kidnapping, "so long as the indictment charges the victim was imprisoned against his will." *See Holly v. State*, 671 So.2d 32, 42-43 (Miss. 1996)(citing *Carr v. State*, 655 So.2d 824, 849 (Miss. 1995)). Petitioner is not entitled to relief on this issue.

Next, Petitioner maintains that there was no evidence presented that Jon's murder was "unnecessarily torturous" or "conscienceless or pitiless" because Jon was rendered unconscious after he was shot. (Pet. Memo 199). Petitioner maintains that a conclusion that Jon experienced mental torture during the drive to the road where he and Miller were shot requires a finding that Jordan's testimony was correct and presumes that Jon expected to be murdered. (Pet. Memo 199). Petitioner asserts that these presumptions are insufficient to establish the aggravating circumstance beyond a reasonable doubt. (Pet. Memo 199).

At trial, the jury was instructed that "the term 'especially heinous, atrocious and cruel' as used in these instructions is defined as being a conscienceless and pitiless crime which is unnecessarily torturous to the victim." (SCP vol. 4, 508). The Mississippi Supreme Court noted Petitioner's argument that this aggravator was unsupported because Jon was "rendered

unconscious immediately by a bullet that destroyed eighty percent of his brain." *See Manning I*, 726 So.2d at 1195. However, the court noted that the jury could properly consider the mental torture the victim probably experienced to determine whether the aggravator was warranted. *Id.* at 1196. The court found that the drive to the deserted road included mental torture and aggravation, and the fact that Jon was run over while still alive indicated a conscienceless and pitiless crime. *See id.*

Federal habeas review of the finding of an aggravating circumstance generally is whether the aggravator itself is constitutionally defined. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). A state court finding that a murder is "especially heinous" is arbitrary and capricious only if no reasonable sentencer could have found its existence. *Lewis*, 497 U.S. at 783. Otherwise, the review requires a determination of "whether, after viewing the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Fear of impending death and mental torture have each been found sufficient to justify the imposition of the "especially heinous" aggravator. *See Pinkney v. State*, 538 So.2d 329, 357 (Miss. 1988) (killing where defendant inflicted physical or mental pain before death sufficient to support aggravator); *Evans v. State*, 422 So.2d 737, 743 (Miss. 1982) (jury could properly consider mental torture in order to determine if aggravator met); *see also Underwood v. State*, 708 So.2d 18, 40 (Miss. 1998) ("Our case law is replete with cases where the length of time that it took the victim to die was not considered to be dispositive on appeal.").

The jury was presented with evidence from which a reasonable sentencer could have concluded the victims were kidanpped at gunpoint and driven to a remote location before being

killed, and the finding of the especially heinous aggravating circumstance on these facts is not so arbitrary and capricious that the Mississippi Supreme Court's finding of this circumstance supported may be deemed unreasonable.[22]  Moreover, Petitioner has not demonstrated that no rational juror could have found support for this aggravator on these facts, and Petitioner is not entitled to relief on this claim.

Finally, Petitioner argues that the robbery aggravating circumstance is invalid, as a theft committed after the death of a victim is not a robbery.  He maintains that the evidence in this case is insufficient to establish beyond a reasonable doubt that a robbery occurred.  (Pet. Memo 201). On direct appeal, the Mississippi Supreme Court rejected the claim that the evidence was insufficient to support a finding that the murders occurred while Petitioner was engaged in the commission of a robbery.  *See Manning I*, 726 So.2d at 1196.  The court noted that Jon was found missing his class ring and watch, while Tiffany was robbed of her watch, ring, necklace, and her car.  *Id.*  Petitioner maintains that there is no evidence that the victims had the items of jewelry on their persons the night they were killed, and that there is no evidence that the killer accosted them for the purpose of taking their possessions.  (Pet. Memo 201).

At trial, the jury was instructed that robbery "is defined as unlawfully, wilfully, and feloniously taking, stealing, and carrying away some property from the presence of another person; either by violence to the person or by the exhibition of a deadly weapon."  (*See* SCP vol. 4, 465).   The jury was instructed to find Petitioner guilty of capital murder if it found that he committed capital murder "while engaged in the commission of the crime of Robbery."  (*See* SCP

---

[22] The Court notes that in *Lewis*, the defendant strangled the victim after she was unconscious.  *See Lewis*, 497 U.S. at 766-67.

vol. 4, 466, 467). The Mississippi Supreme Court has held that a killing that occurs "'while engaged in the commission of' one of the enumerated felonies includes the actions of the defendant leading up to the felony, the attempted felony, and the flight from the scene of the felony. The fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge." *West v. State*, 553 So.2d 8, 13 (Miss. 1989) (citations omitted).

Evidence was presented at trial that Jon Steckler wore his class ring and watch "all the time." (*See*, *e.g.*, Trial Tr. vol. 17, 609, 643). Tiffany Miller's mother identified the ring in evidence as Tiffany's ring that she habitually wore, and she also testified that Tiffany owned and wore a Seiko watch. (*See id.* at 665-66, 667). Tiffany Miller's vehicle was taken from the crime scene and later found with blood and hair on and under the car. (*See*, *e.g.*, Trial Tr. vol. 18, 790). The Sheriff testified that he knew from the beginning of the investigation that law enforcement officials were looking for Jon's class ring, his Pulsar watch, Tiffany Miller's Seiko watch, her drop necklace, and another ring. (*See* Trial Tr. vol. 18, 816). There was testimony that Petitioner attempted to sell a ring and a watch the day the students were murdered. (*See*, *e.g.*, Trial Tr. vol. 19, 922; Trial Tr. vol. 20, 1053-56, 1067). An analysis of the blood underneath Tiffany's car yielded that the blood was the same type as Jon's blood type. (*See*, *e.g.*, Trial Tr. vol. 19, 1022). The Court cannot say that it was unreasonable for the State courts to determine that this aggravator was supported by the evidence, and Petitioner is not entitled to relief on this issue.

## X. Sentencing Instruction on Mitigating Circumstances

Petitioner argues that the trial court erred in rejecting three instructions offered by the defense concerning mitigating circumstances. Rejected instruction DSP-1 would have allowed

the jury to consider specific categories of mitigating circumstances and would have instructed the jury that Petitioner had no significant prior criminal history. (Pet. Memo 202-03, *see also* DSP-1, SCP vol. 4, 528-29). During the jury instruction conference, the trial court refused the instruction based upon the State's objection that there had been no proof as to the statutory mitigating circumstances. (*See* Trial Tr. vol. 24, 1658). The second rejected instruction, DSP-4, would have instructed the jury it could return a verdict of life imprisonment even in the absence of a finding of mitigating circumstances. (*See* DSP-4, SCP vol. 4, 530). During the jury instruction conference, the prosecutor objected to the instruction as being contrary to the law. (Trial Tr. vol. 24, 1659). Defense counsel made no argument in support of the instruction, and it was refused. (*Id.*). Petitioner maintains that the third rejected instruction, DSP-7, would have again instructed the jury on its ability to render a verdict of life and allowed the jury to consider mercy as a factor. (*See* SCP vol. 4, 532). During the jury instruction conference, the proffered instruction was refused as a mercy instruction. (Trial Tr. vol. 24, 1661).

On direct appeal, the Mississippi Supreme Court rejected Petitioner's claim. The court found no error in refusing to submit the instruction regarding criminal history because Petitioner was adjudicated an habitual offender at the time of trial. *See Manning I*, 726 So. 2d at 1197. The court also found that a "catch-all" mitigating circumstance instruction was given, such that it was not necessary to give an instruction regarding non-statutory mitigating circumstances not supported by the record. *Id.* The court found that Petitioner did not request "anything other than the statutory mitigating circumstances. Additionally, there is no instruction in the record submitted by the defense that lists any non-statutory mitigating circumstances. As such, this claim is procedurally barred." *Id.* The court found Petitioner's "life option" instructions to be

mercy instructions, to which a defendant is not entitled. *Id.* at 1197-98. The court otherwise

noted that the jury was informed of its right to return a verdict of life by the grant of Instruction

DSP-2. *Id.* at 1198.

Generally, errors in a State court's jury instructions do not form the basis for federal

habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). The question for purposes of

federal habeas review is whether the failure to give the proffered instruction "by itself so infected

the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S.

141, 147 (1973). At the sentencing phase of a capital murder case, a defendant must be permitted

to introduce mitigating evidence, the nature of which may include "any aspect of a defendant's

character or record and any of the circumstances of the offense that the defendant proffers as a

basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). However, a

court is not obligated to give an instruction where the proof of the mitigating circumstance lacks

evidentiary support. *See Delo v. Lashley*, 507 U.S. 272, 277 (1993). As there was no evidence

presented regarding the specific non-statutory mitigating circumstances offered by Instruction

DSP-1, Petitioner has not demonstrated a violation of his constitutional rights by the court's

failure to allow it. Even if the refusal to grant the instruction could be considered error, the

United States Supreme Court has long-approved of "catch-all" instructions of the type given in

this case to cure any deficiency in jury instructions. *See Brown v. Payton*, 544 U.S. 133 (2005);

*Boyde v. California*, 494 U.S. 370 (1990).

Petitioner claims that he should have been allowed to have the jury instructed that they

could return a verdict of life even in the absence of a finding of mitigating circumstances. (Pet.

Memo 207-08). The Mississippi Supreme Court has repeatedly characterized language such as

that contained in Instruction DSP-7 as "mercy" language.  *See, e.g.*, *Thorson v. State*, 895 So.2d 85 (Miss. 2004) (instruction providing that "a decision to afford an individual defendant mercy and thereby sentence him to life imprisonment without possibility of parole or to life imprisonment with the possibility of parole would not violate the laws of this State or your oath as jurors.  Even if you find there are no mitigating circumstances in this case which are worthy of your consideration, then, nevertheless, you may still sentence defendant to life imprisonment. . ."); *Mack v. State*, 650 So.2d 1289 (Miss. 1994) (same); *Foster v. State*, 639 So.2d 1263 (Miss. 1994) (same).

In *Saffle v. Parks*, 494 U.S. 484 (1990), the Court drew the "distinction between allowing the jury to consider mitigating evidence and guiding their consideration.  It is no doubt constitutionally permissible, if not constitutionally required, for the State to insist that 'the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'"  *Id.* at 492-93 (citing *California v. Brown*, 479 U.S. 538, 545 (1987) (internal citations omitted).  Petitioner was not entitled to a "mercy instruction."  While a State cannot prevent the consideration of mitigating evidence, "it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice."  *Id.* at 493.  The Constitution does not require a particular structuring of the way in which juries consider mitigating evidence.  *See Buchanan v. Angelone*, 522 U.S. 269, 269 (1998).  The relevant constitutional principle is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of relevant evidence."  *Id.* (citing *Boyde v. California*, 494 U.S. 370, 380 (1990).

The jury was instructed by "catchall" language to "objectively consider the detailed

circumstances of the crime for which the Defendant was convicted, as well as the Defendant himself." (*See* SCP vol. 4, 500, 504). The jury was charged with considering Petitioner's age at the time the crime was committed, and "any other circumstances which you deem mitigating" in arriving at a sentence. (*See* SCP vol. 4, 501, 505). The jury was not precluded from considering relevant evidence offered by Petitioner to support a finding that he deserved a sentence less than death. Moreover, the jury was instructed by DSP-2, in part, that even if the prosecution proved the existence of an aggravating circumstance, the jury could "find it insufficient to warrant death." (*See* SCP vol. 4, 522). As the jury was adequately instructed and its consideration of mitigating circumstances not precluded, Petitioner has not demonstrated that he is entitled to relief on this claim, and it shall be dismissed.

## XI.  Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). A federal habeas petitioner's claim that he was denied the effective assistance of counsel at trial is measured by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, Petitioner must establish that (1) his trial counsel's performance was so deficient that it cannot be said that he was functioning as "counsel" within the meaning of the Sixth Amendment, and (2) the deficient performance prejudiced his defense. *See id.* at 687; *see also Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996) (ineffective assistance of counsel claims analyzed under *Strickland* framework).

Where an attorney's representation falls below an objective standard of reasonableness as determined by professional norms, that performance is deficient. *See Rompilla v. Beard*, 545 U.S.

374, 380 (2005); *Strickland*, 466 U.S. at 687-89. Courts scrutinizing counsel's performance assume a "strong presumption" that the assistance was adequate and "that the challenged conduct was the product of reasoned trial strategy." *West v. Johnson*, 92 F.3d 1385, 1400 (5ᵗʰ Cir. 1996) (citation omitted). This presumption may be overcome if a petitioner can identify acts or omissions of counsel that were not the result of a reasoned, professional judgment. *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5ᵗʰ Cir. 1992). However, even unreasonable errors by counsel do not warrant relief if the error did not effect the judgment. *See Strickland*, 466 U.S. at 691. Rather, actual prejudice results from the errors of counsel when there exists a reasonable probability that, but for the error, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* The failure to prove either deficient performance by counsel or actual prejudice as a result of counsel's actions or omissions defeats a claim of ineffective assistance. *See Strickland*, 466 U.S. at 397; *Green v. Johnson*, 160 F.3d 1029, 1035 (5ᵗʰ Cir. 1998); *Smith v. Puckett*, 907 F.2d 581, 584 (5ᵗʰ Cir. 1990). As claims of ineffective assistance of counsel involve mixed questions of law and fact, claims previously considered and rejected by the State court may be overturned only if the decision reached by the State court was contrary to, or involved an unreasonable application of, the precedent set forth by the United States Supreme Court. *See Strickland*, 466 U.S. at 698; *see also* 28 U.S.C. § 2254(d)(1).

Counsel's failure to preserve a claim in State court can in some circumstances constitute cause sufficient to overcome a procedural default. *See Coleman*, 501 U.S. at 753-54. However, a petitioner claiming ineffective assistance of counsel for the purpose of having the underlying substantive claim reviewed on its merits must ordinarily have presented the ineffective assistance

of counsel claim independently in State court before it may be argued as cause to excuse a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451(2000).

A. *Failure to Investigate and Present Mitigating Evidence*

At trial, Petitioner was represented by Mark Williamson and Richard Burdine. Burdine bore the primary responsibility for preparing and presenting the sentencing phase of trial, while Williamson bore the primary responsibility for the guilt phase of trial. (*See* , *e.g*., PCR Ex. 39 (Aff. of Mark Williamson) and PCR Ex. 44 (Aff. of Richard Burdine)). Petitioner maintains that a wealth of potentially mitigating evidence was known to counsel at the time of his trial, but that counsel failed to investigate and present the evidence. During the sentencing phase of trial, Burdine waived opening statement and called only Petitioner's mother and his aunt during the defense's case-in-chief. (*See* Trial Tr. vol. 24, 1640, 1645). Petitioner argues that Burdine's failure to prepare and present witnesses to offer valuable testimony at trial was deficient performance, and he notes that Burdine even failed to put on proof the only statutory mitigating circumstance offered at trial, which was Petitioner's age at the time of the offense.

John Holdridge, who was an attorney with the Mississippi and Louisiana Capital Trial Assistance Project at the time of Petitioner's trial, was asked by Williamson to assist in Petitioner's defense. (*See* PCR Ex. 34, Aff. of John Holdridge, September 24, 2001). Holdridge interviewed witnesses and did some background investigation into Petitioner's case. Both Williamson and Holdridge recommended witnesses for Burdine to present at trial. Petitioner maintains that Burdine never contacted any of the witnesses, and that available mitigating evidence went unused as a result. (Pet. Memo 215, *see also* PCR Ex. 44).

On direct appeal, Petitioner argued Burdine was ineffective in preparing and performing at

trial. Petitioner maintains that Clive Stafford Smith, counsel on direct appeal, felt that the record was sufficient to warrant relief given the documentation that Burdine failed to undertake a minimal amount of investigation for the sentencing phase of trial. (Pet. Memo 221, PCR Ex. 46). Smith also argued that if the trial record was not sufficient, then the issue should be denied without prejudice and Petitioner given an opportunity to develop the claim in post-conviction. (PCR Ex. 46). The Mississippi Supreme Court noted that Petitioner did not identify additional mitigating witnesses that should have been called or the substance of their testimony, and that "there is nothing in the record to suggest that Burdine failed to contact these other witnesses about whom Williamson wrote to him." *See Manning I*, 726 So.2d at 1170. Given the absence an explanation in the record, the court concluded, Petitioner failed to overcome the presumption that Burdine rendered reasonable professional assistance. *See* i*d*. The court also concluded that Petitioner could not demonstrate prejudice, as additional character evidence would not have "tipped the balance" toward a life sentence in light of the brutality of the murders. *See id.*

Post-conviction counsel secured the assistance of Gary Mooers, Ph.D., a professor of social work at the University of Mississippi, to review some of the gathered evidence that would have supported the case in mitigation, and Dr. Mooers swore an affidavit that further investigation was needed in Petitioner's case. (Pet. Memo 217). Dr. Mooers' affidavit highlights information that he opines should have been discovered and investigated prior to trial, such as Petitioner's difficult birth, his mother's alcoholism throughout her pregnancy with Petitioner, Petitioner's two head injuries requiring hospitalization, Petitioner's alcohol dependency beginning in his teenage years, Petitioner's upbringing in poverty, Petitioner's poor academic performance and difficulties in sustaining employment, and the fact that Petitioner was often a witness to domestic violence. (*See*

PCR Ex. 48, Mooers Aff., August 21, 2001).

Post-conviction counsel also consulted with Marc Zimmerman, Ph.D., who specializes in Forensic Psychology and Forensic Neuropsychology. (Pet. Memo 218). Dr. Zimmerman submitted an affidavit in State court opining that Petitioner needed to undergo neuropsychological testing. (Pet. Memo 218-19, *see also* PCR Ex. 48, September 19, 2001). Attorney John Holdridge also submitted an affidavit in State court that incorporated the notes he made on his interviews with Petitioner and Petitioner's mother. (Pet. Memo 219). The affidavit also incorporates Holdridge's letter to Williamson recommending follow-up on issues he had identified as potential issues for mitigation. (*See* PCR Ex. 34).

In post-conviction proceedings, Petitioner reasserted his claim bolstered with the additional mitigating evidence offered in Dr. Mooers and Dr. Zimmerman's affidavits. The Mississippi Supreme Court acknowledged that the record indicates that Burdine never contacted identified mitigation witnesses to testify on Petitioner's behalf at the sentencing phase of trial. *See Manning II*, 929 So.2d at 905. The court also noted Petitioner had included Holdridge's affidavit, which noted valuable mitigating evidence that was not presented at trial. *See id.* The court found that Petitioner's attorneys presented a case in mitigation, and it held the claim barred on the basis of res judicata. *See id.* It alternatively found it without merit, as Petitioner could not demonstrate prejudice related to trial counsel's failure to call other witnesses. *See id.*

This Court allowed Petitioner to subpoena his and his family's Oktibbeha County Department of Human Services ("DHS") records, and DHS disclosed the records still in their possession on December 1, 2008. The only relevant file still in the possession of DHS was a Social Services Case Record for Melvina Manning, Petitioner's grandmother. (*See* Soc. Srv.

Supplement, Ex. A, docket entry no. 68). These records demonstrate that Petitioner was abandoned by his mother, Ruth Manning, when he was two years of age. (*See* Soc. Srv. Supplement, Ex. B). Petitioner was reared by his grandmother, who was illiterate, had "low mentality," and received only a social security payment as a source of income. (*See id.*). A second child of Ruth Manning was left with Mrs. Manning when Petitioner was approximately six years old. (*See id.*). The social services reports indicate that there was often a lack of food and clothing for the family, and that special arrangements were made to have Mrs. Manning provided with food. (*See generally* Soc. Srv. Supplement, Ex. B). The family moved frequently, and they sometimes lived in homes without gas and running water. (*See id.*). The records also state that Mrs. Manning was dependent upon Petitioner to help her read, dial the telephone, count money, shop, and remember important personal information. (*See* id.). A declaration from Catherine Jones, a social worker assigned to Melvina's case, recalls that Mrs. Manning would rely upon Petitioner to tell the social worker his grandmother's address, telephone number, and birth date when he was only eight or nine years old. (*See* Soc. Srv. Supplement, Ex. C).

Petitioner stole a motor cycle when he was approximately eleven years old, and Mrs. Manning decided Petitioner should go live with his mother so that she could monitor him. (*See* Soc. Srv. Supplement, Ex. B at 10). According to the documents, Petitioner was subsequently sent to the Columbia Training School for Juveniles, and when he was not at the training school, he lived with his mother. (*See* Soc. Srv. Supplement, Ex. B at 11-12). At the age of twelve, Petitioner was sent to Piney Woods training school. (*See id.* at 13). Later records, presumably after Petitioner was no longer living in his grandmother's home, indicate that Mrs. Manning had taken in two more of Ruth's children and was unable to feed and clothe them. (*See id.* at 14).

Court records from 1985 through 1987 show that Ruth Manning was sent to prison for stabbing her husband with a butcher knife, which was presumably during the time in which Petitioner was living in his mother's home. (*See* Soc. Srv. Supplement, Ex. E).

Petitioner maintains that trial counsel knew that two DHS employees had volunteered to testify about Petitioner's background, and thus, counsel knew or should have known of the existence of supporting records. (*See* Soc. Srv. Supplement at 9). The records also identify other potential witnesses. For example, Catherine Jones, a social worker who had involvement with the family, was still working for the Oktibbeha County DHS in 1994. (*See id.*, Ex. C).

The record is clear that Williamson suggested potential witnesses to Burdine that Burdine never contacted. (*See*, *e.g*., PCR Ex. 44). The record contains five letters Williamson wrote to Burdine before trial informing him of potential witnesses available to testify on Petitioner's behalf at sentencing. (*See*, *e.g*., Trial Tr. vol. 3, 375, 376, 382, 393, 408). In a letter dated August 30, 1994, approximately two months before trial, Williamson wrote to Burdine that he needed Burdine to be responsible for the sentencing phase of Petitioner's trial, should one occur. (*See id.* at 375). Specifically, he stated he needed Burdine to "prepare all mitigation evidence and witnesses and prepare Mr. Manning" for the sentencing phase. (*See id.*). Enclosed with the letter was some material obtained by Attorney John Holdridge, and that material contained the name, address, and telephone number of a social worker who might be a potential witness. (*See id.*).

On September 9, 1994, Williamson wrote to Burdine that he had gathered more information and spoken to several witnesses about the sentencing phase of Petitioner's trial. Williamson stated that Manning family friend, Dr. Oswald Rendon-Herrero, was willing to assist in Petitioner's defense. (*See id.* at 376). Williamson enclosed Dr. Rendon-Herrero's business card

with the letter.  (*See id*).  Williamson also noted that Kimberly Cook, a professor at Mississippi

State University specializing in the sentencing phase of death penalty cases, was "eager to help"

with Petitioner's trial.  (*See id.*).  He listed her telephone number and requested that Burdine

contact her "as soon as possible."  (*See id.*).  On September 15, 1994, Williamson wrote Burdine,

providing him with the name of two employees with the Department of Human Services who

Williamson believed had "volumes of mitigation" and were willing to assist in Petitioner's trial.

(*See id.* at 382).

On September 19, 1994, another letter was written to Burdine, and enclosed were the notes

from John Holdridge.  (*See id.* at 393).  Williamson also suggested that Burdine contact

Petitioner's mother and family members and suggested that he request pictures of Petitioner at

different ages.  (*See id.*).  He also requested the interior and exterior of Petitioner's home be

photographed to give the jury a visual image of Petitinoer's upbringing.  (*See id.*).  He also

requested that Burdine inform him within the week of who he had contacted and who would be

testifying at trial.  (*See id.* at 393).

On October 5, 1994, Williamson wrote another letter to Burdine.  (*See id.* at 408).  That

letter expressed that Burdine had assured him that he would provide the names and addresses of

the mitigation witnesses to be called at trial, as well as a short summary of their testimony.  (*See

id.* at 408).  He also requested that Burdine furnish copies of his letters verifying that subpoenas

for the witnesses had issued, and that the District Attorney had been notified.  (*See id.* at 408).  He

also requested photographs of Petitioner and his residence within two days, along with a copy of

all material to be introduced at the sentencing phase of trial.  (*See id.*).

In July of 1994, Attorney John Holdridge provided Williamson notes from his interview

with Petitioner and his mother in July 1994. (*See* PCR Ex. 34, attachment to Aff. of John Holdridge). Holdridge stated that during his interview with Petitioner's mother, she admitted to drinking heavily while pregnant with Petitioner, and that he was born at home with a mid-wife assisting who had to "reshape" Petitioner's head at birth. (*See id.*). He suggested that a gynecologist be contacted by the defense to explore the effects of reshaping Petitioner's head at birth. (*See id.*). He also noted the possibility that Petitioner might suffer from Fetal Alcohol Symdrome or Fetal Alcohol Effects. (*See id.*). Holdridge was informed that Petitioner was reared in poverty by his grandmother, and that she was "highly superstitious, and illiterate." (*See id.*). Ruth Manning admitted that she had very little involvement with Petitioner's upbringing. (*See id.*). In interviewing Petitioner in jail, Holdridge noted that Petitioner was hospitalized as a result of a bicycle accident when he was approximately ten years old, and that his medical records were needed for mitigation purposes. (*See id.*). Petitioner provided Holdridge with the names of family and friends who could be contacted as potential witnesses. (*See id.*).

Holdridge's notes also indicate that Petitioner began getting into fights at school when he was approximately eight or nine years old, and Holdrdige opined that it was necessary to obtain Petitioner's school records and speak to his principal and teachers. (*See* id.). Petitioner also disclosed to Holdrige that his mother had informed him since his imprisonment that the man he believed to be his father was not his father. (*See id.*). Holdridge noted that Petitioner was arrested at least twice at the age of ten for theft, and that he was arrested at the age of eleven for stealing jewelry from vehicles. (*See id.*). Following his arrest at age eleven, Petitioner was put in Columbia Training School as a result. (*See id.*). Petitioner went back to his grandmother's house when he was released, and he reported that she and his mother gave him a bicycle so he would not

steal anymore bicycles.  (*See id.*).

Holdridge reported that Petitioner moved in with his mother when he was fourteen years old, and he reported that she drank a lot at that time.  (*See id.*).  Petitioner stated that he did not obey curfew, and his mother initially complained but did not discipline him.  (*See id.*).  He reported that he quit school at fifteen because he felt like he did not fit in, and because he was accused of stealing a girl's purse.  (*See id.*).  Petitioner stated that he lived with his mother until just after he turned eighteen, and that she was convicted of aggravated assault around that time. (*See id.*).  Petitioner stated he started drinking alcohol at age fourteen,  and that he had a drinking problem by age eighteen.  (*See id.*).  He also stated that he smoked marijuana prior to his incarceration.  (*See id.*).

During Petitioner's post-conviction proceedings, Holdridge submitted an affidavit outlining his efforts in the case.  (*See* PCR Ex. 34, Aff. of John Holdridge, September 24, 2001).  In the affidavit, he noted that he urged defense counsel to seek funds for psychological testing and a full social history, as he believed those issues to be "a cornerstone of a persuasive case for life to the jury at the penalty phase" of Petitioner's trial.  (*See id*.).  Despite his recommendations, he noted that no one contacted him again after he passed along to Williamson the results of his interviews. (*See id*.).

Also in post-conviction, Petitioner submitted the affidavit of Gary R. Mooers, a professor at the University of Mississippi teaching in the Social Work Department, who provides sentencing phase investigation and expert services to attorneys defending death penalty cases.  (*See* PCR Ex. 47, Aff. of Gary Mooers, August 28, 2002).  He interviewed Petitioner and his brothers in June 2001 at the request of post-conviction counsel.  (*See id.*).  He also reviewed hospital records,

school records, incarceration records, counseling records, and court files on Petitioner and his family members. (*See id.*). Although Dr. Mooers was unable to provide any specific conclusions, he did identify "major themes" that he believes would have played an important part in Petitioner's case in mitigation. (*See id.*). Those themes were identified as poverty, deprivation, neglect, abandonment, the forced responsibility Petitioner had as a child caring for his ailing grandmother, his mother's lack of supervision and alcoholism, and his exposure to significant violence. (*See id.*). Dr. Mooers noted that Petitioner witnessed his mother being beaten by her husband, Kelvin Bishop, and that he was home when his mother stabbed Bishop in retaliation. (*See id.*). He also believed there exists a "substantial likelihood" that Petitioner suffers from Post-Traumatic Stress Disorder, as Petitioner was shot as a bystander during an attempted robbery at a convenience store. (*See id.*). He also believed there to be a possibility that Petitioner suffers from a neurological impairment based on his mother's drinking during pregnancy, the difficult birth, and Petitioner's own alcoholism. (*See id.*). Dr. Mooers noted Petitioner's several prior convictions and difficulty maintaining steady employment, and he stated that a thorough investigation would provide a better understanding as to why. (*See id.*).

Trial counsel also submitted affidavits during the course of Petitioner's post-conviction proceedings. Mark Williamson's affidavit stated that he and Richard Burdine divided the work in this case, with Williamson primarily focusing on the guilt phase of trial and Burdine on the sentencing phase. (*See* PCR Ex. 39, Aff. of Mark G. Williamson, October 8, 2001). Richard Burdine stated that although he does not remember all of the trial preparations for Petitioner's trial, Williamson requested that he present witnesses and deliver closing argument at the penalty phase. (*See* PCR Ex. 44, Aff. of Richard Burdine, January 1, 2002). He also stated that he does not

believe that he interviewed many witnesses before trial, and that he did not recall speaking to anyone about the trial other Petitioner's mother and one of his aunts. (*See id.*). Burdine stated that the conversations with Petitioner's mother and aunt occurred sometime during the penalty phase of trial. (*See id.*).

This Court ordered the record expanded, and Petitioner submitted affidavits from Mark Williamson and Richard Burdine concerning their investigations and strategies for the sentencing phase of Petitioner's trial. (*See* Supp. to Pet., docket entry no. 72). Williamson noted that he had never been lead counsel in a capital murder trial at the time of his appointment in Petitioner's case, and that he devoted a substantial portion of his time researching issues particular to death penalty trials. (*See* Supp. to Pet., Ex. A., Aff. of Mark Williamson). Noting the "enormous demands" on his time in investigating witnesses interviewed by the State and FBI in this case, the individuals initially identified by the Sheriff's Department as suspects in this case, as well as investigating Petitioner's alibi defense, Williamson estimated that he worked almost exclusively on Petitioner's case for one year. (*See id.*). He stated that he and Burdine agreed that Burdine would take primary responsibility for the sentencing phase of trial. (*See id.*). He stated that Burdine never responded to the letters sent to him, and he did not ask for assistance in contacting the witnesses. (*See id.*). Williamson stated he relied upon Burdine's assurances that he would have everything ready for trial. (*See id.*). Williamson stated he does not know whether Burdine had subpoenas issue for any witnesses to be called at the sentencing phase of trial, nor does he know whether Burdine reviewed any records or contacted any experts for assistance in developing mitigation evidence. (*See id.*).

Federal habeas counsel contacted Burdine, who also gave a supplemental affidavit.

Burdine stated that he had been counsel in several capital murder trials before Petitioner's case, and that, to the best of his recollection, his strategy was to show that this crime was not in Petitioner's "nature or character and that he was generally not aggressive." (*See id.*, Ex. B, Aff. of Richard Burdine, May 19, 2009). Burdine stated that he cannot remember the specifics of trial preparation, and that his files on Petitioner's case no longer exist. (*See id.*). He stated that he did review some of the transcript and the affidavit he filed several years ago, which were read to him as he is now blind. (*See id.*). He also had counsel read some of Williamson's letters to him. (*See id.*). He stated that he does remember meeting with Petitioner, his mother, one of his aunts, and possibly one of Petitioner's brothers, but he does not remember the substance of the conversations or when they occurred. (*See id.*). Burdine stated that he does not recall "any specifics of [his] preparation for either part of the trial." (*See id.*).

After this Court granted Petitioner's request that Dr. Marc Zimmerman be allowed to conduct a neuropsychological interview with Petitioner, Dr. Zimmerman's findings were filed with the Court on November 13, 2009. Dr. Marc Zimmerman conducted a neuropsychological interview with Petitioner and opines that Petitioner has "a 73% probability of brain dysfunction" and "borderline intellectual functioning." (*See* Zimmerman Rpt., Ex. A at 12). He also concluded that Petitioner "may also be diagnosed with fetal alcohol spectrum disorders, in particular, alcohol-related neurodevelopmental disorder." (*See id.*). Dr. Zimmerman opines that Petitioner's early childhood circumstances prevented him from learning the appropriate skills to compensate for his deficits. (*See id.* at 3). Petitioner's mother drank during her pregnancy with him, and Dr. Zimmerman opines that Petitioner's particular problems are associated with pre-natal alcohol exposure. (*See* Pet. Supp., Ex. A at 12).

Having reviewed all of the evidence presented at trial, the evidence that went unused at trial, and the supplemental affidavits and reports filed in this cause, the Court determines that no reasonable investigation was made as to the sentencing phase of Petitioner's trial. The record clearly supports a finding that Burdine did not make a reasonable investigation, therefore, there is no presumption that his decision not to introduce additional character witnesses or mitigating evidence was reasonable. *See*, *e.g.*, *Strickland*, 466 U.S. at 699. No follow-up was conducted after recommendations were made by Williamson and Holdridge. As such, there was no strategy upon which to base the failure to present the available evidence. *See Wiggins*, 539 U.S. at 523 (focus is whether investigation supporting counsel's decision not to introduce evidence was itself reasonable). Where counsel's decisions are based on an inadequate investigation into the facts of the case and the applicable law, *Strickland* requires no deference to the decisions. *See Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000); *see also Williams v. Taylor*, 529 U.S. at 396 (finding decision not tactical where counsel fails to fulfill duty to conduct thorough investigation into petitioner's background). Counsel's failure to investigate Petitioner's background constitutes deficient performance. Holdridge's notes suggested a family history of alcoholism, potential brain injuries or birth defects, poverty, and violence in the home. A reasonably competent attorney would have investigated these factors, and defense counsel's investigation was unreasonably limited in light of the available evidence. *See Wiggins*, 539 U.S. at 527.

However, in order to determine whether Petitioner was prejudiced by counsel's failure to discover and present mitigating evidence, the Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. at 534. Prejudice exists only if there exists a reasonable probability that the sentencing phase would have resulted differently if the jury was confronted with the evidence Petitioner claims should have

been presented.  *See Neal v. Puckett*, 286 F.3d at 241 (court compares evidence actually presented at sentencing with all mitigating evidence contained in record and determines whether additional evidence is so compelling that there is a reasonable probability at least one juror reasonably could have determined death was not an appropriate sentence).  The question of prejudice focuses on whether confidence in the verdict is undermined by trial counsel's errors.  *See Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005).

The Court notes that on January 28, 1994, the report that resulted from the court-ordered evaluation of Petitioner at the Mississippi State Hospital was filed.  (*See* SCP vol. 1, 86-95).  The staff concluded that it knew of no reason why Petitioner would not have known right from wrong or the nature and quality of his actions at the time of the crime.  (*See id.* at 95).  Petitioner was given the provisional diagnosis of Alcohol Abuse and Antisocial Personality Disorder.  (*See id.* at 95).

The case in mitigation at trial consisted of the testimony of Petitioner's aunt and his mother.  His aunt, Ella Lee Fuller, was the first witness called by defense counsel during the sentencing portion of trial.  (Trial Tr. vol. 24, 1640).  Fuller testified that she had known Petitioner since he was a baby, and that he was reared by his grandmother.  (*See id.* at 1642).  She testified that Petitioner's grandmother died in 1991, but that when she was alive, Petitioner went everywhere with her.  (*See id.*).  She stated she lost track of Petitioner when he grew up.  (*See id.* at 1642-43).  She stated that she is Petitioner's aunt by marriage, and she did not know Petitioner's father.  (*See id.* at 1643).  She asked the jury to spare his life.  (*See id.*).  On cross-examination, Fuller stated that Petitioner's mother gave Petitioner to his grandmother.  (*See id.* at 1644).  She stated she did not believe in the death penalty.  (*See id.*).

Ruth Ann Bishop, Petitioner's mother, testified next.  (*See id.* at 1645).  Mrs. Bishop stated

99

that she was sixteen when Petitioner, her oldest child, was born. (*See id.* at 1646). She stated that Petitioner's father was dead, and that Petitioner never had a relationship with him. (*See id.*). She stated that her mother raised Petitioner in the early years of his life. (*See id.* at 1646). She testified that her mother cared for Petitioner from the time he was an infant until he was between twelve and fourteen years old. (*See id.* at 1647). She testified that she took Petitioner back to live with her when her mother's health began to fail. (*See id.* at 1647-48). She stated that her other children lived with her, and that she heard Petitioner had two children, but that she had never seen them. (*See id.* at 1648). She stated she was a good mother to Petitioner, and she asked the jury to spare his life. (*See id.* at 1648-49). On cross-examination, she stated that Petitioner knew it was wrong to kidnap, rob, and kill people. (*See id.* at 1649).

Petitioner maintains that the decision of the Mississippi Supreme Court is contrary to clearly established federal law, as the facts of his case are materially indistinguishable from those in *Wiggins* and *Williams*. While the Court's conclusion is not necessarily controlled by a comparison of Petitioner's case with those cited by Petitioner in support of his claim, its conclusion is guided by them. In *Wiggins v. Smith*, Wiggins "experienced severe privation and abuse while in the custody of his alcoholic, absentee mother. . . . [and] physical torment, sexual molestation, and repeated rape while in foster care," and that he spent time homeless. *See Wiggins*, 539 U.S. at 534-35. He and his siblings frequently were forced to beg for food, sometimes eating paint chips and garbage. *See id.* at 517. Mrs. Wiggins beat her children for breaking into the locked kitchen of the home, and she had sex with men with her children asleep in the same bed. *See id.* Wiggins was once hospitalized after his mother held his hand against a hot stove burner. *See id.* At six years of age, Wiggins was placed in foster care, where he was physically abused. *See id.* In his next foster-home placement, Wiggins was "repeatedly molested

and raped." *Id.* Wiggins ran away from foster care at the age of sixteen and was homeless aside from intermittent returns to foster homes. *See id.* Wiggins alleged that on one such return, the son of the foster mother gang-raped him. *See id.* Wiggins eventually entered a Job Corps program, where he was allegedly sexually abused by his supervisor. *See id.* Given his "excruciating life history" that provided powerful mitigating evidence and the absence of his history of violence, the Court concluded there was a reasonable probability that the jury would have returned a different verdict had it been confronted with evidence of Wiggins' background. *See id.* at 536-37.

In *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), there were "voluminous" and "graphic" descriptions of the petitioner's "nightmarish childhood." *See id.* at 395. Williams was committed at eleven years old, and documents in connection with the commitment proceedings "described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin." *See id.* at 370. The Supreme Court found there was no strategic reason for failing to secure records that would have established the circumstances of the "nightmarish childhood," as trial counsel incorrectly believed state law barred his access to them *See id.* at 395. The records would have demonstrated that Williams' parents "had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody." *See id.* Juvenile records described urine and feces on the floor of the family's home, trash literally covered the kitchen floor, none of the children had underwear and all were dirty, and the parents were too intoxicated to care for the children, four of whom were "under the influence

of whiskey" when they were admitted to the hospital. *See id.* at n.19. Additionally, Williams had received commendations for his assistance in helping crack a prison gun ring and returning a guard's missing wallet since he had been incarcerated. *See id.* at 396. Counsel failed to return the phone call of an accountant who would have testified at trial that he had visited Williams frequently in prison as part of a prison ministry program and felt Williams thrived in the structured environment. *See id.* Counsel also failed to inform the jury that Williams had earned a carpentry degree while in prison. *See id.*

The Court cannot find that the circumstances recounted in the available evidence, even if presented at trial, would have substantially reduced Petitioner's moral culpability for the two murders. *See Williams*, 529 U.S. at 398 (court noting that available evidence might have influenced the jury's appraisal of Williams' moral culpability for the murders). The potentially mitigating evidence available in Petitioner's background is not comparable to that in *Williams* and *Wiggins*. While Petitioner was abandoned by an alcoholic mother and lived in poverty, he was reared by a loving grandmother. Social services records from Petitioner's early childhood note that Petitioner and his brother were healthy, clean, and loved in their home. (*See* Soc. Srv. Supp., Ex. B at 4). When Petitioner began exhibiting criminal behavior as a youth, his family and community intervened. When Petitioner was arrested as a youth for stealing bicycles, his mother and grandmother bought him a bicycle to deter his criminal conduct. (*See* Soc. Srv. Supp., Ex. C). Petitioner was sent to at least two training schools as a youth, and the available records indicate that social services personnel had a vested interest in Petitioner and his family. When the family did not have enough food and clothing, social service workers provided help to the family. (*See* Soc. Srv. Supp., Ex. B at 14-15). Petitioner's childhood, while far from ideal, was not "nightmarish."

Moreover, Petitioner has now had the opportunity to undergo a neuropsychological examination, and Dr. Zimmerman has opined that there is a probability that Petitioner suffers from "alcohol-related neurodevelopmental disorder," the causes of which are not known.[23]  After offering his opinion that Petitioner's borderline intellectual functioning, brain abnormalities, and "lack of adequate support or supervision, chaos, and poverty during his childhood and early adolescence" resulted in bad behavior, Dr. Zimmerman opined that Petitioner would have learned to function well if he had been provided adequate support in his childhood.  (*See* docket entry no. 78, Ex. A, Supp. Rpt. of Dr. Zimmerman).  This Court does not find that the obstacles in Petitioner's childhood, when weighed against the opportunities provided for him and the evidence in aggravation in this case, support a reasonable probability of a different result had this evidence been investigated and used at trial.  Evidence of such neurological conditions, even if supported, is double-edged.  Evidence of brain abnormalities can just as easily show that the defendant is a future threat to others because he has poor impulse control and an inability to learn from his mistakes.  *See Smith v. Quarterman*, 515 F.3d 392, 404 (5th Cir. 2008);  *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (holding no showing of prejudice made where trial counsel failed to introduce double-edged evidence regarding the defendant's brain injury, abusive childhood, and drug and alcohol problems).  Moreover, Petitioner received a diagnosis of Antisocial Personality Disorder from the staff of the Mississippi State Hospital, who found him competent and sane, and he had more than a dozen arrests at the time he was charged with this crime.  *See Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001) (history of violent personality and behavior apart from charged crime and "horrific nature" of charged crime relevant in finding no substantial likelihood

---

[23] Petitioner subsequently sought $ 15, 250.00 in funds to obtain an evaluation for Fetal Alcohol Spectrum Disorders, which the Court denied.

that outcome would have been altered at sentencing phase had evidence petitioner suffered from organic brain damage be introduced); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) (finding no prejudice in counsel's failure to pursue evidence regarding long-term drug and alcohol abuse by defendant). The Court finds that there is "no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, warranted the capital punishment sentence that was imposed." *Sonnier v. Quarterman*, 476 F.3d 349, 363 (5th Cir. 2007). Petitioner has failed to make the showing of prejudice necessary to obtain relief on this claim, and it shall be dismissed.

*B. Failure to Diligently Inspect Files*

Petitioner maintains that trial counsel performed deficiently in failing to investigate and discover the microcasette tapes and transcript of the conversations between Petitioner and Paula Hathorn. (Pet. Memo 70). Respondents aver that this claim is barred, as the Mississippi Supreme Court denied the motion to amend the pleadings that raised this ground for relief. (*See* R. Memo 85 and Ex. C). Respondents otherwise maintain that even if the Mississippi Supreme Court erred in denying the motion to amend, the issue is one of State law and not a basis for federal habeas relief. (R. Memo 88-89).

The Mississippi Supreme Court noted that Petitioner filed a motion to amend his post-conviction application to conform to the evidence introduced at the evidentiary hearing on his *Brady* claim, and the Mississippi Supreme Court denied the motion. *See Manning II*, 929 So.2d at 892 n.1. The court noted that Petitioner had made this claim in his proposed amendment to his petition for post-conviction relief, and the court held the claim procedurally barred. *See id.* at 903. The court otherwise denied the claim on its merits, as the taped conversations "had little if any impeaching value. The record in today's case clearly reveals the existence of an enormous amount

104

of evidence. We refuse to find ineffective assistance of counsel based on a perceived or claimed failure to examine every piece of evidence in every box." *Id.* at 903.

A petitioner must present his claim according to the State court rules in order to receive federal habeas review of the claim. *See Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). The federal claim is defaulted even when a petitioner attempts to raise it but is denied pursuant to an independent and adequate state law rule. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Collier v. Norris*, 485 F.3d 415 (8th Cir. 2007). If a state court could not, "consistent with its own procedural rules, have entertained" the claims, then this Court may not review the presented claim. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). This Court agrees with Respondents' contention that as the Mississippi Supreme Court remanded this case to the trial court for a hearing limited to the remanded issues, and that as the motion to amend was not granted, this issue was never properly before the court. Therefore, it is barred from habeas review. Assuming out of an abundance of caution that this claim is not disposed of on the presence of a State procedural bar, it nonetheless does not entitle Petitioner to relief. Petitioner has not demonstrated that counsel's investigation into the evidence fell below an objective standard of reasonableness, nor has he demonstrated that the tapes and transcript would have altered the outcome of the proceedings. The court found no real impeachment value inherent in them, and they would have added little to the jury's knowledge of the cooperation between Sheriff Bryan and Paula Hathorn that the jury was not exposed to from their own testimony.

*C. Failure to Impeach Paula Hathorn & Failure to Preserve for Review his Limitation of Hathorn*

Petitioner maintains, in the alternative to his conflict of interest claim with regard to Paula Hathorn, that counsel performed deficiently in failing to establish the falsity of her testimony and in failing to impeach her with the bad checks she had written since she began working with the

Sheriff's Department. (Pet. Memo 101-106). The Court notes that it has already addressed the substantive merits of this claim in its discussion of claims relating specifically to Paula Hathorn and determined that Petitioner is not entitled to relief. On post-conviction review, the court considered whether trial counsel rendered ineffective assistance in failing to adequately impeach Hathorn. *See Manning II*, 929 So. 2d at 903. The court noted that it found trial counsel to have rendered effective representation on direct appeal. *Id.* The court found the issue procedurally barred and otherwise without merit, as a full cross-examination was conducted, and the comments regarding Williamson's past representation of her was not prejudicial to Petitioner's defense. *Id.*

On cross-examination, Williamson questioned Hathorn about her prior felony conviction and her plea of guilty to six misdemeanor charges. (*See* Trial Tr. vol. 17, 690-93). Williamson inquired whether Hathorn had written any additional checks since her conviction, and the prosecutor's objection to that question was sustained. (*See id.* at 693). Williamson inquired whether Hathorn had lied to Sheriff Bryan since her release from prison, and Hathorn denied that she had lied to Sheriff Bryan since her release. (*See id.* at 693-94). Later in cross-examination, Williamson asked Hathorn the amount of restitution "of the checks," and the trial court sustained the prosecutor's objection. (*See id.* at 697). During Williamson's cross-examination of Sheriff Bryan, Sheriff Bryan stated he believed Hathorn was writing bad checks while working with law enforcement. (*See* Trial Tr. vol. 19, 888).

In his closing argument, Williamson repeatedly attempted to attack Hathorn's credibility. For example, he stated:

> The only evidence we've got is Paula Hathorn's word. You heard testimony that Paula Hathorn was described prior to she went to the penitentiary as being totally untrustworthy. You heard Paula Hathorn de–described during testimony that you could not believe a single word out of her mouth. You heard she had sixteen or so misdemeanor convictions for writing bad checks, false pretense. That's a matter or

crime involving dishonesty.  You heard then she testified she had that felony
conviction for writing bad checks; she went to the penitentiary for it.  You heard
then she got out and she went to the authorities and was telling them that I want to
change my life.  I want to do right.  I want to do the right thing.  What was she
doing while she was telling them she wanted to do the right thing, she's out writing
more bad checks.  I believe she's got a couple of misdemeanor convictions for bad
checks since she's been out of the penitentiary here and I think she said a half a
dozen or so in Columbus. . . (*See* Trial Tr. vol. 23, 1582-83).

***

Ladies and gentlemen, Paula Hathorn will say anything you want her to say. . . .
She knew that twenty five thousand dollar reward was sitting out there. . . . she'd
had said anything they wanted her to say to get some of that money.

(*Id.* at 1583-84).

The Court assumes, *arguendo*, that this claim is not procedurally barred, as Williamson

represented Petitioner on direct appeal.  *See, e.g., Noe v. Anderson*, 106 F.3d 396 (5th Cir. 1997);

*Wilcher v. State*, 863 So.2d 719, 761 (Miss. 2003) ("The Mississippi Supreme Court has stated

that, where the record cannot support an ineffective assistance of counsel claim on direct appeal,

the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same

issue through a petition for post-conviction relief.").  However, the Court is not persuaded that

Petitioner is entitled to relief on this claim.  Williamson elicited testimony regarding Hathorn's

criminal history, the past concerns about her credibility, and the fact that she had been writing

more bad checks since she began working with the Sheriff's Department.  Defense counsel made

numerous attempts to impeach her credibility and suggest to the jury that Hathorn had an incentive

to color her testimony.  The Court has already determined that Williamson's failure to pursue

questioning to ferret out the details of his past representation of her was not prejudicial.  Petitioner

has not established an entitlement to relief on this claim, and it is dismissed.

### D.  Failure to Impeach Jordan

Petitioner maintains that he received ineffective assistance of counsel when trial counsel

107

failed to take available opportunities to impeach Earl Jordan. First, he maintains that trial counsel performed deficiently in failing to call Jordan back to the witness stand to lay the proper foundation to question Doug Miller as to whether Petitioner ever pulled a gun on Miller. (*See* Pet. Memo 122). Second, he argues that trial counsel failed to impeach Jordan's allegation that his attorney, Bruce Brown, did not know of Jordan's plans to testify for the State against Petitioner. (Pet. Memo 123). Petitioner maintains that Brown, a public defender for Oktibbeha County, was originally appointed to represent Petitioner but was allowed to withdraw his representation based on a conflict of interest. (Pet. Memo 122-23). Petitioner maintains that one of the conflicts was that Brown's client, Earl Jordan, was expected to testify against Petitioner at trial. (Pet. Memo 123). Petitioner maintains that Williamson, who was present at the hearing on Brown's motion to withdraw, should have used that information to impeach Jordan's allegation that his attorney did not know of his plans to testify for the State. (Pet. Memo 123, 127).

On direct review, the Mississippi Supreme Court considered whether Petitioner's attempt to impeach Jordan was improperly restricted. *Manning I*, 726 So. 2d at 1177. The court found it clear that "Jordan was thoroughly cross-examined," and that evidence was before the jury that Jordan hoped to receive some benefit in exchange for his testimony against Petitioner. *Id.* at 1178. The court found no reversible error. *Id.* On post-conviction review, the Mississippi Supreme Court considered whether trial counsel performed ineffectively in failing to improperly impeach Earl Jordan and cross-examine him. *Manning II*, 929 So.2d at 901-02. The State asserted that Petitioner's claim was addressed on direct appeal, thereby precluding its relitigation, and the court agreed. *Id* at 902. The court noted its decision on direct appeal, and it found that defense counsel did not render deficient performance "merely because he did not conduct the cross-examination of Jordan in every regard as post-conviction counsel asserts he should have done." *Id.* at 902.

During cross-examination, defense counsel asked Jordan if he knew of a reason why the State had not brought him to trial on the looting charges even thought it had been a year and a half since the indictment, and Jordan stated it was because he asked his lawyer to delay the trial. (*See* Trial Tr. vol. 20, 1170). When asked whether he had asked his attorney to delay the trial in hopes of getting some assistance on the current charges in exchange for his testimony against Petitioner, Jordan stated that his attorney did not know whether Jordan intended to testify. (*Id.*). The Court notes that the record indicates that Charles Bruce Brown, Jordan's attorney at the hearing to withdraw, was not Earl Jordan's attorney at the time of Petitioner's trial. (*See* Trial Tr. vol. 13, 9, 20). Petitioner has not demonstrated that Williamson had any knowledge of what Jordan had told his current counsel. Moreover, the jury was exposed to the idea that Jordan sought to delay his own trial in the hopes of getting some leniency on the charges in exchange for his testimony. Petitioner has not demonstrated any prejudice stemming from Williamson's failure to explore the issue further.

Prior to trial, Jordan provided a statement that Petitioner had threatened Doug Miller by holding a gun to his head. Petitioner argues that Doug Miller would have testified that the event never happened, and that defense counsel should have used the information to impeach Jordan. In post-conviction proceedings, Petitioner submitted an affidavit from Doug Miller swearing that Petitioner had never threatened him with any type of weapon, and he denied that Petitioner had ever put a gun to his head. (PCR Ex. 9, Aff. of Doug Miller, September 23, 2001). At trial, defense counsel called Doug Miller to the stand and asked him to read Earl Jordan's statement to himself. (*See* Trial Tr. vol. 21, 1199). Defense counsel asked whether Jordan's statement that he had seen Petitioner hold a gun to Petitioner's head was true. (*Id.* at 1200). The prosecution objected, arguing that defense counsel failed to lay the predicate to the question when he had

Jordan on the stand. (*Id.* at 1200). The trial court sustained the objection, noting trial counsel's intention to recall Jordan and lay the proper predicate for the question. (*Id.* at 1201). Defense counsel never recalled Jordan.

Miller's testimony would have, at best, demonstrated that Jordan had lied about seeing Petitioner hold a gun to Miller's head. At trial, the jury was exposed to Jordan's testimony that he was a resident of the Oktibbeha County Jail at the time of trial, and that he had been convicted of "a couple of burglaries" and was in jail awaiting trial on looting charges. (Trial Tr. vol. 20, 1134). On cross-examination, Jordan admitted he had two felony convictions for burglary, and that he was arrested on the looting charge approximately six months after being released from prison on the last burglary charge. (*Id.* at 1144). Williamson elicited from Jordan that looting carried a possible prison term of 15 years, and that he could have been indicted as an habitual offender. (*Id.* at 1145). Williamson elicited that though Jordan was indicted in July of 1993, which was two months after he gave the statement to Sheriff Bryan implicating Petitioner, he was not indicted as an habitual offender. (*Id.* at 1146). He elicited that Jordan had asked his attorney to put off the trial, because he hoped for leniency in exchange for giving testimony against Petitioner. (*Id.* at 1170-71). He also elicited that Jordan had previously given a statement implicating other suspects in this crime. (*Id.* at 1164-65). Given the impeachment testimony presented at trial, the omitted testimony would not provide a reasonable probability of a different result at trial. Therefore, Petitioner has not demonstrated the requisite prejudice, and this claim shall be dismissed.

*E. Failure to Investigate and Develop Evidence to Impeach Frank Parker*

Petitioner next maintains that trial counsel performed ineffectively in failing to adequately investigate and present evidence to impeach Frank Parker by exposing the charges he faced in Texas at the time of trial. (*See*, *e.g.*, Pet. Memo 141-145). On post-conviction review, the

Mississippi Supreme Court held Petitioner's claim procedurally barred for his failure to raise it on direct appeal, but it otherwise determined that the record establishes that Parker was throughly cross-examined at trial.  *See Manning II*, 929 So.2d at 901-02.

This Court will assume without deciding that there is no procedural bar to this claim, as Petitioner was represented by the same counsel at trial and on direct appeal.  *See, e.g., Noe v. Anderson*, 106 F.3d 396 (5th Cir. 1997); *Wilcher v. State*, 863 So.2d 719, 761 (Miss. 2003). However, Petitioner has failed to establish an entitlement to relief on this claim.  Petitioner's argument is essentially that defense counsel failed to present the jury with evidence of Parker's incentive to cooperate by failing to investigate and present evidence that he still had charges pending against him in Texas.  Even if the finding that Parker's Texas charges were dropped is erroneous, it is without consequence.  Defense counsel elicited from Parker that his Texas charges were dropped approximately one month after he gave a statement to police inculpating Petitioner. (*See, e.g.*, Trial Tr. vol. 20, 1128).  The elicited testimony is at least as damaging to Parker's credibility as a pending theft charge would have been, as defense counsel put evidence before the jury to suggest Parker's criminal history and his incentive to cooperate.  Therefore, even if the testimony was incorrect, Petitioner suffered no prejudice as a result.

*F.  Alibi Defense, or, Alternatively, Investigation*

At trial, defense witnesses Mario Hall, King Hall, and Landon Clayborne all testified that they saw Petitioner at the 2500 Club on the night of the murders, but none of these witnesses could definitively state that Petitioner was in the club later than 12:00 a.m.  Additionally, Gene Rice gave testimony that Petitioner was in the club at 12:30 or 1:00 a.m., and Keith Higgins testified that he saw Petitioner between 11:30 p.m. and 12:30 a.m. on the night of the murders.  Petitioner

maintains that the alibi witnesses presented by defense counsel in support of Petitioner's alibi actually weakened the defense case, as none of the witnesses could place Petitioner at the 2500 Club at the time the students were murdered. Petitioner maintains that defense counsel performed deficiently and prejudiced his defense by not calling more credible alibi witnesses who could have placed Petitioner in the club later. (Pet. Memo 146-47). In post-conviction proceedings, Petitioner produced the affidavits of Sherron Mitchell, Doug Miller, and Troylin Jones, each of whom stated that Petitioner was in the club at midnight or later the night of the murders. (Pet. Memo 147-48, PCR Ex. 32, 9, 33).

The Mississippi Supreme Court rejected Petitioner's claim on post-conviction review, finding that he failed to establish deficient performance by trial counsel where several witnesses were produced that placed Petitioner at the club on the night of the murders. *See Manning II*, 929 So.2d at 904. The Court notes that counsel does not perform deficiently merely because he failed to "interview every claimed eyewitness, alibi witness, and/or assertedly exculpating co-participant." *Bryant v. Scott*, 28 F.3d 1411, 1419 n.13 (5th Cir. 1994). The affidavits submitted by Petitioner in support of his claim were each sworn in September of 2001, almost nine years after the murders. (*See*, *e.g.*, PCR Ex. 9, 32, 33). Sherron Mitchell's affidavit stated that Petitioner was still at the 2500 Club when she left around 1:00 a.m. (*See* PCR Ex. 32). She stated that she would have been willing to help had she known the information she could provide would be relevant to the defense. (*Id.*). However, she stated that shortly after the murders she "went to the Delta" to care for her mother. (*Id.*). Troylin Jones' affidavit stated that she remembers seeing Petitioner outside of the Club at around 9:30 p.m. and later, inside of the club, "probably around midnight or maybe a little afterward." (*See* PCR Ex. 33). She did not say whether she was available to testify

or that she would have come forward. (*Id.*). The affidavit of Doug Miller stated that he would have been willing to testify that he saw Petitioner outside of the 2500 Club sometime between 9:00 and 9:30 p.m., and that he later saw him inside of the club. (*See* PCR Ex. 9). Miller also stated that Petitioner was drinking "a good bit of beer, just like everyone else" that evening (*See id.*).

None of the affidavits presented by Petitioner definitively place Petitioner at the 2500 Club between the approximate times of 1:00 a.m. and 2:20 a.m. The victims were last seen alive at the Sigma Chi House around 12:50 to 1:00 a.m. (*See*, *e.g.*, Trial Tr. vol. 17, 607). The fatal wounds had been inflicted on the victims by shortly after 2:00 a.m. (*See*, *e.g*., Trial Tr. vol. 18, 748). The 2500 Club was just inside the city limits of Starkville and within a few miles of the Mississippi State University campus. (*See*, *e.g.*, Trial Tr. vol. 21, 1261-62, 1278). Petitioner has made no showing that Mitchell was available and willing to testify. Jones does not declare that she would have come forward, and Miller is vague as to the time and admits drinking heavily on the night in question. There is no reason to believe that this additional testimony would have bolstered the alibi defense actually presented at trial. Petitioner has not demonstrated that these additional witnesses would have altered the outcome of the case. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994). As Petitioner has not demonstrated that it was unreasonable for the Mississippi Supreme Court to find that counsel was not deficient, this claim is dismissed. *See Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008) (petitioner must satisfy both prongs, and a court need not evaluate both if insufficient showing made as to either).

Petitioner also maintains that trial counsel was possibly constrained in his ability to present a stronger alibi defense, as he was denied timely investigative assistance. (Pet. Memo 149). The Court assumes Petitioner is raising a claim that trial counsel's performance was rendered deficient

due to the denial of timely investigative assistance. Jury selection in Petitioner's trial began November 1, 1994. (*See* Trial Tr. vol. 14). The record reveals that the Oktibbeha County Circuit Court entered an order on August 24, 1994, allowing the defense to hire an investigator, Hubert L. Chandler, and that he began investigating the case on September 7, 1994. (*See*, *e.g.*, Trial Tr. vol. 3, 369; Trial Tr. vol. 4, 597-600). In addition, Clayton M. Hall also investigated the case beginning February 16, 1994, and he terminated his investigation on August 17, 1994. (*See* Trial Tr. vol. 5, 624-25; 627-30). Petitioner has failed to demonstrate an entitlement to relief on this claim, and it shall be dismissed.

## G. Failure to Preserve Issues & Other Errors

Petitioner maintains that trial counsel performed deficiently when he failed to 1) preserve for review the limitations placed upon his cross-examination of Paula Hathorn, 2) object to evidence of Petitioner's alleged bad acts, 3) keep his promise to present evidence that someone else was accused of the murders, and 4) object to improper closing argument. (*See* Pet. Memo 186-194). The Court has addressed Petitioner's argument concerning the defense counsel's performance in the cross-examination of Paula Hathorn, and Petitioner has failed to demonstrate any prejudice as a result of any limits placed upon counsel's cross-examination of Hathorn.

Next, the Court considers Petitioner's argument that he was denied the effective assistance of counsel due to counsel's failure to object to evidence of Petitioner's alleged bad acts. Specifically, he maintains that it was improper to allow Hathorn to testify to the goods Petitioner carried in with him when he returned home on December 14, 1992, as it created the impression that Petitioner had stolen or was fencing stolen merchandise. (*See* Pet. Memo 187). On direct appeal, the Mississippi Supreme Court found the underlying issue, i.e., that Hathorn was allowed

114

to testify that Petitioner came home carrying a load of presumably stolen goods three days after the murder, barred for defense counsel's failure to object to the testimony at trial. *See Manning I,* 726 So.2d at 1171. The court otherwise found the claim without merit, as the testimony was admissible to show motive and identity. *Id.* On post-conviction review, Petitioner presented a claim that trial counsel ineffectively failed to preserve the issue for appeal. *See Manning II,* 929 So.2d at 904. The court found the claim procedurally barred and alternatively without merit. *See Id.*

Hathorn testified that one of the items Petitioner carried into the house when he returned on December 14th was a leather jacket. (Trial Tr. vol. 17, 677-78). During John Wise's testimony, he identified the same leather jacket as the one stolen from his vehicle. (*See* Trial Tr. vol. 17, 640-642). Counsel does not render ineffective assistance of counsel in failing to object to admissible evidence. Miss. R. Evid. 404(b) provides that

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The Court concludes that Petitioner is not entitled to relief on this subclaim.

Third, Petitioner challenges counsel's "unkept promise" to produce a witness who would state that someone else had confessed to the crime. (Pet. Memo 189). During his opening statement, defense counsel stated that the jury would hear testimony from the sheriff that a man named George Patterson had confessed to the crime, but that the sheriff did not follow up on the tip. (*See* Trial Tr. vol. 17, 600-01). Petitioner argues that defense counsel's failure to present the evidence destroyed his counsel's credibility and prejudiced his case, and that the prosecution seized on the failure by reminding the jury during closing argument that defense counsel did not

produce the evidence.  (Pet. Memo 190).

Petitioner raised this claim on post-conviction review, and the Mississippi Supreme Court noted the claim in its consideration of whether trial counsel performed ineffectively in failing to preserve issues relating to Petitioner's claims under *Batson,* of bad act testimony, and prosecutorial misconduct .  *See Manning II*, 929 So.2d at 904.  The court rejected Petitioner's *Batson* claim and the claim relating to Hathorn.  *See id.*  The court stated the issue was procedurally barred, as the issue of counsel's effectiveness was litigated on direct appeal.  *See id.* at 904-05.  The court alternatively denied the claim on the merits.  *See id.* at 905.  Petitioner maintains that deference does not apply to the decision of the Mississippi Supreme Court with regard to this issue, as the court only specifically addressed the *Batson* and prior bad act allegations.  (Pet. Memo 191-92).  However, the Mississippi Supreme Court noted the argument and determined that the merits of the claim did "not rise to the level of *Strickland*."  *See Manning II*, 929 So.2d at 905.  The Court applies the AEDPA's standard under § 2254(d) to the decision of the State court and not its reasoning.  *See*, *e.g., Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc).

During defense counsel's opening statement, Williamson stated:

> You're going to hear testimony, uh, from the sheriff that the sheriff had several or had a call pertaining to a George Patterson, and that George Patterson had confessed to this crime, and you're going to hear testimony that the sheriff didn't follow that up, and you're going to hear testimony that George Patterson was allegedly according to one of the first two suspects with one of the first two suspects that night and all that night.  And you're going to hear testimony he didn't follow it up.

(Trial Tr. vol. 17, 600-01).  While cross-examining Sheriff Bryan, Williamson questioned Sheriff Bryan about other suspects in the case.  (*See* Trial Tr. vol. 19, 880).  When Williamson asked Sheriff Bryan whether initial suspect Anthony Reed stated he was with George Patterson on the

116

night of the murders, the prosecutor's objection to hearsay was sustained by the trial court.  (*See id.*).

    If the Court were to assume deficient performance by trial counsel, this claim would fail for Petitioner's failure to demonstrate prejudice.  The reading of the line of questioning pursued by Williamson makes it apparent that counsel's strategy was to demonstrate to the jury that law enforcement officials targeted Petitioner while ignoring viable suspects.  The questioned posed to Sheriff Bryan concerning George Peterson occurred in the context of a line of questioning about other suspects in the case, and the substance of the evidence alluded to in opening statement was produced at trial.  *See McAleese v. Mazurkiewicz*, 1 F.3d 159, 166-67 (3rd Cir. 1993) (no ineffective assistance of counsel found where counsel in opening made summary of evidence, the substance of which was produced, rather than a specific promise to produce particular proof of alibi defense); *see also Williams v. Bowersox*, 340 F.3d 667, 671-72 (8th Cir. 2003) (noting the various treatment of broken promise claims during opening statement as part of ineffective assistance claims lends itself , through, "diversity of opinion alone suggests the [court] did not unreasonably apply *Strickland.*").

    Counsel here did not abandon his strategy, as the goal was to show that someone else could have committed the crime because the Sheriff had hung his hat on Petitioner and failed to investigate.  Counsel's questioning attempted to have the jury doubt the adequacy of the investigation.  Even if the Court were to assume deficient performance by counsel for his failure to produce the promised testimony, there is no indication that the result of the proceeding would have been different if the testimony had been presented.  *See Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992) (noting that habeas corpus relief is foreclosed on petitioner's failure to meet either

117

prong).

Finally, Petitioner raises an ineffective assistance claim pertaining to trial counsel's failure to object to the prosecutor's alleged prejudicial closing argument. Petitioner maintains that the prosecutor labeled Petitioner a "monster," and he essentially told the jury not to return an outrageous verdict by refusing to consider the evidence. (Pet. Memo 193). Petitioner also contends that the Mississippi Supreme Court failed to address the merits of the claim, so the deference of § 2254(d) does not apply. (Pet. Memo 194). However, the perfunctory dismissal of a claim does not absolve the Court of the duty to apply § 2254 to the claim. *See, e.g., Sellan v. Kuhlman*, 261 F.3d 303, 311 (2nd Cir. 2001) (holding that perfunctory decisions on the merits are "adjudications" under AEDPA); *Harris v. Stovall*, 212 F.3d 940, 943 n.1 (6th Cir. 2000) ("Where a state court decides a constitutional issue by form order or without extended discussion, a habeas court should then focus on the result of the state court's decision, applying the standard" of the AEDPA.); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) (deference owed to result of state court decision even if reasoning not expressly stated).

The statements complained of came during the State's final closing, after defense counsel had been given an opportunity to address the jury. The State's closing argument spans twenty-three pages of the trial transcript. (*See* Trial Tr. vol. 23, 1601-1625 and Trial Tr. vol. 24, 1626-28). For the first twenty or so pages of the State's closing, the prosecutor discussed the proof presented. Petitioner makes no complaint about the prosecution's statements during that portion. The prosecutor then discussed how Americans are ingrained to root for the underdog, which has been popularized by television to mean the defense. The prosecutor stated that the "accused innocent" is a myth accepted by the population because it is what people want to believe. (Trial Tr. vol. 24, 1626). The prosecutor continued:

The opposite is true of reality. When confronted with a horror, we have a tendency to deny it. It confuses the senses; it confounds reasoning; it makes no sense. We don't want to believe it. It's particularly so when you're faced with the horror of the senseless killing, the senseless execution, of two college students on a lonely country road, and when that horror takes human form, when it materializes and takes a human form, few there be that are willing to confront it because you see he's one of us now. He's been sitting in this courtroom up here with us day after day and he's dressed nice and he just doesn't look like a blood thirsty monster. The real monsters never do, ladies and gentlemen, not on the outside. They look just like us, and we don't want to see and we don't want to believe and we don't want to recognize that dark side of humanity, that ugly reality, that beast that lurks inside. We don't want to see it.

You were told about a number of jury verdicts where people are later found to be innocent. There have been a number of jury verdicts lately in cases that I think each and every one of you have followed. It's caught your imagination and you followed it in the press, you've watched it on TV, and at the end of the evidence the jury comes back with a perfectly outrageous verdict, and they'll interview a juror, you know what they always say, 'Well, the State just didn't prove it,' and the whole thing may have been on video tape from start to finish, every bit of it, and the State didn't prove it. They proved it; the State proved it; they just weren't willing to see it. They examine the truths and examined an illusion and found themselves much more comfortable with the illusion, and now, ladies and gentlemen, whatever will you do, because you see, ladies and gentlemen, he proof is here. It's undeniable. It's to the exclusion of any doubt. Now the question is, are you willing to see it?

(Trial Tr. vol. 24, 1626-27).

On post-conviction review, the Mississippi Supreme Court found the argument barred for

Petitioner's failure to raise it on direct appeal. *See Manning II*, 929 So.2d at 904-05.

Alternatively, the court denied the claim on its merits, finding that the claim did not warrant relief

under the test of *Strickland*. *See id.* at 905.

Whether to object to prosecutorial argument may be a matter of trial strategy. *Drew v.*

*Collins*, 964 F.2d 411, 423 (5th Cir. 1992) (finding that defense attorney could have reasonably

decided to let his own closing speak for itself). Petitioner has not demonstrated that the failure to

object falls outside the range of reasonable assistance. Additionally, he has also not shown that

but for the failure to object the result would have been different, thus, the failure does not

undermine confidence in the verdict. Moreover, the prosecutor's reference to Petitioner as a monster is not the type of sufficiently egregious statement by a prosecutor that would warrant a finding that the proceedings against Petitioner were unfair. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 180-182 (1986) (Court refusing to grant habeas relief notwithstanding the prosecutor's summation which described the defendant as an "animal"); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992) (holding prosecutor's reference to petitioner as "sadistic killer" and "a macho man" insufficient to warrant habeas relief); *United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978) (defendant not denied fair trial when prosecutor called defendant "con man" and "hoodlum" where unflattering characterization supported by evidence); *United States v. Cook*, 432 F.2d 1093, 1106-07 (7th Cir. 1970) (prosecutor's characterization of defendant as "subhuman man" with "rancid, rotten mind," a "true monster" not improper in view of evidence); *Kellogg v. Skon*, 176 F.3d 447, 451-52 (8th Cir. 1999) (petitioner called "monster," "sexual deviant," and "liar" by prosecutor not denied fundamentally fair trial, as comments did not misstate evidence, implicate other specific rights of the accused, and the weight of evidence against petitioner was great). Petitioner has not demonstrated an entitlement to relief on this claim, and it is dismissed.

*H.  Burdine's Closing Argument*

Petitioner argues that the closing argument given by Burdine during the sentencing phase of trial failed to articulate a reason why the jury should spare Petitioner's life, and that his emphasis on the difficulty of pleading for the life of a condemned man was actually harmful. (*See* Pet. Memo 244-253). Petitioner maintains that Burdine separated himself from his client and stated he was asked "to perform a miracle" despite the fact that he was "not a miracle maker," thereby implying that he believed that sentencing Petitioner to death was most reasonable under the facts. (Pet. Memo 248). Petitioner maintains that the only mitigating factor was Petitioner's

age, and Burdine urged the jury to "look at him and guess." (Pet. Memo 251).

On direct appeal, the Mississippi Supreme Court noted that Burdine based his closing statement on a plea for mercy and appealed to the "Christian values" of the jury. *See Manning I*, 726 So.2d at 1171. The court found Burdine also argued residual doubt, the facts of the case and the credibility of the witnesses, the inapplicability of the heinous, atrocious, and cruel aggravator, and he asked the jury Petitioner's age as a mitigating factor. *See id.* The court found Burdine's performance not deficient and found Petitioner had demonstrated no prejudice as a result of the performance. *Id.* On post-conviction review, the Mississippi Supreme Court found the issue procedurally barred and alternatively without merit. *See Manning II*, 929 So.2d at 905.

The Court determines that Petitioner has not demonstrated that Burdine's failure to investigate and present mitigating evidence at the sentencing phase of his trial led to an ineffective closing that prejudiced Petitioner. Burdine did argue for mitigation based upon the evidence presented at trial, and he presented an argument to attempt to persuade the jury to impose a life sentence upon Petitioner. Petitioner claimed innocence of the charges for which he had just been convicted, and it was reasonable for trial counsel to concede justification of the death penalty in order to establish credibility with the jury. *See Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997). This Court determines that counsel's decision to argue that Petitioner was deserving of the death penalty but making a plea for mercy was not outside of the range of reasonable professional assistance, and Petitioner has not shown the decision of the Mississippi Supreme Court to be objectively unreasonable. This claim is dismissed.

## I.  Denial of Right to Effective Assistance of Counsel on Appeal

Petitioner maintains that his appellate counsel misunderstood his opportunity to supplement the record during State post-conviction proceedings, believing that he could raise record-based

ineffective assistance of counsel claims on direct appeal without the risk of forfeiting the claims on post-conviction review.  Specifically, Petitioner sought review of his claims that trial counsel rendered ineffective assistance based on a conflict of interest, in uncovering mitigating evidence, and in improper closing argument.  (*See* Pet. Memo 270).  Respondents contend that the claim is not exhausted and barred under Miss. Code Ann. § 99-39-5(2) or § 99-39-27(9), or both.  (R. Memo 240-41).

Appellate counsel believed he could raise ineffective assistance claims based on that record without fear of default, as he believed Petitioner would have the opportunity for additional factual development during post-conviction proceedings.  (*See* PCR Ex. 46, Aff. of Clive Smith).  Petitioner did not raise this claim in his petition for post-conviction relief.  He raised the claim incorporated into his rebuttal memorandum to the State's response to his motion for post-conviction relief.  That amendment was denied, and therefore, the claim was not proper.  Petitioner must present his claim in State court in a procedurally proper manner according to the State court rules in order to receive federal habeas review of the claim.  *See Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988).  This claim was not properly before the Mississippi Supreme Court, and it is barred from federal habeas review. *See* 28 U.S.C. § 2254(b); *Coleman*, 501 U.S. 722, 735 n.1.  Petitioner has not suggested why post-conviction counsel did not present this claim in Petitioner's petition for post-conviction relief, and he has failed to overcome the imposition of the bar.

Moreover, Petitioner presents this claim solely to obtain review of the claims of ineffective assistance deemed by the Mississippi Supreme Court to be barred on post-conviction review.  This Court has determined that the claims of improper closing argument and conflict of interest are without merit; therefore, there is no prejudice stemming from any error committed by appellate counsel in preserving these issues for review.  The ineffective assistance of counsel claim related to

counsel's duty to investigate and present mitigating evidence was not barred by the Court, therefore, Petitioner was not prejudiced by any forfeiture of the claim.

## XII.  Cumulative Error

Petitioner requests this Court grant the writ because the aggregate effect of constitutional errors denied him a fundamentally fair trial.  (*See* Pet. Memo 272-79).  This Court is to consider whether (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Derden v. McNeel*, 978 F.3d 1453, 1454 (5th Cir. 1992)(en banc).  The Court finds Petitioner has failed to demonstrate that he is entitled to relief on this claim, and it shall be dismissed.

## Certificate of Appealability

Under the AEDPA, a petitioner must obtain a certificate of appealability ("COA") before he can appeal this Court's decision.  28 U.S.C. § 2253(c)(1).  A COA will grant only if the petitioner makes "a substantial showing of the denial of a constitutional right" by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Where a petitioner's claim has been denied on procedural grounds, Petitioner must also demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.  Rule 11 of the Rules Governing Proceedings under 28 U.S.C. § 2254 requires the Court to rule on a COA when a final order is issued.  The Court must determine whether Petitioner is entitled to a COA with respect to each claim raised in the petition.  *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding COA is granted on issue-by-issue basis).  The Court, resolving in Petitioner's favor any doubt as to whether a COA should issue,

determines that reasonable jurists could reach differing conclusions as to the Court's resolution of (1) Petitioner's *Batson* claim; and (2) the effect of trial counsel's failure to adequately investigate and present mitigating evidence at the sentencing phase of his trial. A COA shall issue as to these two discrete claims, and Petitioner is denied a COA on all remaining claims in his petition.

## Conclusion

For the reasons set forth above, Petitioner has not demonstrated that the denial of his State petition was contrary to, or involved an unreasonable application of, clearly established federal law, nor has the denial been shown to have been based on an unreasonable determination of facts in light of the evidence presented in the State court proceedings. Accordingly, the Court denies federal habeas relief, and the instant petition shall be dismissed with prejudice. All pending motions are dismissed as moot. The Court will grant Petitioner a COA on his claim that trial counsel rendered ineffective assistance in failing to investigate and present mitigating evidence at the sentencing phase of his trial, as well as his allegation of error under *Batson v. Kentucky*. A separate order in accordance with this opinion shall issue today.

**THIS** the 29th day of December, 2009.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE